i4jnshe

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JUNMIN SHEN, YUZHU WANG, ,

4                     Plaintiffs,        New York, N.Y.

5            v.                          16 Civ. 2015 (RWL)

6    DAN QING LIU, *et al.*,

7                     Defendants.

8    ------------------------------x

9                                        April 19, 2018
                                         10:00 a.m.
10
     Before:
11
                       HON. ROBERT W. LEHRBURGER,
12
                                         U.S. Magistrate Judge
13
                         APPEARANCES
14
     TROY LAW PLLC
15       Attorneys for Plaintiffs
     BY:  JOHN TROY
16
     LAW OFFICE OF BRIAN FREDERICKS P.C.
17       Attorneys  for Defendants
     BY:  BRIAN P. FREDERICKS
18
     ALSO PRESENT:
19   Arthur Kwok, Interpreter (Mandarin)

20

21

22

23

24

25

i4jnshe

1           (Case called)

2           THE LAW CLERK:  Counsel, please state your name for

3     the record.

4           MR. TROY:  Good morning, your Honor.

5           This is John Troy for plaintiffs, Mr. Wang and

6     Mr. Shen.  Thank you.

7           THE COURT:  Thank you.

8           MR. FREDERICKS:  Your Honor, Brian Fredericks for

9     defendants.

10          THE COURT:  Thank you.  You may all be seated.

11          Before we get going, I just had a couple of things I

12    wanted to address and I just want to confirm.

13          The case that is being tried today is with respect to

14    the two individual plaintiffs.  There is no class certification

15    and there is no collective action.

16          Am I correct?

17          MR. TROY:  Yes, your Honor.

18          THE COURT:  OK.

19          Secondly, I had mentioned yesterday that we would go

20    to 4:30 today.  I actually have a proceeding at 4 o'clock, so

21    we are going to adjourn today at 3:45.

22          If we need the full day until 4:30 tomorrow, we will

23    use it, but I am hopeful that will not be necessary.

24          I understand our interpreter is here?

25          THE INTERPRETER:  Yes, Judge.

I4jnshe1                         Opening - Mr. Troy

1            THE COURT:  OK.  I need to swear you in.

2            Why don't you come forward.

3            We don't have the headphones set up, I guess.  OK.

4            All right.  Can you raise your right hand, please.

5            (Interpreter sworn)

6            THE COURT:  Are you a certified translator?

7            THE INTERPRETER:  Certified by OCA.

8            THE COURT:  OK.  All right.

9            Thank you.

10           THE INTERPRETER:  Thank you.

11           THE COURT:  Where do you plan on positioning yourself

12    for the translation?

13           THE INTERPRETER:  For the witness I will be over

14    there.

15           THE COURT:  Are there any matters to address before we

16    actually start from either side?

17           MR. TROY:  Not from the plaintiff, your Honor.

18           THE COURT:  OK.

19           MR. FREDERICKS:  No, your Honor.

20           THE COURT:  All right.  Well, let's go.

21           As I said, I was going to offer you the opportunity

22    for a very short opening statement of some sort.  So please

23    proceed.

24           MR. TROY:  Your Honor, this is a traditional FLSA

25    case.  Our two clients, two plaintiffs, they are the full-time

1  deliverymen.  They work six days per week.  We are going to

2  prove they worked more than 40 hours per week.  They did not

3  get the minimum wage paid.  They did not get overtime.  They

4  are paid monthly.  One is $1100; another one is $1200 and later

5  on changed to $1300.

6          If they worked more than ten hours, they did not get

7  spread of hours, according to New York Labor Law.

8          They have to use their money to purchase the

9  E-bicycles.  They pay the money.  They pay to purchase for the

10 benefit of the employer.  They have to pay maintenance.  They

11 had to change the battery.  The battery always has a life span

12 of about six months.

13         That's about the working conditions for them.

14         When they get hired, they never get pay notice to talk

15 about how much they are going to get paid if they work less

16 than 40 hours; if more than 40 hours, how much they are going

17 to get paid.  They never got this kind of notice.

18         Of course, they did not get the English version.  Of

19 course, they did not get their primary-language version,

20 Chinese.

21         When every month they got paid, they get paid monthly,

22 but they never get pay stubs.  I believe both of them are

23 violations of New York Labor Law.

24         The defendants, the Fresco Tortillas, it's a

25 restaurant.  Everybody knows the restaurant involves a lot of

1    cash.

2          The employer paid almost everyone every employee in

3    cash so they can downsize their annual revenue.  We are going

4    to prove the tax return of the corporation is not worth

5    trusting.  And I believe that regarding to the annual revenue.

6          Regarding to the interstate commerce, the restaurant

7    used a lot of drinks like Coke, like Sprite, like MSG, like

8    avocado.  They are not produced in New York State.

9          Our two plaintiffs, they are the deliverymen.  Even if

10   you call them deliverymen, actually, part of their job function

11   is as a cashier.

12         Why?  Because they get a delivery order, they have to

13   check how much is the order, because they are going to collect

14   the money from the customers when they deliver it.

15         Not only that way, they are concerned about their

16   tips.  So they have to collect the right purchase money because

17   he has to submit to the employer at the same time, when he gets

18   back to the restaurant or maybe at the end of the day.  If for

19   whatever reason they did not collect the right money, they are

20   going to put their money on it, so they are really concerned

21   about the purchasing price.

22         The restaurant always has three kinds of business.

23         One, we are talking about the delivery.

24         The second one we are talking about eat-in, the people

25   come to the restaurant, they eat in over there.

1          The third one is maybe you call pickup or maybe

2     takeout.  Somebody they make an order, and then they come to

3     pick it up or they come to take it home.  I believe the

4     restaurant has those kinds of practices.

5          In our case today, we are going to prove, you know,

6     how many orders are delivered every day, and through personal

7     experience and observation how many people or how many orders

8     come to the restaurant to eat in and how many orders, basically

9     come to pick up from the restaurant.

10          So we are going to prove the restaurant generated more

11     than $500,000, well more than $500,000 a year.

12          And I believe that is the case we have today.

13          Thank you, your Honor.

14          THE COURT:  Thank you very much, Mr. Troy.

15          I will hear from defense counsel.

16          MR. FREDERICKS:  Thank you, your Honor.

17          Your Honor, very briefly, there's one central issue

18     that can quickly dispose of this case.  The corporate defendant

19     is not an enterprise under the FLSA because their gross sales

20     do not approach anywhere near $500,000 per year.

21          Plaintiffs will lead you, lead the Court to believe

22     otherwise by providing self-serving and also incredible

23     statements.  But these statements are not evidence.  The

24     defendants, on the other hand, have produced tax returns along

25     with their bank statements, showing, again, that their gross

I4jnshe                         Wang - direct

1   annual sales do not approach $500,000 per year, not anywhere

2   close.

3           Accordingly, plaintiffs cannot meet their burden of

4   establishing jurisdictional prerequisite that defendants are an

5   employer under the FLSA.

6           Defendants respectfully request that the Court not

7   reward bad faith litigation that is a tremendous waste of

8   judicial resources in the federal court system and decline to

9   exercise supplemental jurisdiction in this case.

10          Thank you, your Honor.

11          THE COURT:  OK.

12          You may call your first witness, Mr. Troy.

13          MR. TROY:  Your Honor, I call Mr. Wang, my first

14   witness.

15   YUZHU WANG,

16       called as a witness by the Plaintiffs,

17       having been duly sworn, testified as follows:

18          (Through interpreter)

19   DIRECT EXAMINATION

20   BY MR. TROY:

21          MR. TROY:  Your Honor, may I approach?

22          THE COURT:  Yes.

23          MR. TROY:  Thank you.  Let's get started.

24   BY MR. TROY:

25   Q.  Mr. Wang, would you like to tell the Court, what is your

I4jnshe                          Wang - direct

1  full name.

2  A.  Wang Yuzhu.

3  Q.  Where do you live right now?

4  A.  Flushing, Maple Avenue, 134-25.

5  Q.  OK.  Do you know there is a restaurant named Fresco

6  Tortillas?

7  A.  That's right.  I work there.

8  Q.  How do you know the restaurant Fresco Tortillas?

9  A.  Well, I used to work at 58th Street at a place called Jago,

10  and the boss lady, there's a menu that they use over there, and

11  she bought the phone number there, and I knew the boss that

12  bought the --

13  Q.  Lady boss?

14  A.  -- the number, phone number.

15         MR. TROY:  I believe he's talking about lady boss, not

16  the boss.  OK.

17  A.  OK.  So, initially, the one that I knew was the male boss,

18  and then I left my phone number there.  And I went somewhere to

19  work, and then they needed some help so I came back to help

20  part-time.

21  Q.  When you start to, came to help part-time?

22  A.  August 2012.

23  Q.  How much time you just came to help for part-time?

24  A.  Well, since August 2012, when I came to work, it wasn't

25  part-time.  It was full time.

I4jnshe                    Wang - direct

1   Q.  OK.  What do you mean full time?

2   A.  Full time means 12 hours of work per day.

3   Q.  How many days did you work per week?

4   A.  Six days.  Six days.

5   Q.  What is your days off?

6   A.  I am off on Sundays.

7   Q.  OK.  You are talking about you work 12 hours a day.  What

8   is your start time to work?

9   A.  Well, they open at 10:30, and we arrive at 11.

10  Q.  OK.  Every day?  Every working day?

11  A.  Yes, basically arrived at 11.

12  Q.  OK.  When were you done with job every working day?

13  A.  Well, they always closed the door down at 10:30.  However,

14  at a minimum every day we haven't left before 11 yet.

15  Q.  OK.  You are talking about the restaurant store hours is

16  from 10:30 in the morning and 10:30 at night.  Am I right?

17  A.  Correct.

18  Q.  OK.  After 10:30, what is the restaurant operation why you

19  cannot go home by 11?

20  A.  Well, at 10:30 -- Jessica would leave at 10:30.  However,

21  the boss would take up the phone after 10:30, and I continued

22  to make deliveries.  So if I go out 10:30 to make a delivery,

23  there's no way I come back before 11.

24  Q.  OK.  Let's go back.  After you know the boss at the closing

25  restaurant, the boss bought the telephone number, how do you

```
1    come to the job?  Who invited you to come to the job?

2    A.  Well, I used to work at 23rd Street, Seventh Avenue, but

3    the restaurant closed down and they even -- there was a new

4    building there.  And then I work there, and the name of the

5    boss over there is Chan Gung, and the boss called.

6    Q.  Who was calling you?

7    A.  The boss lady.

8    Q.  Do you know the lady boss is in this courtroom?

9    A.  The boss lady is sitting right there, yes.

10   Q.  Is that the lady made the phone call to you to invite you

11   to work in the restaurant?

12   A.  Yes.

13   Q.  OK.  What kind of discussion did you have?  On the phone?

14   A.  Yes.  Over the phone.  And the boss lady told me that it's

15   going to be full-time work.

16   Q.  Did you discuss how much money you are going to get paid,

17   how frequently you are going to get paid?

18   A.  Well, I have been doing this kind of work before, and I

19   kind of know how much these type of work would pay.  And she

20   does offer a relatively higher base pay, and I would be paid

21   $1200 per month.  And at that time most other work offer about

22   $850, and she offered $1200.

23   Q.  When did she offer you $1200 per month?

24                 (Question translated)

25                 (Answer not translated)
```

I4jnshe                              Wang – direct

1   Q.   On the phone?

2   A.   No, not at that time.

3          Well, I mentioned this before.  I used to work at

4   Ninth Avenue.  I kind of know how much it pays, this type of

5   work, even though it's not a written -- anything written.  It's

6   not a written rule or anything.

7   Q.   OK.  So you did not discuss the pay on the phone?  You

8   discussed the pay after you came to the job.  Am I right?

9   A.   No.  I started working and I was given 1200.

10  Q.   OK.  How often you get paid?

11  A.   Once a month.

12  Q.   What is the regular day you are going to get your pay?

13  A.   The end of the month.

14  Q.   OK.

15  A.   The end of the month.

16  Q.   Did you have meals while you were working in the --

17          THE INTERPRETER:  I'm sorry, can I have that one more

18  time?

19          MR. TROY:  Did you have meals?

20          THE INTERPRETER:  OK.

21  A.   No, basically no.  Every day I worked side work for them.

22  Q.   I don't think you got my question.  I'm asking you, did you

23  eat at the restaurant?

24  A.   I did.

25  Q.   How many meals did you have per day?

I4jnshe                          Wang - direct

1  A.  Well, lunch and then a simple dinner, just porridge and

2  there's no meal per day for dinner, just porridge.

3  Q.  Did you have a fixed time for meals, lunch or dinner?

4  A.  No.

5  Q.  OK.  How much time did you use to eat your meals during

6  your working day?

7  A.  Well, no set time.  I mean, I often get interrupted, I go

8  deliver, and I finish the meal when I come back.

9  Q.  OK.  But tell us how much time you need to finish your

10  meals.

11  A.  I only needed ten-plus minutes to eat my meal.

12  Q.  OK.  What kind of duties did you have when you were working

13  in the restaurant Fresco Tortillas?

14  A.  I cut the vegetables when I get into the restaurant in the

15  morning.

16  Q.  And then?

17  A.  I cut scallions, I cut vegetables.

18  Q.  Onions or scallions?

19  A.  Onions.

20  Q.  OK.  And what is the next?

21  A.  Tomato.

22  Q.  How do you deal with the tomatoes?

23  A.  I have to cut the tomato into tiny cubes.

24  Q.  How about the onion?

25  A.  I peel the skin of the onion.

I4jnshe                              Wang - direct

1    Q.  That is all you did with the onion?

2    A.  And then I cut them into strips.

3    Q.  OK.  What else?

4    A.  And containers.  I have to clean the metal containers of

5    the restaurant that contain food.

6    Q.  All those jobs is before your first delivery or during your

7    deliveries?

8    A.  Well, I have to make deliveries if there's an order and

9    come back to continue until it's done.

10   Q.  OK.  And what else did you do?

11   A.  Avocado.

12         THE COURT:  Counsel, I hope we are not going to go

13   through every vegetable.  I think we get the point on that one.

14         MR. TROY:  Thank you, your Honor.  OK.

15   Q.  You are talking about avocado?

16   A.  Yes, I have to peel the avocado and then make them into

17   salsa consistency, pulpy consistency.

18   Q.  Do you have any break during the day?  Do you have any

19   break hours during the day?

20   A.  I do not.

21   Q.  Not at all?

22   A.  No set break time.  No set break time.

23   Q.  Did the restaurant close during the day, especially in the

24   afternoon?

25   A.  No, no.  As a matter of fact, after 3 o'clock, when it

I4jnshe                         Wang - direct

1   slowed down, we have to sit there and peel garlic.

2   Q.  OK.  You are talking about you get $1200 in the beginning

3   of your working there.  Who pays you?

4   A.  The boss lady, the lady boss.

5   Q.  When you get paid, do you sign any paper?

6   A.  No.  Not necessary.

7   Q.  Did they pay you cash or did they pay you check?

8   A.  Cash.

9   Q.  During your work at Fresco Tortillas, how many workers are

10  there in the restaurant?

11  A.  Well, not including her family, then three.

12  Q.  OK.  How many workers in their family working in the

13  restaurant?

14  A.  When I went there, the husband and wife and their eldest

15  daughter.

16  Q.  Every employee come to work every day at 11, just like you?

17  A.  The other employees, they could leave at 10, because the

18  boss takes over after that to pick up the phone, for example.

19  Q.  During your work at Fresco Tortillas, did you see any labor

20  law poster like minimum wage overtime pay poster on the wall?

21  A.  No, no.

22  Q.  Not at all?

23  A.  No, not at all.

24  Q.  During your work for the Fresco Tortillas, did you sign any

25  paper in writing related to your employment?

I4jnshe                          Wang - direct

1   A.  No.  No, not at all.  No.

2   Q.  When you made deliveries for the Fresco Tortillas, did you

3   get tips?

4   A.  Yes, yes.

5   Q.  Would you like to tell us roughly how much tips you can get

6   every day?

7   A.  Between 40 and 50.  About $50.

8   Q.  What kind of bicycle you used to make the deliveries?

9   A.  An e-bike.

10  Q.  How much money to purchase for the e-bike?

11  A.  Over 1400.

12  Q.  OK.  What is the lifespan for the E bike to use as a

13  delivery?

14  A.  Well, let alone the life span, I want to talk about the

15  maintenance.  Every month basically I have to maintain and

16  repair the e-bike.

17  Q.  OK.  Roughly how much maintenance do you have to pay for

18  the bicycle?

19  A.  Under normal circumstances, I would say about a hundred per

20  month.

21  Q.  OK.  Did you change the battery for the e-bicycle?

22  A.  Well, all together I believe I changed four batteries while

23  working -- during the time period that I was working there.

24  Q.  How much does a battery cost you, roughly?

25  A.  Four fifty each.

1   Q.  OK.  When is the time you did not work at Fresco Tortillas

2   anymore?

3   A.  March 2016.

4   Q.  Do you have a specific day?

5   A.  Beginning of March.  I think maybe even March 1.

6   Q.  OK.

7   A.  The very first day I stopped, right around there.

8   Q.  Why you stop to work at Fresco Tortillas?  Did you get

9   fired?

10  A.  No, I quit.

11  Q.  Why?  Why did you quit?

12  A.  Well, because I had been working there for a long time, and

13  I feel there was something being unfair.  All the deliveries

14  with the good tips, the boss took them all for himself.  And I

15  had a discussion or actually an argument after I worked there

16  for about three years with the boss.

17          So, for me, I always trusted the boss lady.  Even

18  today, I trust the boss lady.  And there were lots of people

19  who had worked as delivery persons over there, and generally

20  the general consensus is not so good regarding the boss over

21  there.

22  Q.  Why?

23  A.  Well, for example, if the delivery person are making

24  deliveries and there's another order that comes in, the boss

25  they would take that, including the tips if they are a good

1   tipper.

2          So, after three years, I discussed this with the boss

3   lady.  So I had the discussion with the boss lady because I

4   thought the boss lady would be fair, plus the fact that I was

5   recruited by the boss lady, so I respect the boss lady a lot.

6          But ultimately I said to the boss lady, Well, you

7   know, the way that the boss works, don't blame me if something

8   happens in the future.  Don't blame me.

9   Q.  What are you --

10  A.  Something extreme happened, don't blame me.

11  Q.  What do you mean?

12  A.  That I hope that the boss would control himself.  It

13  happened already on several occasions.  If it happens again,

14  what he did, taking away, you know, the good tipper, I might

15  have to go to court on that.

16  Q.  OK.  During your employment with the restaurant have your

17  pay changed?

18  A.  Yes.  After about a year plus that I work there, I was

19  given 1300.

20  Q.  OK.  Let's talk about the deliveries.

21  A.  OK.

22  Q.  How many orders always you or with other deliverymen can do

23  a day?

24  A.  Generally, I always have about 40 deliveries.

25  Q.  Only for yourself or together?

I4jnshe                              Wang - direct

1   A.   That's just for myself.

2   Q.   How many deliverymen when you are working with the

3   restaurant the restaurant has?

4   A.   Other than myself, there's one other person.

5   Q.   Do you know who is the other person?

6   A.   OK.  Right now, that would be Mr. Shen.  Mr. Shen that is

7   sitting right there.

8   Q.   OK.  Mr. Shen come after you come to the restaurant,

9   correct?

10  A.   Yes.  After two years, after I worked there for two years,

11  yes.

12  Q.   OK.  Before Mr. Shen come to the delivery job, did you work

13  with anybody?

14  A.   Yes.

15  Q.   Who is the person?

16  A.   Well, they have a lot of people in and out all the time.  I

17  only remember two of them, but even the two I don't remember

18  their full name.  However, one was a Fuzhounese person whose

19  last name is perhaps called Pan.

20  Q.   P-a-n?

21  A.   Pan, yes.  And then the other person is a Shanghainese

22  person, Mr. Chan.

23  Q.   Mr. Pan or Mr. Chan, did they work full time or did they

24  work part-time?

25  A.   They were all full-timers.

I4jnshe                      Wang - direct

1   Q.  OK.  Do you know when Mr. Shen left the job?

2   A.  Approximately January 2016.

3   Q.  Did you do deliveries after Mr. Shen left the job?

4   A.  Yes.

5   Q.  Did you have any partners after Mr. Shen left the job?

6   Another deliveryman?

7   A.  Well, they did hire some, a few.  However, they did not

8   stay long.  We are talking about a day or two.  Before I even

9   become familiar with these people, they were gone.

10  Q.  Would you like to tell us how much money always it's

11  costing for each delivery order?

12          (Question interpreted)

13          MR. TROY:  No.  How much is the food cost, each order

14  cost.

15          THE INTERPRETER:  Oh, OK.  OK.

16  A.  For the 40 deliveries that I made, on average I would say

17  each delivery's worth is about $18.

18  Q.  Would you like to tell us what is the least money you make

19  the delivery order?

20  A.  So the smallest food delivery I make sometimes could be $5

21  or so.

22  Q.  What is the most money you can deliver in your experience,

23  the most money you can get for each delivery?

24          (Question interpreted)

25          MR. TROY:  No.  Maybe I need to rephrase that one.

I4jnshe                        Wang – direct

1          THE INTERPRETER:  OK.

2    Q.  In your experience, what cost the most for each order ever?

3          THE INTERPRETER:  OK.

4    A.  The most expensive delivery that I ever made was about

5    $500.  That one time.

6    Q.  OK.  Do you know how many eat-ins for the restaurant,

7    roughly every day?

8    A.  Per day, my rough calculation, maybe about 20 or so per

9    day.

10   Q.  How do you know?

11   A.  Because I'm there every day.  I'm in and out very quickly,

12   and I make my deliveries very fast.

13   Q.  Do you know how much money it cost average for each eat-in?

14          It's more expensive or more cheap?

15   A.  On average I would say eat-in, each is about $13, $14.

16   Q.  OK.  Do you know how many pickups or takeouts the

17   restaurant have every day?

18   A.  Pickup each day I would say on average about 50 orders come

19   to pick up, always, each day.

20   Q.  Do you know how much it cost usually for each order?

21   A.  Similar to the deliveries that I make, about $18, $19 per

22   order.

23          MR. TROY:  Your Honor, I have my direct.

24          THE COURT:  OK.  Thank you.

25          MR. TROY:  Thank you.

1           Cross-examination?

2           MR. FREDERICKS:  Yes, your Honor.

3           Your Honor, I apologize.  We spoke about this during

4    our last appearance, about providing you with the transcript of

5    Mr. Wang.

6           May I approach?

7           THE COURT:  Yes, please.

8           MR. FREDERICKS:  Thank you.

9           MR. TROY:  Mr. Fredericks, can I have a copy?

10          MR. FREDERICKS:  Yes.

11          MR. TROY:  Thank you.

12   CROSS EXAMINATION

13   BY MR. FREDERICKS:

14   Q.  Mr. Wang, you testified that there were approximately 20

15   dining patrons at the restaurant per day, is that correct?

16          MR. TROY:  You are talking about 20 or 200?

17          MR. FREDERICKS:  20.

18          MR. TROY:  20, OK.

19   Q.  Is that correct?

20   A.  Correct.

21   Q.  And you testified that the amount of each dine-in bill was

22   approximately $13 to $14, is that correct?

23   A.  Yes.  Correct.

24   Q.  Mr. Wang, I'm going to refer to your deposition testimony,

25   which was taken on July 3, 2017.

1          I'm specifically referring to page 54, lines 23 to

2     page 55, line 4.

3          Sir, at your deposition, my question to you was:

4     "Q.  And on average how much would a typical dine-in customer

5     spend?"

6          And your answer was:  "I don't know because I never

7     seen the -- the receipts or anything."

8          And then my follow-up question was:  "So you don't

9     know?"

10          And your answer was:  "I don't know."

11          So, sir, you clearly testified at your deposition that

12     you don't know the specific amount of money spent on each

13     dine-in order.

14          Can you please explain to me why today you

15     specifically remember that each dine-in order cost

16     approximately $13 or $14.

17     A.  I didn't say I didn't know.  I might have said that I

18     didn't remember clearly.

19     Q.  Your actual testimony was that you don't know.

20          So then my follow-up question, sir, is how come you

21     didn't remember clearly at your deposition, but you remember

22     clearly today?

23     A.  Well, first of all, I have never been -- stepped foot in a

24     courthouse or legal situation before, as a background.

25          So, even today, anytime I come into -- anytime I come

I4jnshe                          Wang - cross

1    into a courthouse, I get nervous.

2    Q.  Right.  Sir, so that doesn't answer my question.

3           At your deposition testimony -- at your deposition

4    your testimony was that you were unaware or do not know the

5    amount of each specific bill for dine-in patrons.

6           Now, today, you are testifying in the court that each

7    bill was $13 or $14.  So I would like you to explain this

8    discrepancy.

9    A.  Well, I already explained just now.  I did say -- I believe

10   I said I couldn't remember clearly, and when I got home, when I

11   returned home I racked my brain and tried to recall, tried to

12   remember every single detail.

13   Q.  And when you racked your brain and tried to remember every

14   single detail, what did you recall?

15   A.  So I remember, I mean, all the deliveries that I made, for

16   example, I'm not saying each single order is $18 precisely.

17   And, as I mentioned before, there were $5 deliveries; there

18   were $35 deliveries.

19          So I'm just giving an average, a general description.

20          THE COURT:  Counsel, the Court recognizes that the

21   witness did not answer the question you asked and also

22   understands the point you have made.

23          MR. FREDERICKS:  Yes, your Honor.

24          THE COURT:  You can move on from that.

25          MR. FREDERICKS:  Thank you.

1    BY MR. FREDERICKS:

2    Q.  Mr. Wang, you also testified there were approximately 50

3    pickup orders at the restaurant per day, is that correct?

4    A.  Yes.

5    Q.  OK.  So the total number of pickup and dine-in orders at

6    the restaurant on any particular day would be approximately 70,

7    is that correct?

8    A.  Not including the deliveries that I made, yes, about 70.

9    Q.  That's correct?

10   A.  70.

11   Q.  70?

12   A.  That's right.  Not including the deliveries, yes.

13   Q.  Sir, I'm going to refer to your deposition testimony again,

14   page 54, beginning on line 10, where the question was:  "Well,

15   about how many people dine in on average, on an average day?"

16           And your answer was:  "I'm not sure this is a hundred

17   percent correct, but I think the takeout orders and eat-in,

18   dine-in -- dine-in customers average would be more than a

19   hundred."

20           And the follow-up question was:  "Takeout orders, plus

21   dine-in customers were more than a hundred per day, is that

22   correct?"

23           And your answer was:  "Yes, more than.  Yeah.  All

24   together, it would -- would be -- would be more than a

25   hundred."

I4jnshe                         Wang - cross

1   A.  Yes.

2   Q.  So, sir, I would like you to explain why today you have

3   testified there are a total of 70, approximately 70 dine-in and

4   pickup orders at the restaurant, yet during your deposition you

5   testified that there were over 100 dine-in and pickup orders

6   per day.

7   A.  The hundred is not wrong.  Including takeout, dine-in,

8   delivery, over a hundred.  Am I wrong?

9   Q.  Sir, during your deposition you were referring specifically

10  to dine-in and takeout orders only, and you testified that

11  there were over a hundred of those total orders, excluding your

12  delivery orders.

13          THE COURT:  Is there a question?

14  BY MR. FREDERICKS:

15  Q.  The follow-up question is -- is my original question, which

16  is why are you testifying today that there are only 70 total

17  dine-in and pickup orders on a daily basis?

18          MR. TROY:  Objection, your Honor.

19          I believe that counsel, he's just talking about

20  exclusive and only eat-in and the pickup.  I don't see any

21  "exclusive" or "only" word on the transcript at all.

22          THE COURT:  OK.  I certainly can read the transcript,

23  and I see what it says.  And I agree the words "only" and

24  "exclusive" aren't there, but there's also no mention of

25  delivery in the context of those particular questions.

1              On the other hand, I am not sure this particular

2    discrepancy, while I see it, necessarily helps the defense for

3    the point that they're ultimately going to make, but I leave

4    that to you.

5    Q.  So, the follow-up question, sir, is why is your testimony

6    different today than when you testified at your deposition?

7    A.  How could it be different?

8    Q.  Sir, out of the delivery orders, the delivery orders are

9    placed in a variety of manners, correct?

10             MR. TROY:  Objection.

11   Q.  Meaning --

12             MR. TROY:  Objection, your Honor.

13             I don't think he liked answer.  I believe he answered

14   you, and you repeated your question.  He answered, when he

15   answered more than a hundred, that's including --

16             MR. FREDERICKS:  This is an entirely different

17   question.

18             THE COURT:  Objection overruled.  The question was

19   about the manner in which people placed orders.

20             MR. FREDERICKS:  Correct.

21   A.  Telephone, pickup, dine-in.

22   Q.  Sir, for the actual deliveries that you made, not speaking

23   of dine-in and pickup orders, for the deliveries that you

24   actually made, how were those orders placed?  Meaning were they

25   placed over the computer?

I4jnshe                      Wang - cross

A.  Telephone, cash, computer.  And the Internet or computer

orders are relatively small, or the smallest.

Q.  When you say relatively small, what numbers are you

specifically referring to, the amount of computer orders?

A.  I don't remember exactly.

Q.  Sir, I am going to refer to your deposition testimony, page

19, line 12.

A.  I only care about how many orders I have per day.

Q.  Right.  OK.

          Sir, so let's go to your deposition testimony, page

19, line 12.

          The question was, "So what percentage of the orders

were placed by the computer?

"A.    Not that many --"

          THE INTERPRETER:  Counsel.

          MR. FREDERICKS:  Sorry.

          THE INTERPRETER:  Yeah.

          THE COURT:  Let's go in segments so we make it easier

for the interpreter.

          THE INTERPRETER:  Because you are reading from a

transcript.  I don't have a copy of the transcript, so you have

to slow down.

          MR. FREDERICKS:  I see.

Q.  So the question was again:  "So what percentage of the

orders were placed by the computer?"

1          And your answer was, "Not that many."

2          And then the question was:  "Approximately how many?"

3          And your answer was:  "Generally like ten something,

4    ten something orders, maybe the most will be 20."

5          So, sir, is that an accurate statement, that there are

6    10 to 20 Internet orders placed per day that you physically

7    delivered on a daily basis?

8    A.  Well, I already told you just now that there's less

9    internet orders than cash.  There's more cash orders.

10   Q.  Right.  But --

11   A.  I only care how many I make -- how many deliveries I make.

12   I don't really care how many Internet, how many pickup, how

13   many through the phone or cash order.

14   Q.  Sir --

15   A.  That's not what my focus is.

16   Q.  Isn't it an accurate statement that there are approximately

17   10 to 20 Internet orders that you did personally, personally

18   delivered that were placed per day?

19   A.  Should be, yes.

20   Q.  Are you aware of what websites were used to place these

21   Internet orders?

22   A.  That I don't really know.  I'm not terribly familiar with

23   computer or that aspect.  I don't really know.

24   Q.  Fine.

25          Your recollection, what percentage of the Internet

1   orders were paid for by credit card as opposed to cash?

2              MR. TROY:  Objection.

3              I don't think that your question is correct.  The

4   computer order is only credit card charge.

5              Am I right?

6              MR. FREDERICKS:  I am asking if that is his testimony.

7   That is my question.

8              MR. TROY:  So I object to your question.  Your

9   question doesn't make sense, because your question asks the

10  computer orders.  You know, what is the pay by check?  What is

11  the pay by cash?  My answer to you is all the computer orders

12  is paid by check -- paid by credit card.

13             THE COURT:  OK, gentlemen.

14             Ask your question again.

15             I want to hear it.

16             MR. FREDERICKS:  OK.

17  BY MR. FREDERICKS:

18  Q.  Out of the Internet orders that were placed for your

19  deliveries, what percentage of those orders were paid for by

20  credit card?

21  A.  I don't understand.

22             Well, when I received the order, the price is already

23  on it, and there is a receipt if it's a credit card takeout,

24  delivery order.

25  Q.  And for all of the Internet orders was there a receipt

1  showing a credit card payment?

2          THE COURT:  Can you just hold on.

3          THE INTERPRETER:  I just asked him to repeat.  I

4  didn't catch what he said.

5          THE COURT:  If you need him to go slower and in

6  smaller segments, tell him to do so.

7          THE INTERPRETER:  OK.

8  A.  If it is an Internet order what's been ordered, the amount

9  is already printed on it, on the printout.  They already pay

10 through the Internet company.  The payment is already paid.

11 Q.  All right.  OK.

12 A.  And I only care how much the order is because that's

13 related to the tips that I might get after I make the delivery.

14 Q.  Sir --

15 A.  So why I pay attention and know about it, because

16 sometimes, for example, if it's a $35 Internet order, I make

17 the delivery and only got a dollar tip, I would then say wow

18 that is a terrible tipper, bad order.

19 Q.  Right.  Sir, you testified that you earned a base salary of

20 $1200 per month that was subsequently increased to $1300 a

21 month.  Is that correct?

22 A.  Yes.

23 Q.  Sir, do you have any documents reflecting the salary you

24 earned during your employment?

25 A.  No.  Can I say something?  Whether it's Chinese food,

1   whether it's Mexican food the restaurants that were opened by

2   the Fuzhounese in Manhattan, basically they did not provide

3   any.

4   Q.  You don't have any tax returns reflecting the income that

5   you earned at the restaurant?

6   A.  Tax return records I do have.

7   Q.  And your tax return records reflect the amount of income

8   that you earned at the restaurant; is that correct?

9   A.  No.  Because the boss would not allow me to report tax, and

10  I only pay just a small, small amount.

11  Q.  Well, what's a small amount?

12  A.  OK.  I meant to say I report 1099.  That's what I meant by

13  that.

14  Q.  OK.  And what small amount did you report on your 1099?

15  A.  I reported six to seven thousand dollars.  I don't remember

16  exactly.

17  Q.  OK.

18          MR. FREDERICKS:  Nothing further, your Honor.

19          THE COURT:  OK.

20          The witness may step -- oh, any redirect?

21          MR. TROY:  Yes, your Honor.  Only one.

22  REDIRECT EXAMINATION

23  BY MR. TROY:

24  Q.  Just now you are talking about the computer order and

25  another one.  I don't think the translation is clear.  You are

I4jnshe                          Wang - redirect

1    talking about get phone calls.  That's a cash order.  Am I

2    right?

3    A.  Yes.

4    Q.  The telephone calls, it's always paid by cash?

5              MR. FREDERICKS:  Objection.  Leading.

6              THE COURT:  Sustained.

7              MR. TROY:  Your Honor, it's redirect and according --

8              THE COURT:  Sustained.  You can still ask the question

9    in a different way.

10             MR. TROY:  OK.

11             THE COURT:  Hold.  On, there was an objection.

12             I sustained it.  So he has to ask a new question.

13             THE INTERPRETER:  OK.

14             THE COURT:  I am not sure what you were just

15   translating, me, or you were translating the question.

16             THE INTERPRETER:  I repeated the question.

17             THE COURT:  So just tell him there's going to be a new

18   question.

19             THE INTERPRETER:  OK.

20             MR. TROY:  OK.

21   BY MR. TROY:

22   Q.  Would you like to give us an estimate, what is the

23   percentage of the computer orders and what is the percentage of

24   telephone calls orders?

25             THE COURT:  Are you asking for pickup and delivery

I4jnshe                          Wang - redirect

1 | together or only one of those?

2 |           MR. TROY:  Roughly all the deliveries.

3 |           THE COURT:  Just deliveries?

4 |           MR. TROY:  Yes, sure.

5 |           THE COURT:  All right.

6 | A.  OK.  Can I have the question again.  I'm not sure -- I am a

7 | little confused about the exact percentage that I'm being asked

8 | for.

9 | Q.  OK.  Let's put it the easy way.  What is the percentage

10 | related to the so-called credit card orders and the cash

11 | orders?

12 | A.  I would say cash orders takes up about 60 to 70 percent.

13 |           MR. TROY:  Thank you, your Honor.

14 |           THE COURT:  Thank you.

15 |           All right.  Mr. Wang, thank you.

16 |           You may step down.

17 |           (Witness left the stand)

18 |           THE COURT:  Plaintiffs may call their next witness.

19 |           MR. TROY:  Your Honor, can we have a few minutes.

20 |           THE COURT:  A little break?

21 |           MR. TROY:  Yes.

22 |           THE COURT:  Let's take a ten-minute break.  We'll be

23 | back here at 11:50.

24 |           MR. TROY:  Thank you, your Honor.

25 |           THE COURT:  OK.

1          (Recess)

2              THE COURT:  All right.  Are you ready to proceed?

3              MR. TROY:  Yes, your Honor.

4              The plaintiffs call Mr. Shen.

5      JUNMIN SHEN,

6          called as a witness by the Plaintiffs,

7          having been duly sworn, testified as follows:

8              (Through interpreter)

9      DIRECT EXAMINATION

10     BY MR. TROY:

11     Q.  Mr. Shen, would you like to state your full name and the

12     address for the record.

13     A.  Junmin Shen, 134-30 Maple Avenue, Flushing.

14     Q.  OK.  Let's talk about Fresco Tortillas.

15              How did you come to know the restaurant?

16     A.  I got a phone call from the boss.

17     Q.  Do you know the boss before?

18     A.  I do, I did.

19     Q.  How do you know him?

20     A.  In '03, '04, I did work there part-time.

21     Q.  OK.  So what is the date the boss called you?

22     A.  I remember I went back to work August 26, 2014, and the

23     phone call I think he called me maybe a day or two prior to

24     that.

25     Q.  What is your conversation during that phone call?

I4jnshe                        Shen - direct

1   A.  He asked me whether I was working.  I said I'm looking for

2   work.  He said, well, why don't you come over and work for me.

3   Q.  Any other conversation during the phone call?

4   A.  No.

5   Q.  OK.  When is the first day you come to the job?

6   A.  August 26 I went to work.

7   Q.  OK.  During the phone call, did you talk about how you get

8   paid, how much you get paid?

9   A.  No, not initially.  I didn't ask until the end of the

10  month, after I worked.

11  Q.  So what did you ask at the end of the first month you

12  worked for Fresco Tortillas?

13  A.  Well, it was only a few days until the end of the month, so

14  I found out that they would pay me $1100.

15  Q.  How often did you get paid during your work for the

16  restaurant?

17  A.  Per month.

18  Q.  OK.  Have you ever been paid weekly, biweekly, or semi

19  months?

20  A.  Salary, no.

21  Q.  How much did you get paid?

22  A.  $1100 per month.

23  Q.  So your pay never got changed during your employment with

24  the restaurant?

25  A.  They were changed.

I4jnshe                         Shen - direct

1    Q.   When did it change?

2    A.   About half a year later it was raised to 1200.

3    Q.   About six months later from the start of your work or six

4    months before you left the job?

5    A.   I started at 1100 and half a year later they told me it's

6    raised to 1200.

7    Q.   How many days did you go to work?

8    A.   Six days per week.

9    Q.   Which day you were off?

10   A.   Saturday.  I'm off Saturdays.

11   Q.   You ever were off not on Saturday?

12   A.   No.  If there's nothing unusual, I take my day off.

13   Q.   OK.  What time did you go to work, did you arrive to the

14   work every working day?

15   A.   Around 11 basically.

16   Q.   OK.  What time you left the restaurant, left the job every

17   working day?

18   A.   11.  At least 11.  Maybe sometimes a little bit earlier,

19   but basically 11.

20   Q.   OK.  Did you get any break time during the working day?

21   A.   Well, basically, if there's an order to deliver, obviously

22   I make that delivery.  And if there is no such delivery order,

23   the time would be spent doing side work.

24   Q.   OK.  What kind of side work did you do?

25   A.   Yes.  Quite a bit of -- quite a bit -- quite a few things

I4jnshe                          Shen - direct

1     to do.  Cut tomato, peel onion, cut cabbage, cut cabbage into

2     strips, peel shrimps, quite a few things.

3     Q.  OK.

4     A.  And garlic, things like that.

5     Q.  OK.

6     A.  Peel garlic.

7     Q.  That's so-called side jobs?

8     A.  Yes.  And avocados, peel them and pulverize them.

9     Q.  Your side job is exactly the same with Mr. Wang, who just

10    testified?

11    A.  Yes.  The same.  Basically --

12    Q.  OK.

13    A.  -- it is the same.

14    Q.  Would you like to tell us roughly how many hours is the

15    side job every working day?

16    A.  Two, three hours at a minimum, two three hours per day.

17    Q.  OK.  And how many meals did you have during your working

18    for the restaurant?

19    A.  Mainly just a lunch, 2, 3 o'clock in the afternoon, mainly

20    just a lunch.

21    Q.  Do you have a fixed time for the meals?

22    A.  No, no, no.

23    Q.  How much time it takes to have a meal in the restaurant for

24    you?

25    A.  Ten-plus minutes.

1   Q.  OK.

2   A.  Ten-plus minutes, very quickly.

3   Q.  What is your pay date?

4   A.  Usually the end of the month.

5   Q.  OK.  Who pay you?

6   A.  The boss -- I mean, sorry, the lady boss.

7   Q.  Did you get paid cash or did you get paid check?

8   A.  Cash.

9   Q.  OK.  What time did you come to the job?

10  A.  I arrived at roughly around 11.

11  Q.  What time you left the job?

12  A.  Basically 11.  Sometimes a little bit beyond that.

13  Sometimes a little lit earlier, maybe a few minutes earlier.

14  Q.  OK.  When the first day you come to the job, did the boss

15  give you any pay notice for you to sign?

16  A.  No, no.

17  Q.  Have you ever signed any paper during your work with Fresco

18  Tortillas?

19  A.  No, no.

20  Q.  When you get your pay, did you sign any paper?  Did you

21  give any receipt?

22  A.  No.

23  Q.  During your employment I believe you had two deliverymen,

24  you and Mr. Wang.  How do you arrange the tips?  How do you

25  arrange the deliveries?

I4jnshe                         Shen – direct

A.  Well, generally independently.  In other words, he make the
tips on the delivery he makes and vice versa for myself.
Except when there is a large order, then it would be equally
divided, the tips would be equally divided between the two of
us.

Q.  Are you talking about you share big tips with each other?

A.  Correct.

Q.  Just now you are talking about what day you are off every
week?  Saturday or Sunday?

A.  I am off on Saturdays.

Q.  OK.  Do you know what day Mr. Wang off?

A.  Sunday for him.

Q.  OK.  So did you work on Sunday?

A.  Well, I'm off.  That's my freedom to be off on Sunday.

Q.  So when you work on Saturday, Mr. Wang did not work on,
right?

A.  Yes.

Q.  OK.  So on Saturday, if you get big tipper, you get good
tips, big tips, did you share it with anybody?

A.  No, no, no.  I keep it.

Q.  OK.  Vice versa:  If Mr. Wang, during that day only
Mr. Wang works and he get big tips, did he share with you, if
that day you did not work?

A.  No.

            THE COURT:  I have a question.

1         What does he consider big tips that would be shared?

2    What amount?

3         THE WITNESS:  When the order is over a hundred, two

4    hundred and up, when the tips is 20 or 20 plus, under those

5    circumstances, we share them.

6         THE COURT:  Thank you.

7    BY MR. TROY:

8    Q.  Would you like to tell us how much tips you get average

9    every day?

10   A.  40 plus, 50 on average.  I would say that's about it.

11   Q.  Average how much tips you get per order?

12   A.  Hard to say, two dollars, one dollar, less than that, no

13   tips.  All kinds of situations.

14   Q.  OK.  How do you make your deliveries?  What kind of

15   transportation instrument do you use?

16   A.  An electric bike.

17   Q.  Did the restaurant provide the e-bike or you have to buy

18   yourself?

19   A.  Not provided by the restaurant.  Purchased on my own.

20   Q.  Usually how much it cost for an e-bike?

21   A.  1420, 1450.  It all depends on quality.

22   Q.  Did you pay the maintenance of the e-bike, or the

23   restaurant paid for it?

24   A.  We pay.  We paid it.

25   Q.  Did you change battery when you working for Fresco

I4jnshe                              Shen – direct

1    Tortillas?

2    A.   Changed on my own.

3    Q.   OK.  When you get paid every month, did you sign anything?

4    Did you sign a receipt?

5    A.   No.

6    Q.   OK.  How do you leave the job?

7    A.   At the end it was not a happy ending.

8    Q.   OK.

9    A.   I wasn't happy working there.

10   Q.   When is the last day you left the job?

11   A.   The last day of January of 2016.

12   Q.   Would you like to tell why you were not happy with it.

13   A.   The boss has got a bad temper, I guess that's the way I put

14   it, and gets angry very often.  And the longer it went on, I

15   became -- I didn't like it.

16   Q.   Have you ever complained this kind of stuff to the boss or

17   lady boss?

18   A.   I have discussed this with the boss lady.  And she said

19   that that's his personality; he's not a bad guy however, he's

20   not a bad guy.

21   Q.   OK.  Roughly, how many orders did you deliver every working

22   day?

23   A.   30, 40.  Myself alone, 30, 40.

24   Q.   Would you like to estimate what is the price for the

25   orders, for the deliveries?

I4jnshe                        Shen - direct

A.  I would say on average a very general average, 15, 16, 17,

18.  In general, under 20.  So that's the way I put it.

Q.  OK.  Did you get any chance to evaluate how or observe how

many eat-ins at the restaurant on every working day you worked?

A.  Well, you know, other than the fact that I would be out

delivering, which makes me unable to observe what was going on,

what I could observe, what my estimation each day would be

roughly 20 some-odd customers that eat in.

Q.  What is the price, you think, about the eat-ins, each?

A.  Well, it varies.  A group of two, three, could be eating

$15, $16, and sometimes one person come in and maybe $10.  Hard

to say.

Q.  OK.  Did the restaurant have any pickups?

A.  Yes.

Q.  OK.  Would you like to tell us in your experience how many

orders there are a day?

        THE INTERPRETER:  Pickup?

        MR. TROY:  Yes.

A.  My estimation, 40, 50 orders.

Q.  OK.

A.  Could be more than 50 times.

Q.  OK.  Do you know what is the average price for each order?

A.  I would say they are roughly equal to the delivery orders,

the value in our delivery orders.

Q.  How many employees during your employment with the

1    restaurant the restaurant has?

2    A.   Three employees.

3    Q.   Three employees.  Does that include the boss and the boss

4    lady?

5             They are the boss.  I'm right?

6    A.   No, including the boss and boss lady, then you have five.

7    Q.   OK.  Did you ever mention when is the day you left the job?

8    A.   Yes.  The last day of January of 2016 or January 31, I

9    think.

10            MR. TROY:  Your Honor, plaintiff is good with this

11   witness.

12            THE COURT:  Thank you.  Cross?

13   CROSS EXAMINATION

14   BY MR. FREDERICKS:

15            MR. FREDERICKS:  Your Honor, may I approach again.

16            THE COURT:  Of course.

17            MR. TROY:  Can I get a copy.

18   BY MR. FREDERICKS:

19   Q.   Sir, you testified that you earned approximately 40 to 50

20   dollars in tips, is that correct?

21   A.   Yes.  The majority 50, 50 plus, majority.

22   Q.   50 plus.  OK.

23            Sir, I'm going to refer to your July 3, 2017,

24   deposition testimony on page 22, line 9.

25            It indicates, the question is:  "On average, how many

I4jnshe                              Shen - cross

1   tips -- how much did you earn in tips per day?"

2           And your answer is, "Maybe 50 something, 60 something

3   a day."

4           So my question is, sir, which one is it?

5           Is it 50 to 60 dollars per day, as you testified at

6   your deposition, or 40 to 50, as you're testifying today?

7   A.  Well, there is a distinction.  I mean, Monday generally is

8   not a good day for tips, so that's why I said 40 to 50 plus.

9   But, in general, Wednesdays, Thursdays, Fridays, the tips are

10  better.  So that's why I said majority were 50 plus.

11  Q.  Sir, you testified that there were approximately 20 dine-in

12  patrons per day, is that correct?

13  A.  Yes.

14  Q.  I am going to refer to your deposition testimony, page 24,

15  line 20 to 24:

16          The question is:  "I understand, but for the time that

17  you were there what would you estimate the number of dine-in

18  patrons?"

19          And your answer was:  "I would say that maybe like 30

20  or 40 receipts."

21          Are there 30 to 40 dine-in receipts per day, or 20

22  dine-in receipts per day, as you are testifying to now?

23  A.  Well, let's say Monday, then you, on average, would have a

24  relatively fewer, and then on the weekends then you would have

25  relatively more dine-in.

I4jnshe                         Shen - cross

1   Q.  Right.  So, averaged out on a weekly basis, how many

2   dine-in patrons would you estimate that the restaurant received

3   per day?

4   A.  Well, the question -- this question ought to be asked of

5   the boss or the boss lady, because I often make deliveries out

6   there.

7   Q.  Well, what percentage of the time would you estimate you

8   spend making deliveries?

9   A.  Approximately eight, nine hours.

10  Q.  Out of how many hours per day?

11  A.  I basically spent eight to nine hours on the road, out

12  there making deliveries.

13  Q.  Out of how many hours in a workday?

14  A.  12 hours a day.

15  Q.  Now, sir, if you spend approximately 75 percent of your

16  time outside making deliveries, how are you aware of the amount

17  of dine-in and takeout receipts of the restaurant per day?

18  A.  Yes.  Even though we go in and out making deliveries, but

19  we notice tear-off receipts of orders.  That's the stack there.

20  Every time we come in and out, we notice or I notice.

21  Q.  Sorry.  The stack of tear-off receipts represents what?

22  A.  That would represent dine-in, pickup, and also delivery

23  orders that were phoned in, whether they're credit card or some

24  other method.  They represent orders.

25  Q.  OK.

1              MR. TROY:  Your Honor, I would like to make one thing

2       clear, because the translation, there was a little bit of

3       difference between the original and one, because --

4              MR. FREDERICKS:  Your Honor, plaintiff's counsel is

5       not testifying.

6              MR. TROY:  I know.  But --

7              THE COURT:  But there is a question about the

8       translation.

9              MR. TROY:  Yes.

10             Your Honor, I believe he is not talking about on the

11      stack of the receipts the orders include, I don't know, I did

12      not hear he say include the delivery orders.

13             THE COURT:  OK.

14             MR. TROY:  But the translation was the delivery

15      orders.

16             THE COURT:  I actually noticed that the translator was

17      collecting his thoughts.

18             Can you actually ask the question again about what

19      those represent, or if they included delivery receipts?

20             MR. FREDERICKS:  Right.

21      BY MR. FREDERICKS:

22      Q.  You testified that there was a stack of receipts that

23      allows you to estimate the number of dine-in and takeout

24      deliveries, is that correct?

25      A.  Well, the delivery orders that we made includes cash,

I4jnshe                          Shen - cross

1   computer, and credit card orders.

2              THE COURT:  But of the tear receipts that he would

3   notice in the restaurant, did those include delivery receipts?

4              THE WITNESS:  Yes.  Cash ones, other than cash, no.

5              MR. FREDERICKS:  OK.

6   BY MR. FREDERICKS:

7   Q.  Where were the noncash delivery represents located?

8   A.  I don't understand the question.

9   Q.  All right.  You testified that a stack of receipts

10  represents takeout orders, dine-in orders, and also cash

11  delivery receipts, correct?

12  A.  Should be included in there.

13  Q.  OK.  Sir, so my question is, looking at this -- strike

14  that.

15             Where was this stack of receipts located again?

16  A.  On the table or on the counter.

17  Q.  On the counter where?  In what area of the restaurant?  The

18  front?  The back?

19  A.  In the middle, by the cashier machine.

20  Q.  By the cashier machine.

21             Sir, did you work as a cashier during your employment

22  there?

23  A.  No.

24  Q.  So, you were never stationed near the cashier location,

25  correct?

1    A.  I don't touch that.

2    Q.  OK.  Sir, how confident are you that you are able to

3    estimate the number of particular receipts by glancing at a

4    stack of papers?  Can you explain that to me, please.

5    A.  They are the boss.  As the employee all I can tell you is

6    that's my estimate.

7    Q.  Right.  And how confident are you that this is an actual

8    estimate based on glancing at a stack of receipts.

9    A.  Well, I get a feeling that business is good, then the stack

10   would be thicker.  It would be a thicker stack.

11   Q.  Right.  And how are you able to estimate the number of

12   receipts generated by the width of the stack?

13   A.  I don't have the right to look at it to verify it.  It was

14   just out of curiosity I check, I look.  However, I can only

15   just tell you that my estimation of the number of deliveries

16   that I make is about 40.

17   Q.  And my question is how confident are you that your estimate

18   is accurate out of the number of receipts that are in that

19   stack?

20   A.  I can't tell.  Maybe half and half.

21   Q.  I am going to refer you to page 36 of your deposition, line

22   3 the question:  "How are you certain that as you are looking

23   at this that the stack of receipts represents the number of

24   pickup orders?"

25            MR. TROY:  Which number?

I4jnshe                        Shen - cross

1          MR. FREDERICKS:  36.

2          And the answer is:  "It's an estimate.  In reality,

3    are there 30 or 40 or 50, it is an estimate number.  It's an

4    estimated number.  Sometimes we were there, sometimes we -- we

5    were out.  So, we -- we really don't know, so it's a rough

6    estimate."

7          So you really didn't know the number of takeout or

8    dine-in receipts on a daily basis, correct?

9    A.  Well, it's the boss' business.  It's just an estimate,

10   approximate figure.

11   Q.  Let's go on to pickup orders.  You testified there are

12   approximately 40 to 50 pickup orders or more than 50, correct?

13   A.  I said average.

14   Q.  40 to 50, is that correct?  Or more than 50 was your

15   testimony, I believe.

16   A.  Yes.  I also said Monday may be a little bit worse, the

17   weekend a little bit better.

18   Q.  I am going to refer you to page 25 of your deposition.  I

19   will make this brief.  Let me only start at line 2.

20          The question was:  "How many takeout customers do you

21   estimate there were per day?  How many takeout customers would

22   you estimate there were per day?"

23          And your answer, down at line 11:  "It would be,

24   depending on the thickness of the receipts, my estimate would

25   be like, 30, 40 orders a day."

I4jnshe                       Shen - cross

1              So is it your testimony that there are 40 --

2              MR. TROY:  Your Honor --

3    Q.  -- to 50 pickup -- sorry, takeout orders per day, or 30 to

4    40 takeout orders per day?

5              THE COURT:  Is there an objection?

6              MR. TROY:  Your Honor, relating to the translation, I

7    believe Mr. Fredericks' question is directed to the takeout.

8    That means pickup, not a delivery.  But I believe the

9    translation is talking about deliveries.  So I believe it's

10   confused.

11             MR. FREDERICKS:  He's also testified that there are 40

12   to 50 pickup orders.  He testified that he was doing 30 to 40

13   deliveries.

14             THE COURT:  Yes.  OK.

15             I have down that he testified on direct 40 to 50

16   pickup orders, and you are now trying to point out that at his

17   deposition he said 30 to 40.

18             MR. FREDERICKS:  Right.

19             THE COURT:  Go ahead.

20   Q.  So which one is it, sir?

21             Are there 30 to 40 pickup orders per day or 40 to 50

22   as you testified to today?

23   A.  Basically 40 plus, 50.  Possibly a little bit less on

24   Monday.

25   Q.  Sir, are you currently employed?

I4jnshe                    Shen - cross

A.  Sometimes I work, sometimes I do not work.

Q.  Where were you employed today?

A.  I am off these days.

Q.  OK.  You previously worked at a restaurant on 95th Street,

a Chinese restaurant on 95th Street, is that correct?

A.  Yes.

Q.  So, at that restaurant, the Chinese restaurant on 95th

Street, what percentage of the delivery orders placed were paid

for by credit card?

A.  Anything to do with this case?

Q.  Please answer the question.

A.  Why?  What's the reason?

        THE COURT:  You can tell him that he's not here asking

questions.  He's here to answer.

        Please answer the question.

        MR. FREDERICKS:  I don't think it's too intrusive.

        THE WITNESS:  OK.

A.  What is the question again?

Q.  At your position as delivery person at a Chinese restaurant

located on 95th Street, what percentage of the orders were paid

for by credit card?

A.  A little bit more in credit card in terms of the orders

from the computer.

Q.  When you're saying -- when you're referring to a little bit

more, are you in comparison to your deliveries made at Fresco?

I4jnshe                          Shen - cross

1    A.  What I'm saying is that the shop I worked at at 95th Street

2    had relatively more, more than the cash portion.

3    Q.  Right.  And when you say "relatively more," what exactly

4    are you referring to?  What percentage?

5    A.  Cash orders, 30 percent; the rest, 70 percent.

6    Q.  70 percent of the delivery orders would be paid for by

7    credit card, is that correct?

8    A.  Well, for example, if there is a hundred orders, 70 would

9    be a credit card order.

10   Q.  OK.

11          THE COURT:  Counsel, can you just kind of have him

12   clarify which restaurant he's referring to.

13          MR. FREDERICKS:  Right.

14          Sorry, your Honor.

15   BY MR. FREDERICKS:

16   Q.  And you're referring to the Chinese restaurant at 95th

17   Street, correct?

18   A.  Yes.

19   Q.  The specific address for that restaurant, are you aware of

20   the cross-street?  95th and what avenue?

21   A.  Columbus.

22   Q.  95th Street and Columbus, that's a residential area,

23   correct?

24   A.  Should be, yes.  Correct.

25   Q.  And where is Fresco Tortillas located?

1   A.  Columbus, 95th Street.

2   Q.  No.  We are talking about Fresco Tortillas now, for the

3   case you are suing --

4   A.  Between 56th and 57th on Tenth Avenue.

5   Q.  56th and Tenth Avenue.  That is also a residential area,

6   correct?

7   A.  Yes.  Majority residential.

8   Q.  OK.  So what percentage of the patrons of Fresco Tortillas

9   paid for their delivery orders by credit card?

10  A.  I don't know.  That's the boss's business.

11  Q.  Do you have an estimate of what percentage of the delivery

12  orders are paid for by credit card?

13  A.  I don't know.  That's the boss's business.

14  Q.  Sir, I want to refer you to page 40 of your deposition,

15  line 20.

16          This is regarding your employment at Fresco.

17          The answer is: "Perhaps, for example, today I make

18  about 40 deliveries -- sorry, deliveries -- 30 of them are cash

19  payment and maybe five of them are credit card payments, and

20  the other five are computer orders."

21  A.  I don't understand what you are saying.

22  Q.  Well, sir, during your deposition testimony we discussed

23  the amount of credit card delivery orders, and you testified at

24  your deposition that out of 40 deliveries, 30 of them are cash.

25          But earlier you testified that you were unaware of the

1   amount of credit card delivery payments.

2   A.  Well, I thought you were asking about the boss.  If you ask

3   me, I would answer you.

4   Q.  OK.  Let's just leave that.

5        You testified that 70 percent of the patrons at the

6   Chinese restaurant on 70 -- is it 75th and Columbus, or 95th

7   and Columbus?  Sorry -- paid by credit card.

8        But how come only 25 percent of the patrons of Fresco

9   Tortillas, as you testified at your deposition, paid by credit

10  card?

11       MR. TROY:  Objection, your Honor.

12       You know, I believe that is an expert question.  It is

13  not our client's knowledge and everything to evaluate each

14  district, if they are residential or they are commercial.

15       THE COURT:  Objection overruled.

16       He's given estimates.  If he had a basis to give

17  estimates, then he may have a basis to explain the difference.

18  A.  I don't know why.

19       MR. FREDERICKS:  Nothing further, your Honor.

20       THE COURT:  Thank you.

21       Any redirect?

22       MR. TROY:  No, your Honor.

23       THE COURT:  OK.  All right.

24       You may step down Mr. Shen.  Thank you.

25       It is now almost 5 minutes to one.  We will take a

1    lunch break.

2              What do we have in store?

3              Are we going to have two more witnesses in total?

4              MR. FREDERICKS:  Correct, yes.

5              THE COURT:  OK.  So let's resume at 2, and we'll see

6    what we can do in the hour and 45 minutes we have after that.

7              OK.

8              MR. FREDERICKS:  Thank you, your Honor.

9              MR. TROY:  Thank you, your Honor.

10             THE COURT:  Thank you.

11             (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I4jnshe                        Shen - cross

1

2                    A F T E R N O O N    S E S S I O N

3                         (2:05 p.m.)

4          THE COURT:  Mr. Fredericks, where are your clients?

5          MR. FREDERICKS:  I have the same question, your Honor.

6    They are aware of when they are supposed to be back.  I just

7    checked with them.  I will check with them again.

8    Unfortunately I don't have my phone.  Presumably they are going

9    through security.

10         THE COURT:  The LiveNote isn't working at the moment

11   but everything else is fine.  So we are going to start.

12             Let's see.

13             Mr. Troy, are you calling another witness?

14         MR. TROY:  Your Honor, I would like to defer to call

15   the defendant on the condition of the defense counsel is going

16   to call his client.

17         THE COURT:  That is fine.

18             So if you want to conduct direct, there will be cross

19   by Mr. Troy.

20         MR. FREDERICKS:  Sure.

21             I call Dan Qing Liu, your Honor.

22    DAN QING LIU,

23        called as a witness by the Defendants,

24        having been duly sworn, testified as follows:

25             (Through interpreter)

1    DIRECT EXAMINATION

2    BY MR. FREDERICKS:

3    Q.  Ma'am, please state your name for the record.

4    A.  Dan Qing Liu.

5    Q.  What is your position at Number One Fresco Tortillas Inc.?

6    A.  Well, it's a limited company, so I am managing, the person

7    that's managing.

8    Q.  Are you responsible for the tax preparation and submission

9    of the tax returns for the company?

10   A.  Mostly that would be myself, yes.  Sometimes.  My husband

11   does send over to information to the accountant.

12   Q.  Well, ma'am, I am going to show you what's been marked as

13   Defendants' Exhibit 1, Bates number D000001.

14          This is your federal income tax return, submitted for

15   the year 2013 in connection with this litigation.

16          Do you recognize this document?

17          MR. TROY:  Could I have a copy.

18          MR. FREDERICKS:  This was previously produced.

19          MR. TROY:  I don't think you produced it to me.

20          THE COURT:  No, it was.

21          MR. TROY:  Your Honor, I have an objection to it.

22          Regarding to the tax return, I believe the tax return

23   goes to the motion for summary judgment and the motion to

24   dismiss.  And the, Judge, number one, since this tax return

25   they did not sign and did not authenticate it, I don't think it

I4jnshe2                          Lui - direct

1   is admissible.

2            THE COURT:  OK.  Well, let's see what's established

3   and lay the appropriate foundation.

4            MR. FREDERICKS:  OK.

5            THE COURT:  We'll see.

6   BY MR. FREDERICKS:

7   Q.  Ma'am, do you recognize this document?

8   A.  I recognize it.  I have seen it before.

9   Q.  I am going to show you what's indicated on line 1A, gross

10  receipts or sales.

11           THE COURT:  Before you do that, I would like you to

12  establish -- first of all, what's the last Bates number on that

13  document.

14           The last page is 493?

15           MR. FREDERICKS:  The last is --

16           THE COURT:  Is it all of Exhibit 1?

17           MR. FREDERICKS:  Yes, it is all of Exhibit 1.

18           THE COURT:  OK.

19           MR. FREDERICKS:  The last page of the returns are 493.

20           MR. TROY:  2013?

21           MR. FREDERICKS:  2013, correct.

22           THE COURT:  So this appears to me to be a collection

23  of several documents.

24           MR. FREDERICKS:  That's correct.

25           THE COURT:  So I think you need to have that

1   established with the witness rather than just saying this is

2   one document.

3            If it's a collection of documents, what is that

4   collection, what's in here.  Certainly, I will say for the

5   plaintiff on cross, you can certainly establish whether these

6   documents were filed, who signed them, etc.  I would think that

7   defense counsel would want to establish some of that as well.

8            But if it turns out that for some reason it can't be

9   authenticated or there is a basis not to admit it, I'll either

10  exclude it or take it for whatever weight it's worth.

11           MR. FREDERICKS:  Thank you, your Honor.

12           THE COURT:  OK.

13  BY MR. FREDERICKS:

14  Q.  Ma'am, I'm going to show you a collection of documents that

15  have been Bates stamped starting from D00000 --

16           THE COURT:  I'm sorry, one more thing.

17           For the record, there has been an objection to the

18  admission of Defendants' Exhibit 1, correct?

19           MR. TROY:  Yes.  Your Honor, but for --

20           THE COURT:  OK.

21           MR. TROY:  -- for argument purposes --

22           THE COURT:  I am reserving judgment on that for the

23  reasons I just said.

24           MR. TROY:  Thank you, your Honor.

25  Q.  D000001 through D000493.

I4jnshe2                        Lui - direct

1              THE COURT:  Two requests.

2              One is do you have an exhibit that you can provide the

3      witness, or are you going to have to stay right at the witness

4      box?

5              MR. FREDERICKS:  No.  I just have the -- I can do

6      this.

7              THE COURT:  If you want to read through it, if

8      necessary, we have an extra copy that would allow you to do

9      that.  I don't think it is appropriate for you to be standing

10     right there.

11             MR. FREDERICKS:  Yes, your Honor.  Sorry.

12             THE COURT:  We have the extra copy here.

13             MR. FREDERICKS:  Let's just do it like that.

14             THE COURT:  Also, just raise your voice a little bit.

15     I am having trouble hearing you.

16             MR. FREDERICKS:  OK.

17             THE COURT:  Thank you.

18     Q.  Let the record reflect that I've handed the witness D00001

19     through D000010.

20             Ma'am, do you recognize this document?

21     A.  Yes.

22     Q.  What is this document?

23     A.  Originally, there were Chinese characters written on this

24     page, originally.

25     Q.  I'm sorry.  Can you explain that?

1  A.  I am talking about expenses, gas, rent, electric, phone

2  bills, all that.

3  Q.  Ma'am, who prepared this document?

4  A.  The accountant office.

5  Q.  Do you recall when that specific document was prepared?

6  A.  2013.

7  Q.  OK.  For that particular document, are you aware of what

8  the gross receipts or sales that the restaurant reported in

9  that particular tax year?

10          THE COURT:  Counsel, if you haven't established that

11  this was submitted and that this was the return that was

12  submitted, I don't know if the witness can answer that or not.

13  You can continue.

14          Even if for any reason this exhibit isn't admissible

15  at some point, you can certainly ask what your clients know the

16  receipts to be, and you can still use the document to ask

17  questions.

18          MR. FREDERICKS:  OK.

19          THE COURT:  It won't necessarily be admitted, but

20  we'll see.

21          MR. FREDERICKS:  Right.

22          THE COURT:  The pending question is?

23  BY MR. FREDERICKS:

24  Q.  I believe the pending question was are you aware of what

25  the gross reported sales of the restaurant were for that

1    particular tax year?

2    A.  So, in other words, the entire restaurant for the entire

3    season tax returns or tax reporting?  Is that correct?

4    Q.  That's correct.

5    A.  About -- for the season for each month the reported amount

6    was about 20 something, 20,000 something, 20,000 plus, about

7    24,000.

8    Q.  OK.  Ma'am, looking at that particular document and

9    referring to the top page, are you aware if this document was

10   submitted to the IRS by your accountant?

11            MR. TROY:  Objection, your Honor.  I believe defense

12   counsel did not establish from which page to which page for

13   this document.

14            THE COURT:  Just to be clear, I think right now we're

15   dealing with only 1 through -- was it 13?  What was the number?

16            MR. FREDERICKS:  1 through 10.

17            THE COURT:  1 through 10.

18   A.  Yes.

19   Q.  OK.  How did you obtain a copy of this tax return that you

20   produced in this litigation?

21   A.  They kept a copy of the original.

22            THE COURT:  Who is that?

23   Q.  Who?

24   A.  The accounting office.

25   Q.  And, ma'am, what records were provided to the accountant

I4jnshe2                        Lui - direct

1   office to prepare this particular return?

2              MR. TROY:  Objection, your Honor.  It's leading.

3              THE COURT:  I think it's what documents were provided,

4   which is not a leading question.  Overruled.

5   A.  All the statements from Internet or computer sales, credit

6   card monthly statements, and daily cash receipts as well.

7   Q.  OK.  Anything else?

8   A.  There are no other incomes.

9   Q.  OK.

10             MR. FREDERICKS:  Your Honor, may I approach the

11  witness again?

12             THE COURT:  Sure.

13  BY MR. FREDERICKS:

14  Q.  Ma'am, I'm going to show you what's been marked as D000011

15  through D000018.  Do you recognize this document?

16  A.  Yes.

17  Q.  What document?  What is it?

18  A.  Also, tax return for 2014.

19  Q.  Are you aware of what the gross reported receipts were for

20  Fresco Tortillas for tax year 2014?

21  A.  Well, yes, I do know.  And the business fluctuates,

22  sometimes less, sometimes a little bit more.

23  Q.  Who prepared this document?

24  A.  Also by the same accounting office.

25  Q.  Are you aware if this particular tax return was submitted

1    to the IRS?

2    A.  Yes.

3    Q.  How did you obtain a copy of this tax return for tax year

4    2014?

5    A.  Every month, every season -- sorry, every season I sent

6    over the check for making tax payments.  So, also, in the same

7    way I requested that they made a copy of the original form that

8    they prepare.

9    Q.  OK.  And did you provide any records to the accountant who

10   prepared this tax return?

11   A.  I did.

12   Q.  What records did you provide?

13   A.  Yes.  Similar to the other one, I submitted receipts, costs

14   for gas, garbage, rent, food cost, receipts for all the costs.

15   Q.  Ma'am, I'm going to show you what's been marked as D000460

16   through D000467.

17          Ma'am, do you recognize that document?

18   A.  I have.

19   Q.  What is that document?

20   A.  Also a tax return for 2015.

21   Q.  Is that a true and accurate reflection of the gross

22   receipts or sales reported to the IRS for that tax year?

23   A.  Yes.

24   Q.  Was this particular tax return submitted to the IRS?

25   A.  Yes.

I4jnshe2                         Lui - direct

1   Q.   Who prepared this document?

2   A.   By the same accounting office.

3   Q.   How did you obtain a copy of this document?

4   A.   Same thing.  Made a request that they make copies of the

5   original and provide that to us.

6   Q.   What documents, if any, did you provide in the preparation

7   of this tax return?

8   A.   Also normal business expenses, costs, repairs, maintenance,

9   monthly rent, gas, all the normal costs.  So definitely, we --

10  that had to be paid.  That had to be paid.

11  Q.   Does Fresco Tortilla maintain a corporate bank account?

12  A.   Yes.

13  Q.   Who do they maintain a bank account with?  Which bank?

14  A.   Citibank.

15             MR. FREDERICKS:  Your Honor, may I approach the

16  witness?

17             THE COURT:  Yes.

18             MR. FREDERICKS:  I'm going to give her what's D2.

19  It's Bates number D000377.

20             THE COURT:  You are giving her the first page?

21             MR. FREDERICKS:  That's correct, your Honor.

22             MR. TROY:  What is the document name?

23             MR. FREDERICKS:  377.

24             MR. TROY:  No.  You gave us Exhibit -- which one?

25             MR. FREDERICKS:  D2.

I4jnshe2                       Lui - direct

1                MR. TROY:  D2?

2                MR. FREDERICKS:  D2.

3                MR. TROY:  You needed to give me a copy.  You are at a

4    hearing with your exhibit.  You have to give me a copy of the

5    exhibit.

6                MR. FREDERICKS:  This was previously produced in the

7    course of this litigation.

8                THE COURT:  Well --

9                MR. TROY:  No, I'm talking about the trial.

10               THE COURT:  Hold on.

11               The exhibits were disclosed in a pretrial order as

12   well, i.e., as to exactly what would be used as an exhibit.

13   But it is customary that an attorney using an exhibit would

14   have a copy for their adversary in the event that their

15   adversary isn't prepared with their own.

16               Why don't we do what we did before.  I am going to ask

17   my clerk to provide Mr. Troy with the exhibit or maybe even the

18   exhibit notebooks, since it looks like this is going to be an

19   ongoing issue.

20               MR. FREDERICKS:  It looks like there's two exhibits.

21   BY MR. FREDERICKS:

22   Q.  Ma'am, do you recognize this document?

23   A.  I have.

24   Q.  What is this document?

25   A.  A bank statement of the restaurant.

I4jnshe2                    Lui - direct

1   Q.  Are you aware of what the monthly deposits were for the

2   restaurant on that particular statement month?

3   A.  Well, I know roughly how much it was because it included

4   three checks from the Internet sales, three separate checks

5   from the Internet sales.

6   Q.  So the deposited amount that's reflected on that statement,

7   what does that number consist of?  What revenue that is earned

8   by the restaurant?

9   A.  Credit card income and income from online orders.

10  Q.  Anything else?

11  A.  Nothing else.

12  Q.  Ma'am, one final exhibit.  I am going to approach with

13  what's been marked as D000389.

14          MR. TROY:  What is the number?  389?

15          MR. FREDERICKS:  389?

16          MR. TROY:  OK.

17  Q.  Ma'am, do you recognize this document?

18  A.  Yes.

19  Q.  What is this document?

20  A.  Another bank statement.

21  Q.  Are you aware of what the restaurant's gross deposits were

22  in that particular month?

23  A.  Every month approximately about 10,000 plus, a little bit

24  more than 10,000 was deposited.  Also it depends on the

25  business.

I4jnshe2                        Lui - direct

1    Q.  And the number that's reflected in the amount that's been

2    deposited, what revenue does that consist of?

3               THE COURT:  Where is that number?

4               MR. FREDERICKS:  It should be right on the front page.

5    It may be easier --

6               THE COURT:  What is the figure that you are referring

7    to in terms of the actual --

8               MR. FREDERICKS:  I believe it's 19,606.09.

9               THE COURT:  That is an average daily collected balance

10   according to this.

11              MR. FREDERICKS:  Right.

12              So that would be what's collected on an a monthly

13   basis.

14              THE COURT:  I'm sorry.  I am still not understanding.

15   It says average daily collected balance.  So isn't that the

16   average amount on any given day in the account?  I would think

17   you would have to add up all the credits, and there may be

18   credits for other things that aren't related.

19              MR. FREDERICKS:  Right.

20              THE COURT:  But that's speculation on my part.

21              MR. FREDERICKS:  I believe that if you --

22              THE COURT:  On 390, the following page, I see at the

23   bottom are the credits a total of 19,269.48.

24              But, A, that is an assumption on my part that those

25   are all deposits; and, B, I don't know if any of the credits

I4jnshe2                          Lui - direct

1   are things unrelated to receipts from the restaurant.

2              I just point it out because I don't think we are

3   operating on the right information.

4              MR. FREDERICKS:  Right.  My apologies.

5              To the extent we can establish that these records

6   accurately reflect what is being deposited and what sort of

7   revenue has been deposited into the corporate account, we can

8   credibly show the amount of money that they're actually taking

9   in.

10             THE COURT:  I understand the purpose you want to use

11  it for.  I'm saying that it's not clear what these numbers

12  actually represent.

13             MR. FREDERICKS:  Right.

14             THE COURT:  I am not saying that is a basis to keep

15  out the statements.  I'm saying when you were asking about the

16  deposit number, I don't see any number here that is a single

17  deposit number.

18             MR. FREDERICKS:  I understand, your Honor.  My

19  apologies.  I believe I may have just misread the statement.

20             THE COURT:  All right.

21             MR. FREDERICKS:  I can continue on or --

22             THE COURT:  Well, let me ask, since this seems to be

23  coming up.

24             I assumed that when the exhibit list was provided to

25  me these were all exhibits for which there were no objections

I4jnshe2                        Lui - direct

1   because none were indicated as something to be dealt with.

2         I will leave it to you gentlemen to say, are you

3   agreeing that all the exhibits that you have each listed and

4   provided to me, are you going to stipulate that they are

5   admitted into evidence, or am I going to be ruling on each one?

6         MR. TROY:  Your Honor, can we do the cross-exam.

7         THE COURT:  Yes.  I just raised that --

8         MR. TROY:  I believe if we can start on these and then

9   we do the cross-exam for the tax return and the bank deposit, I

10  believe that should be more convenient for everybody.

11        THE COURT:  We don't need to deal with it now.  I just

12  raise it because it appears to be an issue that is unresolved.

13        Go ahead.

14        MR. FREDERICKS:  I will move on.

15        THE COURT:  I will put it this way.  I will reserve at

16  the moment judgment on the admissibility of all the exhibits

17  since this is apparently an issue.  You certainly can ask about

18  these documents if you want.

19        MR. FREDERICKS:  Right.  I believe that the documents

20  somewhat speak for themselves.  It is just that they are spoken

21  in an incorrect manner.

22        I will continue.

23  BY MR. FREDERICKS:

24  Q.  The cash that was received by the restaurant as revenue,

25  how was that cash distributed or allocated?

I4jnshe2                       Lui - direct

A.   Some portion of the supply of the restaurant has to be paid

by cash as well as every night the tips from the online orders

and credit card tips was also required by us to be paid in the

form of cash.

          THE COURT:  I'm sorry.  I don't want counsel to in any

way to be misled by what I said, because I do see a line on

that statement that says deposit, but then there are a lot of

other lines that say electronic credit.

          So if you wanted to ask your question previously about

that particular line on page 390.

          MR. FREDERICKS:  No.  That's fine, your Honor.

          THE COURT:  OK.

          MR. FREDERICKS:  I think I have provided -- the

statements themselves should establish a sufficient foundation.

          THE COURT:  I apologize.

          MR. FREDERICKS:  No, no, no.

          THE COURT:  Go ahead.

BY MR. FREDERICKS:

Q.   Outside of supplies and tips from online orders, is the

cash that is received from -- is the cash revenue distributed

in any other manner?

A.   Yes.  Used to pay their salary.

Q.   OK.  Now, on a typical month, of the cash that's used to

pay for supplies, tips from online orders and the employee

salaries, is there excess cash remaining?

I4jnshe2                        Lui - direct

1   A.  No.  As a matter of fact, sometimes I have to withdraw some

2   money, cash from the account.

3   Q.  What are the typical monthly costs for the supplies that

4   you need to purchase in cash?

5   A.  Well, one of them was for 1,000 or so.  The other one was

6   for about two, three thousand.

7   Q.  And what supplies were those specifically?

8   A.  Snapple, sodas, chicken meat, taco chips, vegetables and

9   meat.

10  Q.  You also indicated that you used some of the cash to pay

11  employees.  During the times that plaintiffs were employed by

12  the restaurant, what employees were paid in cash?

13  A.  Both of them, the two delivery persons.

14  Q.  Did you compensate your daughter for her services at the

15  restaurant?

16  A.  Well, if you are talking about 2015, my daughter did not

17  work there that year.  So, that year, no, she did not work

18  there.

19  Q.  So during the time of plaintiffs' employment with the

20  restaurant, how many employees were paid in cash at any one

21  given time?

22  A.  The cashier.

23  Q.  OK.  And what was the cashier's salary on a monthly basis

24  during plaintiffs' employment?

25  A.  Two to three thousand.

1    Q.  OK.  What percentage -- strike that.

2            Ma'am, you indicated that the bank statements

3    reflected the credit card receipts generated by the restaurant.

4    What percentage of the restaurant's total sales were paid for

5    by credit card?

6    A.  75 percent, a huge percentage.

7    Q.  Breaking down each specific category of revenue, what

8    percentage of deliveries were typically paid for by credit

9    card?

10   A.  High also.

11   Q.  When you say high, what number are you referring to, as an

12   estimate?

13   A.  Also high, 70 percent, 80 percent on some nights.  When you

14   deduct that, there isn't much left, not much money left.

15   Q.  Ma'am, for pickup orders, what percentage of the patrons

16   paid via credit card?

17   A.  That would be slightly lower.

18   Q.  When you say slightly lower, what percentage lower, as an

19   estimate?

20   A.  About half.

21   Q.  And for the dine-in customers, what percentage of those

22   patrons paid for their meals via credit card?

23   A.  Also on the lower side.  The reason is we have a minimum

24   requirement, minimum charge for credit card.

25   Q.  What is the minimum charge?

I4jnshe2                    Lui - direct

1  A.  (In English) $8.

2  Q.  And the typical cost for the meal of a single dine-in

3  patron?

4  A.  Chicken quesadilla or combo, so on average about $8.

5  Q.  Ma'am, are you aware of what the total square footage of

6  the restaurant is?

7  A.  Not very big, because we are just really a takeout delivery

8  restaurant and fresh food -- and fast food, fast food.

9  Q.  How many seats are available for eat-in patrons?

10  A.  Under ten.

11  Q.  How many tables are available for the eat-in patrons?

12  A.  Two tables that allows eight people, and then two counter

13  space that allow two people to eat standing, or counter.

14  Q.  So each table allows for four people?

15  A.  So, ten in total, two tables that allow eight diners, four

16  each, and two counter spaces.

17  Q.  What is the square footage of the actual kitchen area?

18  A.  I am not exactly sure, but in total maybe the square

19  footage, maybe 900, and the kitchen maybe 50.  Yes, the

20  kitchen.

21  Q.  In square feet?

22  A.  Yes.

23  Q.  So how many people can the kitchen physically hold?

24  A.  Not very big; two, three people.

25  Q.  And what is your monthly rent?

I4jnshe2                          Liu - cross

1   A.  $5,000 plus.

2   Q.  In your experience a $5,000-plus lease, is that on the

3   lower or the higher end for a Manhattan restaurant?

4   A.  I would say that's a very, very good price.  I consider

5   myself very lucky that I got a very good offer from the

6   landlord.

7           THE COURT:  I just have one question on that same

8   line.

9           How many people are cooking in the kitchen at any one

10  time?

11          THE WITNESS:  Maximum three.  That would be my

12  husband, the cashier -- at the highest or the busiest point in

13  the kitchen, maximum three, maybe even packing in there,

14  something like that.

15          THE COURT:  OK.

16          MR. FREDERICKS:  Nothing further, your Honor.

17          THE COURT:  OK.

18          Cross?

19          MR. TROY:  Yes, your Honor.

20  CROSS EXAMINATION

21  BY MR. TROY:

22  Q.  Just now, Miss, you are talking about the cash expenses.

23  We did not quite get it.  I would like to get the details.  OK?

24          Before I ask you, would you like to tell us how much

25  roughly each month you can get in cash in the restaurant?

I4jnshe2                        Liu - cross

1    A.   Several thousand dollars.  It varies, it depends.  I would

2    say four, five, six thousand, depending on business.

3    Q.   OK.  So your cash expenses how much total?

4    A.   Salaries, some restaurant supply by cash, because some

5    restaurant supplies we have to pay in check.

6    Q.   How much is the restaurant supplies you have to pay cash?

7    A.   Not a lot.  Maybe every week two, three hundred, including

8    paying for chips.

9    Q.   What is the total cash you have to pay each month, roughly?

10   A.   Approximately five, six thousand.

11   Q.   How about only just what you are talking about that is more

12   than that.  Let's talk about the cashier, how much you pay.  I

13   believe she was paid, you are talking about two thousand to

14   three thousand how much she got paid?

15   A.   2500, yes.

16   Q.   OK.  That's 2500.

17           How much do you have to pay to the deliverymen?

18   A.   2,000 plus.  2500 together.  2500.

19   Q.   And just now you are talking about you spend $1,000 for the

20   materials.  So how much is that?  $1,000?

21   A.   Yes, approximately.

22   Q.   So how much is that one right now?

23   A.   Sometimes they take checks.  Sometimes they don't.  They

24   take cash only.

25   Q.   OK.  That's $6,000.

I4jnshe2                    Liu - cross

1        Let's talk about -- you are talking about the tips

2   from credit card or online.  How much money do they get in tips

3   each month, one?

4        How much is the tips for each deliveryman per month?

5        THE COURT:  I'm sorry.  I don't know if you were

6   purposely trying to ask a different question or not.  First, I

7   heard a question about tips received on credit card and online,

8   and then I didn't hear an answer, and then now you asked about

9   tips on deliveries.

10        MR. TROY:  No.  Tips from the online and credit cards.

11        THE COURT:  OK.

12        MR. TROY:  Because she's talking about at the end of

13   the day they got to give the cash, they have to count the

14   credit card and online tips and then give them the cash.

15        THE COURT:  I just wanted to understand which tips we

16   are talking about, where they're coming from.  OK.

17   BY MR. TROY:

18   Q.  Is it fair to say every one is more than 1100?  Each

19   deliveryman.

20        THE COURT:  Each deliveryman?

21   BY MR. TROY:

22   Q.  Gets more than $1100 per month for only online or credit

23   card tips.  Yes or no?

24   A.  In terms of the online order and credit card cards who

25   actually pay cash tips, we would not know how much that would

I4jnshe2                        Liu - cross

1    be.  They keep it and don't tell us.

2    Q.  My question would only be directed to tips generated online

3    and the credit card charges.

4    A.  There are a few tens.

5    Q.  Per day?

6    A.  Yeah.

7    Q.  Would you like to tell us how much it is?  What do you mean

8    a few tens?

9    A.  What can be seen is several tens of dollars.

10   Q.  Is that 50?  70?  90?  Which one?

11   A.  About 50, 60.

12   Q.  OK.  Per day?

13   A.  Approximately, yes.

14   Q.  OK.  So how many days the delivery person work per month?

15   Average is 26 days?  I'm right?

16   A.  No.  Not 26 days.  Sometimes.

17   Q.  OK.  How many days do they work a week?  How many days?

18   A.  Six days.  Sometimes they did not work so many hours.

19   Q.  I am talking about how many days.  If they worked 26

20   days -- we won't take 60.  Let's take 50.  That's 1300 for

21   each.  So two are named.  That's 26.  So until now we have cash

22   expenses for 8600.

23            THE COURT:  Can I interrupt you.

24            I want to make sure I heard it correctly.

25            The witness said about 50 to 60 dollars a day in tips

I4jnshe2                        Liu - cross

1    from credit card and online that were paid to the delivery --

2              MR. TROY:  Every day.

3              THE COURT:  -- people, split between two of them?

4              MR. TROY:  No.

5              THE COURT:  OK.

6    A.  Yes.  However, they are not always together in the same

7    weekend.  So they don't overlap on some weeks.

8    Q.  OK.  Let's go back to the basics.

9              THE COURT:  I need to interrupt you, because I have

10   one more question.

11             So those tips would be in addition to tips that they

12   received when they made a delivery?  Is that the idea?

13             MR. TROY:  When they get their cash tips, they just

14   keep it.

15             THE COURT:  Right.

16             MR. TROY:  OK.

17             THE COURT:  So this is on top of that.

18             MR. TROY:  Yes.  This is from the credit card and the

19   one.

20             THE COURT:  Got it.

21   BY MR. TROY:

22   Q.  Miss, let's go back to square one.

23             Did you get any -- the restaurant ever hire Mr. Wang

24   and Mr. Shen?

25   A.  Yes.

I4jnshe2                          Liu - cross

1    Q.  When is the first time you hired Mr. Wang?

2    A.  Initially, he only came to work one day a week.

3    Q.  When?

4    A.  Several years ago, or many years ago.  2012, I believe.

5    That's when he started doing one day a week of work.

6    Q.  When did you hire Mr. Wang full time?

7    A.  I think 2015.

8    Q.  How many days Mr. Wang work for you per week?

9          MR. FREDERICKS:  I will just object to this line of

10   questioning.  It is outside the scope of direct.

11         THE COURT:  I will allow it.

12   A.  Six days a week he works.

13   Q.  OK.  During what period?

14   A.  2015.

15   Q.  He worked six days?

16   A.  The second half of the year.

17   Q.  OK.  And how many hours he worked per day?

18   A.  Eight hours.

19   Q.  And from what time to what time?

20   A.  Sometimes lunch hour, sometimes dinner hours.

21   Q.  But it's the same only five hours?  Is that five hours

22   total?

23         MR. FREDERICKS:  Objection.  That misstates the

24   testimony.

25         THE COURT:  Agreed.

I4jnshe2                    Liu - cross

1  A.  No.  Eight hours.

2  Q.  Eight hours for Mr. Wang, right?

3  A.  Well, eight hours includes lunch hours and/or break time.

4  Q.  What is the time for his break hour?

5  A.  3 o'clock, 4 o'clock.  3 o'clock is lunch time, and 3

6  o'clock, 4 o'clock, that's break time.

7  Q.  What time he start work?

8  A.  Sometimes morning shift, sometimes in the afternoon shift.

9  Q.  So, if he worked for the early shift, did he get a break?

10 If he get a later shift, did he get a break?

11 A.  Well, if the late shift is not busy, then, yes, there are

12 break times.

13 Q.  Do you have fixed time for the break?

14 A.  3 to 4 o'clock together with the meal.  So that's the time

15 period.  That's the time.

16 Q.  Let me show you the Defendants' Exhibit -- you are talking

17 about later in 2015 our client working for eight hours, and

18 then they work for six days.

19        THE COURT:  Your Honor, may I show defendant D000342,

20 348, 357, and then 375.

21        Are these selected pages of Defendants' Exhibit C?

22        MR. TROY:  Your Honor, actually, that's from

23 plaintiffs' exhibit, but defendants' exhibit is a little bit --

24 I believe that's Exhibit 2, and at the end of Exhibit 2 we have

25 four pages.

I4jnshe2                        Liu - cross

1                  MR. FREDERICKS:  What are the Bates numbers again?

2                  MR. TROY:  OK.  Let me give you --

3                  THE COURT:  So this is Plaintiffs' Exhibit 2, pages

4    342, 348, 357 and 375.

5                  MR. TROY:  You have the paper?  Would you like to tell

6    us how many days he worked according to your records?

7                  Can I give you this one instead of mine.

8                  That's the same one.

9    Q.  So how many days he work per week?

10                 THE COURT:  Well, counsel, are you asking for those

11   particular months or every month of the year?

12                 MR. TROY:  Your Honor, we are talking about July and

13   August --

14                 THE COURT:  OK.

15                 MR. TROY:  -- and September, and then I only have

16   December.

17                 THE COURT:  OK.

18   BY MR. TROY:

19   Q.  First, may I ask you the question, who make this record?

20   Did you do it or your husband do it?

21   A.  My husband did.

22   Q.  OK.  Thank you.  Let me have this one.

23                 Let's come back.  You are talking about the cash

24   expenses.  I'm right?

25                 First, let's talk about cash income.  Let's go to the

I4jnshe2                        Liu - cross

1   exhibit just now Mr. Fredericks showed you, I believe that's

2   the 377, D000377.

3          THE COURT:  This is from Defendant's Exhibit 2, the

4   Citibank statement?

5          MR. TROY:  Yeah.  That's 2000 -- OK.

6   Q.  You have this one?

7   A.  I have it.

8   Q.  You have that one.  OK.  Very good.

9          For these months would you like to tell me, where is

10  the deposit you deposited the cash into the bank?

11         Which entry is the cash income you deposit?

12         MR. FREDERICKS:  I just object.  It assumes facts not

13  in evidence.

14         THE COURT:  Overruled.  You can seek further

15  clarification if you need to on redirect.

16  A.  No cash deposit because --

17  Q.  Just --

18  A.  No cash deposit, there's no cash to make the deposit.

19  Sometimes I need to withdraw from the account.

20  Q.  So you are talking about when you get cash from your

21  business you did not deposit it to the bank, or you did not

22  have any official record to reflect that's your income?  I'm

23  right?

24  A.  Well, sometimes.  Sometimes when there is some cash I would

25  make deposits.

I4jnshe2                    Liu - cross

Q.  OK.  Let's make the question clear.  When you get the cash

income, you just try to disburse all the expenses without any

record, but if you don't have enough cash to pay the expenses,

you withdraw from the bank account.  But if you have some

remaining money after you pay all the expenses of the month,

then you deposit into the bank account?  I'm right?

A.  Yes.

Q.  Would you like to point out you able to deposit cash into

your bank account?  I am talking about through all the exhibits

defense counsel present regarding to the bank statements.  Do

you have any entry, cash deposit entry?

A.  Definitely deposit was made.  However, it may not be on

these two because over here you have -- over here, this

statement is very limited because they only show 10 days, 13

days.  That's not enough.  That's limited.

Q.  Let me give you --

        THE COURT:  I'm sorry.  Let's just clarify.

        Page 377 is the first page of a multipage statement.

The second page has the rest of the month.  I don't know if the

witness has both or not.

        MR. TROY:  OK.

BY MR. TROY:

Q.  May I present you all the bank statements from 000377 to

000459.  I believe that's from 2015, July 7, to the month of --

let me give you that one and then let's see whether it's the

I4jnshe2                    Liu - cross

1    last one.  That's 2016, October 6.

2              May I present you this one.  I am talking about from

3    here to here.

4              Would you like to tell me which entry is the cash

5    deposits.

6              THE COURT:  Counsel, you are just asking from the

7    first entry or from every one?

8              MR. TROY:  Every one.  Because I don't think we have

9    because --

10   Q.  OK.  Forget every page.  How about those two where your

11   attorney was talking.  Come to the exhibit.

12   A.  Well, I know -- well, if you are talking about these two,

13   well, yes, yes, yes.  Whenever I have cash, I make deposits.  I

14   make deposits.

15   Q.  But you cannot point out for those two months even your

16   attorney used as exhibits?  I'm right, some of those exhibits?

17             So is it fair to say you run another bookkeeping for

18   cash somewhere without reflect to your official corporation

19   account?

20             MR. FREDERICKS:  Objection.

21             THE COURT:  I will allow it.

22             But you have asked if there is actually another

23   bookkeeping, as if there was another set of records.  I don't

24   know if you're asking that or something else.  You may want to

25   clarify your question.

1          MR. TROY:  OK.  Thank you.

2     A.  No, I don't keep another book.  There isn't that much money

3     to do that.  Each day maybe I get a hundred or so dollars left

4     that I keep.

5     Q.  After expenses, cash expenses?

6     A.  It is not like this every day.  I don't take every day in

7     cash.  And online orders payment by check happen only once a

8     month.  And a lot of times we were waiting for that to pay

9     expenses.

10    Q.  OK.  It's fair to say you admit maybe the bank statement

11    did not reflect the difference of the cash the restaurant

12    generate in the amount of at least the expenses in the amount

13    of $8600 of the cash expenses?  I'm right?

14         THE INTERPRETER:  I'm sorry.  Can I have the question

15    back one more time.  I didn't catch the question.

16         THE COURT:  The interpreter didn't get the question.

17         MR. TROY:  Would you like to read it please.

18         THE COURT:  Yes.

19         (Record read)

20    A.  What was the cash expense again?  Amount?

21    Q.  At least $8600.  We counted, right?  Yes or no?

22    A.  As a matter of fact, as I mentioned before, I sometimes

23    have to wait for payment to come in to pay my expenses.

24         THE COURT:  Counsel, I understand this point.

25         MR. TROY:  OK.

I4jnshe2                        Liu - cross

1            THE COURT:  But I do have a question about the bank

2    statement, if I may?

3            MR. TROY:  Sure.

4            THE COURT:  On page 377, do you have that?

5            THE WITNESS:  Yes.

6            THE COURT:  OK.  There is an entry, the third line,

7    the third date down, that says 07/08.

8            Then it says deposit.  Do you know what that deposit

9    represents, what that means?

10           MR. TROY:  That is a credit card or that's the online?

11   A.  This is a check amount.  This is the check payment from

12   online.

13           THE COURT:  Thank you.

14           MR. TROY:  OK.

15   Q.  Let's come back to the tax return, before we go for tax

16   return.  In 2013, how many employees you have?  Forget that.

17   How about 2015?

18   A.  About four or five sometimes.  You can see in the records.

19   Q.  OK.  I believe you testified, a lot of people testified in

20   2015 you hired our client Wang, you hired our client Shen, and

21   then you have cashier named Jessica, and you are paying her

22   $2500 per month.  I'm right?

23           And you talk about, you pay to our clients it's around

24   $2500 per month at the same time.  I'm right?

25   A.  Yes.

I4jnshe2                          Liu - cross

1    Q.  So how much did that total?

2    A.  $5,000.

3    Q.  OK.  $5,000 per month.  What is the yearly?  How much do

4    you pay over the year?  Is that $60,000?  I'm right?

5    A.  Approximately, yes.

6    Q.  OK.  Let's go back to the tax return, 1120, that's

7    D000460.  That's return of 2015.

8          OK.  Would you like to tell us the line 13, name,

9    salary, and wage -- how much does your tax reflect the wage or

10   salary for the whole year?

11   A.  Well, they did not work there for the full year, for that

12   year.  And everybody -- and sometimes they don't even work

13   there for one day, and they move around very often, work here

14   today, work there tomorrow, vice versa.  (In English) And maybe

15   they take some time, they want to go and take a break for the

16   vacation time, you know.

17         THE COURT:  Counsel, about how much longer do you

18   have.  We have ten minutes until I need to break for the day?

19         MR. TROY:  Your Honor, I'll try to finish in ten

20   minutes.

21         THE COURT:  OK.

22         MR. TROY:  I'm trying to temporarily finish for the

23   day to go.

24   BY MR. TROY:

25   Q.  Let me give you the exhibit.  Maybe you don't need me to

1    give it to you, that's D000124 and D000375.  I believe that's a

2    the whole year's of 2015 by you to Wang, Mr. Wang.

3            Did he work for you every month of the 2015?  Yes or

4    no?

5    A.  For 2015.  I asked him to report tax.  He refused.

6    Q.  My question is, did he work for you the whole year?

7    A.  No.

8    Q.  No?

9    A.  No.

10   Q.  Which months he did not work for you?

11   A.  Part-time.

12   Q.  No.  How much did he get paid?  He get paid $1300 basically

13   per month?  I'm right?  And, your record, it doesn't show that

14   way?  I am talking about D000124.  That's 2015, the whole year.

15   Right?

16   A.  Well, 1300 per month is correct.  It's not inaccurate.  It

17   was agreed full time, $1300 base salary.

18   Q.  OK.

19   A.  But that doesn't mean he did in fact work full time all the

20   time.

21   Q.  OK.  How much you pay him the whole year for the part-time?

22   A.  (In English) Per day, per hour, maybe per week.  It

23   depends.  It's different you know.

24   Q.  Totally per year.  So, I'm talking about total year 2015.

25   How much did he get in money from the total year?

I4jnshe2                     Liu - cross

1   A.  I only pay him salary and some of the tips, so I have no

2   idea.  I really don't know exactly how much he's making.

3   Q.  I'm asking the base pay, how much you pay yearly in 2015.

4   A.  Base salary is 1200, 1300, as agreed.  However, there are

5   day rates, day pay.

6   Q.  OK.

7   A.  That depends -- or weekly pay.  So that depends on that

8   time period.  He would be paid by the day, by the hour, or

9   perhaps by the week.

10  Q.  OK.  You want to go, let's go.  That's D000124, in 2015,

11  March.

12  A.  Say again?  Where is that page?

13  Q.  Let me give you this one.  Oh, I can give you here.  OK.  I

14  will help you to this one.  OK.

15          THE COURT:  Which month are we looking at?

16          MR. TROY:  March.

17          THE COURT:  March 2015, right?

18          MR. TROY:  Yes.

19  BY MR. TROY:

20  Q.  How much did he get paid?

21  A.  (In English) Like a short time, you know, not like -- you

22  know, part-time, not like full time.

23          (Through interpreter) Not like full-time only

24  part-time, didn't do the full-time.

25          (In English) How much money we pay, we do that very

1   fair.  If they don't like it, maybe one day they want to fight

2   it for me, they come, you know.

3   Q.  Miss, this is the document that your attorney presented to

4   us.  That's monthly employees time sheet.

5   A.  Uh-huh.

6   Q.  You claim he worked from 6 to 10:30.  So how many hours did

7   he work?  Even we challenge this authenticity.  You know we

8   don't think this is truth, but for argument purposes, how much

9   money you pay for him according to this record?

10  A.  (In English) It's true.  This is like a per month, per

11  week, per hour, per month.  Averaging $13,000 -- 36, let me

12  pull up how many hours, one hour, how much the money.  They

13  know.  They knew how much an hour.

14  Q.  How much you pay him in March 2015?

15  A.  (In English) March 15 he only working a couple of days.

16  They gone, you know.

17  Q.  Are you telling me --

18          THE COURT:  Wait.  What did she say.

19  A.  (In English) 2015, they gone.  In --

20          MR. TROY:  Your Honor, we request to read the back.

21          Maybe that's easier.

22          THE COURT:  Well, I want to ask the witness.

23          Do you see at the bottom where there is a line that

24  says "Total Pay"?

25          THE WITNESS:  Yes.

I4jnshe2                         Liu - cross

1              THE COURT:  And there's an entry that indicates 891.

2              Is that what he was paid for the hours he worked that

3     month according to this sheet?

4              THE WITNESS:  Yes.

5              MR. TROY:  OK.

6              THE COURT:  And does the total under the column that

7     says tips, according to this sheet, represent the amount of

8     tips that he received for that month?

9              THE WITNESS:  Yes.

10             THE COURT:  And who prepares these time sheets?

11             THE WITNESS:  My husband did.

12    BY MR. TROY:

13    Q.  On behalf of the corporation, your husband do this monthly

14    employees time sheet?  I'm right?

15    A.  Yes.

16    Q.  OK.  So, according to this one, Mr. Wang get about 17,

17    maybe around 18 hundred on the month?  I'm right?

18    A.  Yes.  Yes.

19    Q.  How about April?  Is this the one?

20    A.  Approximately that's the number.  However --

21             THE WITNESS:  (In English) OK.  By the way, I need to

22    say something, OK.

23             THE COURT:  There's not a question pending.

24    BY MR. TROY:

25    Q.  So in March how much is it?

1    A.  Is that March or May?

2    Q.  May.

3    A.  Uh-huh, approximately that amount.

4    Q.  Thank you.

5           So it's fair to say Mr. Wang gets more than 1700 per

6    month?

7    A.  Not including the cash tips.  More than 1700, not including

8    cash tips.

9    Q.  So how about the base pay?

10   A.  Well, wasn't base pay already paid for.  How many hours

11   like -- that's his base salary, how many hours.  How much was

12   paid that's base pay, no.

13   Q.  OK.  Let's come back.

14          Just now you testified Mr. Wang and Mr. Shen both are

15   making a base pay about 1300.  Two of them, that's 2600.

16          The cashier, Jessica, got 2500.

17          So, add them all up, it's about 5,000 a month.

18          If they work full time for a whole year, it's going to

19   be 60,000 per year.

20          Let's talk about the tax return of 2015.  OK?

21   A.  Hold on.

22   Q.  The tax return --

23   A.  Hold on, hold on.  In New York everybody agrees the salary

24   amount in the restaurants.

25   Q.  So you are talking about the page of the employees time

I4jnshe2                    Liu - cross

1   sheet doesn't reflect the hours both plaintiffs really worked

2   in hours?  I'm right?

3   A.  They do.

4           THE COURT:  Mr. Troy, you have one minute.

5           MR. TROY:  Your Honor, I will just try to finish in

6   one minute.

7           THE COURT:  Please.

8   Q.  OK.  Let's go to Exhibit D000460, line 13.

9           What is the number?   Line 13.

10  A.  I know.

11  Q.  What is the number?

12  A.  Well, over here, right?  21,151.

13  Q.  OK.  So it's fair to say you downsized the salary and the

14  wages of the employees from at least 60,000 to 21,000.  I'm

15  right?

16  A.  No.

17  Q.  OK.  And why Jessica was paid 2500 and both of our clients

18  they are paid 12 or 13 hundred each per month, and then it's

19  going to generate becoming 21,000?

20  A.  Well, I already mentioned this before, that the two of

21  them, on the surface it's not that amount because they

22  didn't -- they were paid on a day or a week sometimes basis.

23  Q.  It's fair to say the salary and wage 21,000 doesn't reflect

24  the true number of wages and salary you paid to all the

25  employees in 2015?

I4jnshe2                        Liu - cross

A.  Yes.  Jessica sometimes take off.

            MR. TROY:  Your Honor, we'll continue tomorrow?

            THE COURT:  Yes.

            MR. TROY:  Thank you.

            THE COURT:  Are you not done with your cross?

            MR. TROY:  Not yet, your Honor.

            THE COURT:  OK.

            All right.  We will continue tomorrow morning at 9:30.

            This witness is on cross-examination, so defense

counsel is directed not to discuss her testimony either as it

has come forth or as it is expected to come forth.

            Any questions or any applications?

            The witness may step down.

            THE WITNESS:  OK.  Thank you.

            THE COURT:  Mr. Troy, anything to discuss?

            MR. TROY:  Your Honor, regarding to the amended

caption, I believe defense counsel already consents, so we will

file, if the Court approves, for the change of the caption.

            THE COURT:  OK.

            MR. TROY:  That is all we have.

            THE COURT:  I appreciate the consent.

            Anything from the defendants?

            MR. FREDERICKS:  No, your Honor.

            THE COURT:  Thank you.  I will see you all at 9:30.

            (Adjourned to April 20, 2018 at 9:30 a.m.)

I4jnshe2                        Liu - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3      YUZHU WANG

4      Direct By Mr. Troy . . . . . . . . . . . . . . 7

5      Cross By Mr. Fredericks  . . . . . . . . . . .21

6      Redirect By Mr. Troy . . . . . . . . . . . . .31

7      JUNMIN SHEN

8      Direct By Mr. Troy . . . . . . . . . . . . . .34

9      Cross By Mr. Fredericks  . . . . . . . . . . .43

10     DAN QING LIU

11     Direct By Mr. Fredericks . . . . . . . . . . .57

12     BY MR. FREDERICKS

13     Cross By Mr. Troy  . . . . . . . . . . . . . .75

14

15

16

17

18

19

20

21

22

23

24

25