I4knshe1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JUNMIN SHEN, YUZHU WANG, ,

                    Plaintiffs,          New York, N.Y.

          v.                             16 Civ. 2015 (RWL)

DAN QING LIU, *et al.*,

                    Defendants.

------------------------------x

                                         April 20, 2018
                                         9:30 a.m.

Before:

                    HON. ROBERT W. LEHRBURGER,

                                         U.S. Magistrate Judge

                         APPEARANCES

TROY LAW PLLC
     Attorneys for Plaintiffs
BY:  JOHN TROY

LAW OFFICE OF BRIAN FREDERICKS P.C.
     Attorneys  for Defendants
BY:  BRIAN P. FREDERICKS

ALSO PRESENT:
Arthur Kwok, Interpreter (Mandarin)

1            (Trial resumed)

2            THE COURT:  I understand that the witness who was

3    testifying yesterday had an issue for which she went into a

4    hospital last night, was released at about 4 this morning and

5    currently is not here.

6            So, at this time, we are going to proceed with the

7    defense's second witness.

8            Do I have that right counsel?

9            MR. FREDERICKS:  That's correct, your Honor.

10           MR. TROY:  Yes, your Honor.

11           THE COURT:  Please call your witness.

12           MR. FREDERICKS:  The defense would like to call Jian

13   Hui Chen.

14    JIAN HUI CHEN,

15        called as a witness by the Defendants,

16        having been duly sworn, testified as follows:

17           (Through interpreter)

18   DIRECT EXAMINATION

19   BY MR. FREDERICKS:

20           THE COURT:  Before your attorney starts examining you,

21   I have a few questions for you myself.

22           THE WITNESS:  Yes.

23           THE COURT:  Can you look towards me?

24           THE WITNESS:  Yes.

25           THE COURT:  OK.  So tell me what happened last night,

I4knshe1                        Chen - Direct

1   very briefly, with respect to your wife.

2              THE WITNESS:  Yesterday, halfway through the day, she

3   had some dizziness.  That's why she came back after lunch kind

4   of late.

5              THE COURT:  OK.

6              THE WITNESS:  And her dizziness continued after she

7   got home, lack of strength in her limbs.  And around 7 or 8

8   o'clock when she went to the bathroom she passed out, and she

9   had similar experience four times in the past where it was an

10  emergency and she had to be taken to the hospital.  She has

11  diabetic condition and her uterus removed.

12             THE COURT:  You said she's had to go for emergency

13  previously.  Was that because of similar symptoms, where she

14  passed out or almost passed out?

15             THE WITNESS:  Yes.  Similar and sometimes bleeding.

16             THE COURT:  OK.  Was there any bleeding associated

17  with this episode?

18             THE WITNESS:  Not this time.

19             THE COURT:  And when she was released from the

20  hospital, did the doctors give her any instructions?

21             THE WITNESS:  Yes.  She was instructed to go to a

22  specialist and to her family doctor.

23             THE COURT:  OK.  Was she instructed to do anything

24  with respect to what she should be doing today?

25             THE WITNESS:  Yes.  To go for the doctors that I

I4knshe1                        Chen - Direct

1   mentioned.

2              THE COURT:  Is she going to a doctor today?

3              THE WITNESS:  Yes.

4              THE COURT:  What time?

5              THE WITNESS:  I am not sure.  I'm not certain when,

6   because she's still in bed, laying in bed.

7              THE COURT:  She was still in bed when you left this

8   morning?

9              THE WITNESS:  Yes.

10             THE COURT:  Do you think she would be up by now?

11             THE WITNESS:  Maybe no, probably no.

12             THE COURT:  OK.  Do you have a way to reach her by

13   phone?

14             THE WITNESS:  Yes.

15             THE COURT:  OK.  What I would like you to do is call

16   her, not in public, but in private, and find out if she has

17   made an appointment yet and if she can still come to court

18   either before or after that appointment, and, if so, what time

19   would that be.

20             THE WITNESS:  Yes.

21             THE COURT:  So what I am going to do I am going to ask

22   the translator to go with the witness and with defense counsel

23   back in my robing room to make the call, OK?

24             THE WITNESS:  OK.

25             THE COURT:  I don't think we need to put it on the

I4knshe1                        Chen - Direct

1    record.   So go ahead.

2              (Recess)

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         THE COURT:  All right.  We're back on the record.  I

2    understand you were not able to reach your wife but you left a

3    message and a text message.  Thank you for doing that.  So we

4    will proceed with you as a witness and the examination.

5         THE WITNESS:  OK.

6         THE COURT:  Please proceed.

7    DIRECT EXAMINATION

8    BY MR. FREDERICKS:

9    Q.  Sir, please state your name for the record.

10   A.  Jian Hui Chen.

11   Q.  And what is your position at the restaurant Number One

12   Fresco Tortilla, Inc.?

13   A.  I suppose I'm the manager.

14   Q.  OK.  What are your duties in your position as manager?

15   A.  Well, I do everything for the little restaurant, for the

16   little shop.

17   Q.  Can you please describe everything.

18   A.  Well, I take orders, I cook, I wash things, I chop and cut

19   stuff.

20   Q.  Are you involved in the management of the employees?

21   A.  Generally, basically, yes, I manage it.

22   Q.  OK.  Does that include maintaining records related to their

23   employment?

24   A.  Yes.

25   Q.  Do you make deliveries as well?

I4K7SHE2                         Chen - Direct

1   A.  Well, how shall I put it?  Take-out delivery, no.

2   Q.  Are you involved in any of the financial aspects of the

3   company?

4   A.  Yes.

5   Q.  In what manner are you involved?

6   A.  Well, how should I put it, I guide or instruct my wife.

7   I'm the one who comes up with the idea what to do; I'm the

8   person.

9   Q.  OK.  Are you involved in the preparation or submission of

10  the tax returns?

11  A.  Yes.

12  Q.  OK.  And are you involved in the administration of the

13  corporate bank account?

14  A.  It is my wife who exclusively takes care of the corporate

15  account.

16  Q.  Are you aware of the types of costs and expenses that are

17  reflected in the bank account?

18  A.  Not really, not terribly familiar.

19  Q.  Are you aware of the revenues that are reflected in the

20  bank account?

21        MR. TROY:  Objection, your Honor.  It's leading.  He

22  already asked a lot of leading questions.

23        THE COURT:  Well, hold on.  I think a lot of these

24  have been foundational to find out what the witness can testify

25  to or not, and I don't find anything problematic about that

I4K7SHE2                        Chen - Direct

1    particular question, which is whether he is aware of the

2    revenues that are reflected in the bank accounts.  I will

3    overrule that objection.

4            THE WITNESS:  What was the question again?

5    Q.  Are you aware of the revenue streams that are reflected in

6    the corporate bank account?

7    A.  I do know or I am -- is aware of the main revenue streams

8    but maybe not in detail.

9    Q.  OK.  Well, let's step back for a moment.  How many

10   employees are employed by the company?

11   A.  There is no fixed number in terms of the company employees

12   that are employed at any one time.

13   Q.  Can you provide a minimum and a maximum?

14   A.  Not including myself and my wife, three maximum and two

15   minimum; however, sometimes there would only be just one.

16   Q.  How would you characterize the size of the restaurant's

17   operations in comparison to a typical Manhattan restaurant?

18   A.  Well, ten for Manhattan restaurants, mine would be two.

19   Q.  What makes you -- what makes you think that?

20   A.  Because I suppose that would express it better, make it

21   clearer.

22   Q.  Yes, please.

23   A.  What should I say?

24           THE COURT:  What is your basis for saying that your

25   restaurant is a two compared to a ten?

I4K7SHE2                        Chen - Direct

1              THE WITNESS:  Well, first of all, it's a very small

2      restaurant, total area maybe just about 400, 500 square feet,

3      and it's only got two tables.

4      Q.  Anything else?

5      A.  In what area are you talking about?

6      Q.  Sir, well, I'm just asking overall regarding the layout of

7      the restaurant, anything that's useful in determining -- in

8      helping us learn the size of the restaurant, the size of the

9      restaurant's operations.

10     A.  Well, mine is a fast food restaurant.  Other people are

11     gourmet, high end, or other restaurants are medium.  Mostly my

12     restaurant is in a neighborhood that tries to provide for a

13     cheap lunch for companies nearby and for school nearby; I would

14     say similar to a pizza type of outfit.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I4knshe3                           Chen - direct

1   Q.  Let's talk briefly about your menu.

2           Give us a sampling of the items, a brief sampling of

3   the items on the menu and the cost of the items on the menu.

4   A.  Fajitas, for example, is 3, 3.09.  And the most popular

5   item is the special combo ordered by the majority or most of

6   the people.

7   Q.  What is the price of the special combo?

8   A.  8.50 plus tax, comes with a soda and two bread.  Enough for

9   one person.

10  Q.  OK.  So we're here today for two deliverymen who used to

11  work at your restaurant.  Besides delivery orders, what are the

12  manners in which orders at the restaurant are placed?

13          Besides delivery orders, how else are orders placed at

14  the restaurant?

15          THE COURT:  Counsel, some of this is I think

16  undisputed and sort of established, so I would encourage you

17  for things like that to sort of go --

18          MR. FREDERICKS:  Right, your Honor.  Yes, I don't want

19  to deal with any objections, but I can easily just dive right

20  into it.

21          Thank you, your Honor.

22  BY MR. FREDERICKS:

23  Q.  OK.  So let's first talk about delivery orders, what is the

24  average amount of a delivery order?

25  A.  Average order I would say about $13, $14.

I4knshe3                          Chen - direct

```
 1    Q.  For those orders, what percentage are placed by credit card
 2    and what percentages are paid for by cash?
 3    A.  Credit card would take up about 60 percent, more or less.
 4    Q.  And for takeout orders, what percentage -- strike that.
 5              How many takeout orders does the restaurant typically
 6    receive per day?
 7    A.  Between 50 and 70, approximately.
 8    Q.  Out of those takeout orders, what percentage are paid for
 9    by credit card typically?
10    A.  Pickup or delivery?
11    Q.  We're talking pickup right now.
12    A.  Pickup, about 40 percent, but I want to clarify something.
13    Q.  Please.
14    A.  I just want to say there is a big difference at the
15    beginning of the month compared, for example, to the end of the
16    month.  So that's what I remember.  So there is a phenomenon
17    that at the beginning of the month there usually is more cash,
18    and towards the end of the month, more credit card.
19    Q.  Right.  Well, we are looking just for an average on a
20    monthly basis.
21    A.  So, on average, about 40 percent.
22              THE COURT:  Can you just clarify for me, 40 percent
23    which?
24    Q.  40 percent of the takeout deliveries are you referring to
25    that are paid for by credit card?
```

1  A.   No.   So pickup is about 40 percent.   Takeout, delivery is

2  60 percent.

3          MR. TROY:   Your Honor, if I may, I believe the

4  translation now we have a little bit of problem.   The reason

5  why is when we are talking about pickup or takeout, I believe

6  that's the same stuff, but the translation in Chinese is always

7  talking about delivery, delivery.   So we have a little bit of

8  confusion.

9          MR. FREDERICKS:   Should I just start again?

10          THE COURT:   Unfortunately, given my directive, I think

11  you do need to establish what the different means of orders

12  are.

13          MR. FREDERICKS:   OK.

14          THE COURT:   So that we have clarity for the record.

15          MR. FREDERICKS:   Let's start from the beginning.

16  BY MR. FREDERICKS:

17  Q.   Sir, let's discuss orders that are delivered by the

18  delivery people.

19          How many deliveries are placed per day typically?

20  A.   Approximately 50, 60.

21  Q.   What is the typical amount of delivery order?

22  A.   Some are 8.50, some are twenty something, $11, $12, as well

23  as $30.

24  Q.   Out of those delivery orders, what percentage are paid for

25  by credit card?

I4knshe3                          Chen - direct

1    A.   60 percent, as I mentioned before.

2    Q.   Now let's discuss pickup orders, where a customer will come

3    into the restaurant or call in beforehand and pick up their

4    food but not eat, physically eat at the restaurant.  OK?

5    A.   Yes.

6    Q.   How many of those orders are typically placed at the

7    restaurant per day?

8    A.   40, 50, 60 pickup.

9    Q.   What is the typical amount of those orders?

10   A.   Pickups are usually about 8.50, 5, somewhere around there.

11   Q.   And what percentage of those pickup orders are paid for by

12   credit card?

13   A.   40 percent.

14   Q.   Now let's discuss dine-in customers, where a customer will

15   order at the counter and physically eat at the restaurant, OK?

16   A.   Yes.

17   Q.   How many dine-in receipts are there typically on an average

18   day?

19   A.   I have two tables for dine-in.  Sometimes two people

20   sometimes four people sit at a table.

21   Q.   Total receipts on a typical day, sir, for dine-in patrons

22   only?

23   A.   Ten plus.

24   Q.   What is the typical amount of each dine-in receipt?

25   A.   Usually 8.50.

I4knshe3                         Chen - direct

1   Q.   And what percentage of the dine-in receipts are paid for by

2   credit card?

3   A.   About 40 percent.

4   Q.   So the restaurant typically generates a certain amount of

5   cash on a daily or monthly basis, correct?

6   A.   Yes.

7   Q.   Are you aware of how that cash is distributed?

8   A.   Yes.

9   Q.   Please explain.

10   A.   Well, I'm the one that usually closes the books at night,

11   each day.

12   Q.   OK.

13   A.   And the cash would be used to pay out the tips for credit

14   card orders, the tips for the web, Internet orders.

15   Q.   Anything else?

16   A.   And whatever amount, little amount that was left I leave

17   them in the drawer.  And maybe just several tens of dollars and

18   $100 or so, sometimes no money at all in the cashier's, in the

19   cashier machine, register machine.

20   Q.   Any other uses for the cash?

21   A.   Sometimes vendors demand cash payment.

22   Q.   Anything else?

23   A.   We want to write checks to them actually, but people in the

24   restaurant industry, restaurant business, the way I write the

25   checks are not perfect, not ideal.  So that's the reason I am

1    reluctant to write checks.

2    Q.  What are the typical vendor expenses on a monthly basis

3    that are paid for by cash?

4    A.  Tacos or taco flour, ingredients related to Mexican food.

5    Q.  Right.  So then what is the typical amount of the total

6    vendor expenses that are paid for in cash on a monthly basis?

7    A.  Well, I don't get involved in the money.  I don't get

8    involved in the money.  I only get involved in receiving the

9    supplies when they arrive.  So that's why I am not terribly

10   familiar.  However, these two workers, since they worked at my

11   place, they understand.  They know how I operate.

12   Q.  Did the restaurant also employ a full-time cashier?

13   A.  In reality, there's no full-time employees.  It's just a

14   matter of some people work longer hours, some people shorter

15   hours.

16   Q.  OK.  Did the restaurant employ a cashier?

17   A.  Well, I do cashier work.  Jessica also do cashier work.

18   Jessica also helped me out with cooking, too.

19   Q.  What percentage of your time did you spend performing

20   cashier work?

21   A.  Hard to say, too complicated to say.  Maybe let me explain

22   the way I work over there.  Is that OK?

23   Q.  Well, we already understand that, sir.

24          To the extent you can provide an estimate of the

25   percentage of time that you are actually working the cash

I4knshe3                          Chen - direct

1    register or familiar with the financial transactions.

2    A.  Well, most of my time I will spend on cooking.  I would say

3    70 percent.

4              MR. FREDERICKS:  Your Honor, may I approach.

5              THE COURT:  Sure.

6              MR. FREDERICKS:  You have that.

7              MR. TROY:  Which one?

8              MR. FREDERICKS:  405 through I believe 410.

9    Q.  Sir, I'm going to show you what's been marked as D000405

10   through D000410.  Let's take a look at the first page of 405.

11   There is an entry for it looks like --

12             MR. FREDERICKS:  Your Honor, may I approach just one

13   more time.

14             THE COURT:  Sure.

15             MR. FREDERICKS:  I apologize.

16   Q.  It appears to be an entry on 12/14, depositing an amount of

17   $452.06.  Do you know what that deposit is for?

18             MR. TROY:  Which one?

19             MR. FREDERICKS:  12 -- down at the bottom.

20             MR. TROY:  OK.  That one.  OK.

21   A.  452.06, right?

22   Q.  That's correct.

23   A.  Yes.  Deposit from the business.

24   Q.  Describe specifically where is that money coming from.

25   A.  Revenue.  Business income from customers.

1   Q.  Right.  Is that generated through credit card orders or is

2   that generated through, if you're aware, cash orders?

3   A.  I don't remember exactly.

4   Q.  You have testified that the cash generated by the

5   restaurant is distributed in a number of manners.  To the

6   extent there is excess cash, where does that excess cash go?

7             MR. TROY:  Objection, your Honor.  I believe the

8   witness already is talking about he did not deal with the

9   money.  He only received the money and put it on the drawer and

10  then the wife know everything.

11            THE COURT:  Well, to the extent he knows, he can

12  answer the question.

13            MR. TROY:  Your Honor, if that's the case, I believe

14  defense counsel hasn't established he knows, you know, who

15  deposited and everything.  He has to establish the foundation.

16            THE COURT:  That's fair.

17            Counsel, please lay a little more foundation.

18            MR. FREDERICKS:  Right.  OK.

19  BY MR. FREDERICKS:

20  Q.  You've testified that the cash generated by the restaurant

21  is distributed in a variety of manners.

22  A.  Yes.

23  Q.  So, to the extent there's excess cash after paying the

24  expenses that you have previously testified to, how is that

25  cash handled?  Where does it go?

1    A.  Well, cash would be left at the restaurant because all the

2    cumulative cash was not even enough to pay for vendor supplies.

3    Q.  Who is responsible at the restaurant for making the

4    deposits?

5    A.  My wife.  She does the deposits.  Of course, sometimes some

6    extra amount will be brought home.

7    Q.  OK.  Are you aware whether your wife makes any cash

8    deposits to the corporate bank account?

9    A.  Yes.  Every time she goes to the bank, she will tell me,

10   I'm going to the bank now; or sometimes in the morning, when

11   she goes to the bank and make change for quarters.

12   Q.  OK.  Are you aware of the amounts that your wife deposits

13   in cash into the bank account?

14   A.  Cash, right?

15   Q.  Correct.

16   A.  She informed me, but I didn't really pay great attention to

17   it because, you know, a deposit is just a deposit.

18   Q.  Are you aware of what those amounts are?

19   A.  She mentioned them to me, but I just didn't pay attention

20   to her.  That's all.

21   Q.  Now, help us understand, for the orders that are paid for

22   by credit card, where does that money go?

23   A.  Directly to the bank.

24   Q.  OK.  So those orders that are placed for by credit card are

25   reflected in the bank statements, correct?

1   A.  Yes.

2   Q.  I want you to turn to the second page, D000406.  I want you

3   to look all the way down at the bottom.  There's two entries,

4   one indicate debits in the amount of 30,068.82.  All the way

5   down at the bottom of the second page, 406.

6         Do you see that all the way down at the bottom?

7         OK.  And you also see a number for credits in the

8   amount of $18,558.80.

9         Do you know what that means?

10  A.  Is that equivalent to deposit over here?

11  Q.  To the extent you know, please describe for us what these

12  numbers mean.

13  A.  That looked like a total, sum total.

14        MR. FREDERICKS:  Your Honor, may I approach again.

15        THE COURT:  Yes, you may.

16        MR. FREDERICKS:  I'm going to show the witness what's

17  been marked as D000460 through D000467.

18        MR. TROY:  460?

19        MR. FREDERICKS:  Yes, through 467.

20  BY MR. FREDERICKS:

21  Q.  Sir, do you recognize that document?

22  A.  Yes.

23  Q.  What document is that?

24  A.  A tax return.

25  Q.  Who prepared this document?

I4knshe3                           Chen - direct

1    A.  I did it.  I did it, and then I gave it to my wife.  A lot

2    of times I was the one who was asked to work on it.

3    Q.  OK.  Did you hire an accountant to prepare the tax return?

4    A.  Yes, yes.

5    Q.  What information did you provide the accountant to prepare

6    the tax return?

7    A.  Bank statements, rent, gas, water, maintenance, repair

8    costs sometimes.

9    Q.  Anything else?

10   A.  Yes, revenues.  In terms of revenue or income, the

11   accountant should have that already, so that's not provided,

12   because they already have everything about the credit card.

13   They also have all the web or Internet orders.

14   Q.  The revenues of the restaurant that are paid for in cash,

15   are they reflected in these tax returns?

16   A.  Yes, yes.  Every day when I report the sales tax every day,

17   they have that information.

18   Q.  And, sir, are you aware whether that particular document

19   was submitted to the IRS?

20           MR. TROY:  Which document are you talking about?

21           MR. FREDERICKS:  The document that he's --

22           MR. TROY:  The tax return?

23           MR. FREDERICKS:  Yes.

24           MR. TROY:  OK.

25   A.  Yes, yes, yes.

1              MR. FREDERICKS:  May I go off the record for a second.

2       Your Honor, to the extent you think it's necessary for me to

3       establish a foundation for the other returns or the tax years,

4       I believe that's been established by the prior witness.

5              THE COURT:  I would just ask a global question, if for

6       all the returns the dates submitted, do the revenues reflect or

7       do the revenues include the cash.

8              MR. FREDERICKS:  And do I need to give them these

9       documents?

10             THE COURT:  Yes.

11             MR. FREDERICKS:  OK.

12      BY MR. FREDERICKS:

13      Q.   Sir, for the tax returns that were previously submitted in

14      connection with this litigation, do these tax returns reflect

15      the total revenue generated by the restaurant, including cash?

16      A.   Correct.

17      Q.   OK.  Sir, I want you to return to the first page of that

18      document, of the 2015 tax return, and I want you to go down to

19      line 13, salaries and wages.

20             Do you see that?

21      A.   Yes.

22      Q.   What is that number?

23      A.   $21,151.

24      Q.   Are you aware of whether that number reflects the

25      compensation that was paid to plaintiffs during that particular

I4knshe3                    Chen - direct

1   tax period?

2   A.  This money is not with them, is not theirs.

3   Q.  Why not?

4   A.  Because they asked for cash.

5   Q.  Who is "they"?

6   A.  The two that is present who make deliveries.

7   Q.  Are you referring to the two plaintiffs in this room?

8   A.  Yes.

9   Q.  When did they ask to be paid in cash?

10  A.  Before he came, he asked for cash payment.

11  Q.  When you say "he," who specifically are you referring to?

12  A.  Plaintiff.

13  Q.  Which plaintiff, sir?

14  A.  Both make the same noise, same voice.

15  Q.  Did they express why they wish to be paid in cash?

16  A.  Well, at the time they said they want cash.  Without cash,

17  they are not going to come.  But I happened to be short handed,

18  so I asked them to come.  After a certain period of time I

19  asked him, I requested that he file tax.

20  Q.  When was this?

21  A.  No more than two months later I told him you need to report

22  tax.

23  Q.  And who are you referring to specifically?

24  A.  That would be Mr. Wang.

25  Q.  What was the response?

1   A.  He said he doesn't want to report, he said reporting too

2   much.  He needed to apply for Medicaid.  I don't know at what

3   place or what time he claimed he filed tax, and he used that to

4   apply for Medicaid.  At the time he asked me to write him a

5   certificate of work and I refused.  I didn't do it.

6   Q.  During the course of the restaurant's operations, has the

7   corporation ever been audited by the IRS or the New York State

8   Department of Taxation and Finance?

9   A.  Yes, yes.  They audited.

10  Q.  When?

11  A.  I don't remember exactly when, but approximately ten years

12  ago.

13  Q.  What happened during that audit?

14  A.  Well, at that time it was a surprise.  They sat in my

15  restaurant all day long and watched customers, watched the

16  number of customers.

17  Q.  Then what happened?

18  A.  So they sat there the whole day, from when I opened until I

19  closed shop.  Then they left.

20  Q.  OK.  And did they indicate anything to you when they left

21  regarding the outcome of this audit?

22  A.  Well, I can tell you what happened.  At the time in terms

23  of the audit I was fined about $2,000.

24  Q.  Do you know why you were fined $2,000?

25  A.  Well, they claimed or he claimed that there was a

1   difference of several tens of dollars, so I needed to pay a

2   little bit more tax.  But, you know, it depends on the day's

3   business.  Sometimes better business on a particular day than

4   another day.

5   Q.  Sir, you testified that was approximately ten years ago.

6           Since that time, has the corporation ever been audited

7   again either by the IRS or the New York State Department of Tax

8   and Finance?

9   A.  No.

10  Q.  Sir, are you aware whether the corporation made any efforts

11  to determine the lawful rate of pay for its employees?

12  A.  Yes.

13  Q.  What did the corporation do?

14  A.  Yes.  Labor laws, scheduling material were picked up from

15  the accountant and the labor rules and regulations were posted.

16  Q.  Do you know when you picked up this material from the

17  accountant or -- strike that -- when the corporation obtained

18  this material from the accountant?

19  A.  It's been a few years, but I don't remember.  Because 90

20  percent of the restaurants in Manhattan were sued by their

21  employees.  But obviously those are bigger restaurants.  So in

22  order to avoid a situation like that, I follow all these rules

23  and regulations.  In the past, for sure, I have been not paying

24  particular attention to these matters, it's true.

25          And in the last three to five years entire Manhattan a

I4knshe3                         Chen - direct

1     lot of employees sue restaurants, and initially all the

2     Japanese restaurants were sued.

3              MR. FREDERICKS:  Your Honor, may I approach again.  I

4     am going to --

5              MR. TROY:  D150, right?

6              MR. FREDERICKS:  Yes.  And 124.

7     BY MR. FREDERICKS:

8     Q.  Sir, I'm going to show you what's been originally marked as

9     Defendants' Exhibit 3 and also Plaintiffs' Exhibit 2.  D000124.

10             MR. TROY:  What is the number?

11             THE INTERPRETER:  124.

12             MR. TROY:  124.

13    BY MR. FREDERICKS:

14    Q.  Sir, do you recognize this document?

15    A.  Yes.

16    Q.  What is this document?

17    A.  OK.  Employee scheduling and salary.

18    Q.  Who created these documents?

19    A.  This record was done in front of their face every day.

20    Q.  OK.  Were you involved in the creation of these documents?

21    A.  Yes.

22    Q.  What aspects of plaintiffs' employment were recorded on

23    these time sheets?

24    A.  Working hours, tips.

25    Q.  Anything else?

1  A.  Yes.  The time they came to work and off work.

2          MR. FREDERICKS:  Your Honor, may I approach?

3          THE COURT:  Yes.

4  BY MR. FREDERICKS:

5  Q.  I'm going to show you what's been marked as Defendants'

6  Exhibit 3, also Plaintiffs' Exhibit 3, Bates D000150.

7          Do you recognize this document?

8  A.  Yes.

9  Q.  What is this document?

10  A.  Another sheet that records the other plaintiff's working

11  hours.

12  Q.  Who created this document?

13  A.  I wrote it in front of them.  At the time they refused to

14  look at it, and I followed them around in the restaurant and I

15  wrote it down in front of them and I said, Look, I wrote it.

16  It's not inaccurate.

17  Q.  OK.  So let's talk about each individual plaintiff.  Let's

18  first discuss plaintiff Shen.

19          What was Mr. Shen's dates of employment?

20  A.  OK.  So working on August 1 and 2.

21  Q.  Of what year?

22  A.  Is that what you were asking me?

23  Q.  No.  I want to know Mr. Shen's dates of employment from the

24  beginning of his employment to the termination of his

25  employment.

I4knshe3                        Chen - direct

1    A.   2015, June or July, I don't remember exactly.

2    Q.   Through when?

3    A.   I only remember that it was before Chinese New Year.

4    Q.   Do you know when he left the job?

5    A.   Yes.

6    Q.   Chinese New Year of what year?

7    A.   '16, 2016.

8             THE COURT:  Counsel, before you go further down this

9    line, I would like to take a break since we've been going a

10   good part of the morning.

11            MR. FREDERICKS:  OK.

12            THE COURT:  And give everyone, including the

13   translator and the court reporter, a little rest.

14            So let's resume in 10 minutes.

15            MR. FREDERICKS:  OK.

16            THE COURT:  25 after.

17            THE INTERPRETER:  Thank you.

18            (Recess)

19            THE WITNESS:  I was here ten years ago as a witness

20   because I was robbed.

21            THE COURT:  Sorry.

22            Welcome back.

23            THE COURT:  Counsel may resume.

24            MR. FREDERICKS:  Thank you, your Honor.

25   BY MR. FREDERICKS:

I4knshe3                          Chen - direct

```
 1   Q.  OK.  So let's return again to plaintiff Shen.

 2             What were Mr. Shen's hours of work?

 3   A.  Sometimes the morning, sometimes evening or early or late,

 4   12 o'clock to 5.

 5   Q.  What was Mr. Shen's rate of pay?

 6   A.  9 per hour.

 7   Q.  And did Mr. Shen earn tips?

 8   A.  Yes.

 9   Q.  Approximately how much did Mr. Shen earn in tips on a daily

10   basis?

11   A.  Well, he asked for $10 an hour because he said that

12   sometimes the tips are good, sometimes they are not.

13   Q.  Do you know how much Mr. Shen earned in tips on a daily

14   basis?

15   A.  I don't know.  I don't know the cash tips that he earned.

16   Q.  OK.  Was Mr. Shen aware that tips that -- strike that.

17             Was Mr. Shen aware that he would earn tips as part of

18   his employment?

19   A.  Yes.

20   Q.  How was he aware of that?

21   A.  Because there was a discussion with him that he would have

22   base pay and tips.  So the tips that I pay him would be credit

23   card tips and computer web order tips.

24             So, as the boss, they are counted as my income, but

25   the money went to pay him or them.  So, as a small businessman,
```

I4knshe3                         Chen - direct

1    that is the hardship that I am stuck in.

2    Q.  Did you inform Mr. Shen that he would earn tips as part of

3    his income?

4    A.  Yes.

5    Q.  When?

6    A.  That day that Mr. Wang brought Mr. Shen over.  That was the

7    day I told him.

8    Q.  OK.  When was that?

9    A.  I don't --

10   Q.  Was this before or after Mr. Shen was hired?

11   A.  Before.  Before he was working at a different restaurant.

12   Mr. Wang told him to come over.

13   Q.  OK.  So what did you tell Mr. Shen regarding tips as being

14   part of his income?

15   A.  All three of us was present.  We were talking about it

16   outside of the restaurant.

17   Q.  What did you say?

18   A.  That Mr. Shen's salary, pay would be the same as Mr. Wang.

19   Q.  OK.  Did you have any specific mention regarding tips being

20   earned as part of his income?

21   A.  Yes.

22   Q.  What specific --

23   A.  He realized that tips is part of the salary, and later on

24   he told me, he said I know for a fact that the tips at your

25   restaurant is very good.

1    Q.  Was Mr. Shen offered breaks during the course of his

2    employment or rest periods?

3            MR. TROY:  Your Honor, I believe there has been

4    leading, and this is the direct from the defense counsel.

5            THE COURT:  Yes.  There's been a little bit of

6    leading, but again this is sort of basic information.  The same

7    questions were asked yesterday, I believe.  So for this

8    particular subject it's OK on that level.  He's just asking did

9    they get breaks, did they have breaks.  So then he will get an

10   answer, and then he'll go open-ended after that.

11           So overruled.

12           MR. TROY:  Your Honor, I believe if he doesn't imply

13   any specifically that's fine.  But he implied specifically,

14   including, do you talk about, you know, tips or something.  I

15   believe that's leading.  That's misleading.

16           MR. FREDERICKS:  Well, hold on --

17           THE COURT:  Mr. Fredericks.

18           MR. FREDERICKS:  I'm sorry.

19           THE COURT:  We've already gone on from there.  So you

20   could have objected earlier, but we are on to a different

21   question now.  In any event, I don't even know if he answered

22   the questions on the tips in a way that was something you would

23   not find favorable.  So, let's move on.

24   BY MR. FREDERICKS:

25   Q.  Was Mr. Shen offered any breaks throughout the day during

I4knshe3                       Chen - direct

1   the course of his employment?

2              MR. TROY:  Objection, your Honor.  It's leading.

3              THE COURT:  Overruled.  It's the same question and the

4   same objection that was just overruled.

5              MR. TROY:  Your Honor, he did not establish whether or

6   not the restaurant had the breaks, and then he can direct --

7              THE COURT:  Mr. Troy, you have been overruled on that

8   objection.

9              Go ahead, Mr. Fredericks.

10  BY MR. FREDERICKS:

11  Q.  Was Mr. Shen offered breaks during the course of the day

12  throughout his employment?

13  A.  Well, I told him since the beginning, outside of the time

14  that you make deliveries your own free time.  But, of course,

15  as a small restaurant, I don't have any fixed break schedule or

16  time.

17  Q.  Can you please describe Mr. Shen's work performance related

18  to his adherence to his work schedule or his timeliness?

19  A.  He's always on time coming to work, and the same thing for

20  getting off work.  However, whenever he stopped delivering, he

21  would play games, betting horses, for example.

22              And I spoke to him on several occasions not to talk or

23  pick up the phone on the way.  He also had a little booklet and

24  a pen on him.  Any break, any stop, he would bet on the horses.

25  He would make phone calls, tell other people to buy this, buy

I4knshe3                          Chen - direct

1    that.

2              And I heard that within his social circles in terms of

3    betting horses, a lot of people would come to him.

4    Q.  OK.  So these activities of Mr. Shen relating to this horse

5    gambling, typically how long would these excursions last?

6    A.  Well, if there's no delivery, he would be right there

7    making phone calls, and Mr. Wang told me that he's really good

8    at betting horses.

9    Q.  And how frequently would this occur?

10   A.  Every day, anytime there's a stoppage, anytime it stop.

11   Q.  Let's move on to Mr. Wang.  What were Mr. Wang's dates of

12   employment?

13   A.  At the end of 2014.

14   Q.  When did he begin his employment with the restaurant?

15   A.  I didn't look at this, this is the original, but I think it

16   was the end of 2014, beginning of 2015.

17   Q.  OK.

18   A.  That's why I don't remember the exact time, the exact date

19   and did not communicate with my attorney about anything.

20   Q.  When did Mr. Wang end his employment?

21   A.  After New Year, after Chinese New Year.

22   Q.  Of what year?

23   A.  2016.  I think maybe a month of time between the two of

24   them.

25   Q.  OK.  What were Mr. Wang's hours at work?

I4knshe3                         Chen - direct

1   A.  Sometimes early shift, sometimes late shift.

2   Q.  What was Mr. Wang's rate of pay?

3   A.  Same.  $9.

4   Q.  Did he earn tips?

5   A.  Yes.  He was told tips was part of the salary.

6   Q.  OK.  How much did he earn in tips on a daily basis?

7   A.  Whatever is taken from my hand I recorded, and he's aware

8   of it, but I would not know.  I don't know the cash tips that

9   he received.

10  Q.  You testified that Mr. Wang was told that he would earn

11  tips as part of his salary.  When was he told that and by whom?

12  A.  Before he came.

13  Q.  Did Mr. Wang receive any breaks on any particular date

14  throughout his employment?

15  A.  Well, if he has a delivery to make, he does that.

16  Otherwise, it's basically break time.  He would sometimes be

17  sleeping in the back room behind me.

18  Q.  How often would he be sleeping?

19  A.  It happens every day.  So one person goes to sleep.  The

20  other person bet on horses.

21  Q.  How long did these naps last?

22  A.  It varies.  Sometimes, if there's no delivery, it could be

23  half an hour, one hour.

24  Q.  And how would you describe Mr. Wang's work performance in

25  relationship to his ability to adhere to his work schedule or

1   his punctuality?

2   A.  Well, in terms of coming to work, he's always on time; same

3   thing for leaving work.  And when I'm not around he would even

4   accompany my wife to close the gates and leave together.

5          So, when he first came they didn't do anything other

6   than making deliveries.  When he first came, he was really, has

7   his own initiative and helped me out in terms of unloading

8   deliveries and helped me move around the marinated chicken on

9   his own initiative.  Slowly I realized that whenever he moved

10  new merchandise he did not remove the older foodstuff.  So I

11  observed that for a few times, and then I made a marking of

12  some old items.

13  Q.  Two final questions, sir.  Is there a minimum delivery, a

14  minimum delivery fee that the restaurant had in effect during

15  plaintiffs' employment?

16  A.  At the time, $8 minimum for delivery.

17  Q.  And during the course of plaintiff's employment, were there

18  any disputes that arose concerning their pay?

19  A.  A dispute, no.  They always thanked after they take that

20  from me.

21          MR. FREDERICKS:  Nothing further, your Honor.

22          THE COURT:  OK.  Cross.

23          MR. TROY:  Yes, your Honor.

24  CROSS EXAMINATION

25  BY MR. TROY:

1    Q.  Mr. Chen, let's talk about the evidence, Defendants'

2    Exhibit from 000043, to I believe it should be 375, 76.

3            From here to the end of here.  Do those documents come

4    from you?

5    A.  Yes.

6    Q.  Did you prepare it?

7    A.  Yes.  I wrote it in front of them.

8    Q.  Who?  Who are you talking about now?

9    A.  Every one of the takeout deliveries persons, employees.

10   Q.  What time did this usually happen in the day?

11   A.  Usually 11, when the employee comes in first, first thing.

12   There's nothing to do initially.

13   Q.  OK.  Who prepared the forms, the original forms?  I am

14   talking about the forms themselves.

15   A.  The accounting office.

16   Q.  Did you get it or your wife got it?

17   A.  I did.

18   Q.  OK.  Can you tell me when is the first time you get the

19   form.

20   A.  Five years ago was the first time.

21   Q.  Who picked out this form here?

22   A.  There were several different types of forms available at

23   the accounting office at that time, and I was the one who chose

24   this particular type of form.  They had weeklies, biweeklies,

25   all from the same accounting office.

I4knshe3                           Chen - cross

1   Q.  Did you pay for the forms?

2   A.  No, did not pay.

3   Q.  So it's free?

4   A.  Yes.  The form itself was free.

5   Q.  OK.  You are talking about time sheets.  So whatever it's

6   the time in, that's the time they come to work, right?

7   A.  Yes.

8   Q.  So every day they come to the, for instance, for the --

9   let's get 2015, September.  Let me show you those kind of

10  schedules.  OK.  Exhibit D000159.

11            OK.  That's starting from column 1, time in?

12  A.  OK.

13  Q.  Did Mr. Shen come in to the job every day at 12 o'clock

14  exactly?

15  A.  Yes.

16  Q.  He was never late one minute?

17  A.  No.

18  Q.  He never earlier arrived to the restaurant?

19  A.  No.

20  Q.  Even one minute?

21  A.  No.

22  Q.  And he continued to do that one for all the month?

23  A.  Yes.

24  Q.  How about the time out?  What time is his time out?

25  A.  5 o'clock, 5 p.m.

I4knshe3                          Chen - cross

1    Q.  OK.  He stepped out of the restaurant every day at 5

2    o'clock exactly?

3    A.  Yes.

4    Q.  And he do that from the first until the end of the month?

5    A.  Yes.

6    Q.  He never stepped out of the restaurant one minute or two

7    minutes after 5?

8    A.  Well, yes, I mean, but I told him you are off at 5.  I told

9    him, and I told him directly that whether sometimes you leave

10   five minutes, ten minutes early or sometimes you leave five or

11   ten minutes late I'm going to write 5 o'clock for you.  That's

12   it.

13   Q.  So it's not the accurate record of his time sheets; I'm

14   right?

15   A.  Well, if you're going to say it that way, I admit it.  I am

16   a small company, not a big one.  I don't have these kind of

17   expenses.  I even bought a card machine, but I don't know how

18   to use it.

19   Q.  I believe you have answered my question already.

20   A.  So I even asked my daughter sometimes to change the time on

21   the punch machine, depending on spring forward or fall back.

22   Q.  I believe --

23            THE COURT:  There's no question.

24   A.  OK.

25   Q.  What is the hourly pay for Mr. Shen on this month?

1           THE INTERPRETER:  What is the question again.

2           MR. TROY:  Hourly pay for the month.

3   A.  $9 per hour.

4   Q.  You don't think you should pay him the exact working hours

5   instead of your time schedule?

6   A.  Even though I do operate a small restaurant, but I see

7   myself as on the lower rung, lower level.  So I did not pay

8   great attention to something is five minutes, ten minutes, a

9   dollar or so here or there.

10  Q.  You have already answered my question.

11  A.  OK.

12  Q.  So this is not an accurate time sheet; I'm right?  Yes or

13  no.

14  A.  Well, yes, I admit that it is inaccurate.

15  Q.  Thank you.

16  A.  Because even if I record 5:10, for example, it could be a

17  few seconds off.

18  Q.  OK.  And they are not accurate for everybody on these

19  so-called time sheets; I'm right?

20  A.  Well, for us, other than money, we have feelings or

21  friendships.

22  Q.  Yes or no.  Please answer my question.

23  A.  You can say it that way, but I do not want to admit that

24  I'm wrong.

25  Q.  OK.  Let's talk about this page again.

1           THE COURT:  Mr. Troy, does he have a copy in front of

2    him separate from what you have.

3           MR. TROY:  I believe that's the defense.

4           THE COURT:  I would appreciate it if you would leave a

5    little more room between you and the witness.

6           MR. TROY:  Sure.  Because I have --

7           THE COURT:  Do we have a copy we can give the witness?

8           MR. TROY:  Can I borrow yours, because that's your

9    exhibit for your client.

10          THE COURT:  He needs it, too.

11          MR. FREDERICKS:  These were your exhibits.

12          MR. TROY:  That is yours.  I'm referring to yours.

13          THE COURT:  Here's mine.

14          MR. TROY:  OK.

15   BY MR. TROY:

16   Q.  And let's talk about the handwriting, the 12 o'clock almost

17   at the same position of the paper every day.

18          Are you telling us you do that one every day, or you

19   do it every month or even all together?

20   A.  They are written daily.

21   Q.  It seems you use the same pen; I'm right?

22   A.  Same pen.  But can I explain?

23          THE COURT:  Yes.

24          MR. TROY:  Thank you.

25          THE COURT:  He can explain.

1              MR. TROY:  All right.

2    A.  Very often a takeout delivery person take my pen or take

3    the pen and they never bring it back.  A lot of times I can't

4    even find a pen.  So I had a specific pen that I used there,

5    that I used all the time.

6    Q.  I believe you just testified you bring the paper, you chase

7    the plaintiff to have name to sign in, but they refuse, so how

8    can you keep a pen at the same time?

9    A.  Well, all the time sheets are put together in a folder,

10   similar, but not like this.  And one pen would be inside that

11   folder or a booklet.

12   Q.  Do you agree each handwriting looks so similar at every

13   position?  It seems as when you write it down, you never change

14   the paper's position.  I'm right?

15   A.  Well, if you have time, you can test me and write a whole

16   bunch today and then write something tomorrow.

17             MR. TROY:  Your Honor, can we testify in here?

18             Are you allowed?

19             THE COURT:  I didn't quite understand your point,

20   Mr. Troy, on that question.  I heard the witness.  I understand

21   it wasn't a direct answer.

22             MR. TROY:  OK.  Let's talk about the tips.

23   Q.  For the whole month my clients got $50 every day, exactly,

24   in 2015?

25   A.  Well, it was the two of them who spoke to me and said that

I4knshe3                         Chen - cross

forget about the credit card, forget about the Internet web

orders.  Cash belonged to them.  I don't get involved.  I am

responsible for the money that is involved with the credit

card, that's involved with the web order.  But, obviously, it

is a little bit convenient for me.  It is a convenience because

in the restaurant I'm the only person cooking.

Q.  So you are talking about the $50 every day reflects the

credit card or the web online orders, tips, right?

A.  Yes.

Q.  How can -- it's every day it's $50?

A.  They made that request.

Q.  So, $50 is not accurate.  I'm right?

A.  There is no such thing as accurate or inaccurate.  There

are less and less people in Manhattan making takeout

deliveries.

Q.  You're done?

A.  OK.

          THE COURT:  Counsel, can I just ask a question to

clarify.  You said they made that request.  What was the

request they made?

          THE WITNESS:  They asked for a minimum payment of each

hour, and I told them the tips count as part of the salary.

After they came in, they started -- they said to me, in terms

of the credit card orders, in terms of the web orders, can we

not make that calculation with you.

1          (In English) My mistake.

2          (Through interpreter)  Sorry, my mistake.  I meant to

3     say that they asked me that the credit card and the web orders

4     tips be fixed to a certain amount.

5          THE COURT:  OK.

6          MR. TROY:  Thank you.

7     Q.  How do you count the online and credit card tips at the end

8     of each day?

9     A.  Well, if it's theirs, they were not counted; the

10    Internet-related tips are not counted.  So, in terms of the

11    credit card, I have to call the credit card company and charge.

12    Q.  Let's put it this way, did you pay the online and credit

13    card tips every day to the deliverymen?

14    A.  Yes.

15    Q.  Did you pay them $50 every day?

16    A.  Yes.  That's right.  That's why I don't have much cash,

17    cash flow.  Everything went into the credit card, the web

18    company.  That's the reason my wife often go to the bank and

19    withdraw cash, and that is the reason that moneys were not

20    deposited into the bank account that often, because there's

21    such a minimal amount.

22    Q.  So are you telling us the tips, $50 every day, is not

23    accurate?

24    A.  Accurate.  Why not accurate?

25    Q.  Because, according to your accounting, right, online and

I4knshe3                      Chen - cross

1   credit card tips, it's different from $50 per day; I'm right?

2   A.  So web tips, what's different?

3   Q.  Yes or no.

4   A.  Can I have that again.  I didn't hear it clearly.

5   Q.  $50 tips every day is not accurate statement on your time

6   sheet?

7   A.  Well, I paid that amount and I recorded the amount that I

8   paid.  So I don't understand why it's not accurate.

9   Q.  I don't think you paid tips.  The tips come in from

10  customers.  You just passed the tips back to whoever make the

11  delivery.  I'm right?

12  A.  Correct, correct.

13  Q.  Even the $50 doesn't reflect the cash tips; I'm right?

14  It's not included in this $50; I'm right?

15  A.  It's not.  That's right.  It's not.

16  Q.  So, the tips for the day even more wrong or maybe really

17  not accurate; I'm right?

18  A.  Well, there's no accurate or not accurate in terms of the

19  tips.  I was told that -- they told me other restaurants had

20  better tips.  It makes $150 per day, $200 per day.

21          THE COURT:  Mr. Troy, can I help clarify on this for

22  the Court.

23          Do you mind?

24          MR. TROY:  Yes.

25          THE COURT:  OK.

1              MR. TROY:  Your Honor, may I ask one more question?

2              THE COURT:  Yes.

3              MR. TROY:  Then you can have one.

4              THE COURT:  Go ahead.

5    BY MR. TROY:

6    Q.  Is it fair to say you don't care how much is their tips on

7    the credit card and online, you only care how many hours they

8    put in?  If they work five hours there you put $50; if they

9    work 4.5 hours every day, you put $45 for the tip; if they work

10   for six hours a day, you put $60?  I'm right?

11   A.  Correct.

12   Q.  So it's not accurate totally?

13   A.  Well, you said that I am inaccurate with your client, but I

14   say that the inaccuracy is between me and the website and the

15   web orders; and, however, I am the one who became responsible

16   for that situation.

17             THE COURT:  Mr. Troy, I understand the point.

18             But I think what this establishes is that the tips

19   paid each day for credit card and online don't necessarily

20   reflect the actual tips paid by the customers, and, therefore,

21   could be more or less than the tips for that day.

22             So, while the form may be technically not accurate in

23   terms of reflecting the actual information, the tips, again,

24   could be more or less than what was paid for those tips.

25             MR. TROY:  OK.

I4knshe3                        Chen - cross

1    Q.  Let's talk about 2015, January, that's Defendants' 000136.

2    Do you know who is Wang De Ling.  Who is Wang De Ling?

3    A.  A female, De Ling Wang is a female.

4    Q.  What did she do for the restaurant?  What kind of position

5    she is?

6    A.  Sometimes she also made deliveries.

7    Q.  Are you sure about that?

8    A.  Yes.  Deliveries.  Takeout, delivery.

9    Q.  OK.  Let's talk about her tips.  On January 2 she worked

10   from 12 to 3, so totally her regular hours is three hours.

11             Would you like to tell us how much she make?

12   A.  What day?  What month?

13   Q.  January 2?

14   A.  January 2 made $90.45.

15   Q.  OK.  So she is so good she can make $30 tips every day,

16   every hour, I'm right?  The 2nd?

17   A.  Can I explain?

18   Q.  Go ahead.

19   A.  She's single, she's female, with one daughter, someone from

20   my village.  So sometimes the tips from the deliveries that I

21   made I give it to her, because there's just the two of them.

22   She's with her daughter here.

23   Q.  So did she make a delivery January 2?

24   A.  She did.

25   Q.  So how much is her money?

1    A.   What date?  Wasn't that $90.45?

2    Q.   OK.  Did you just testify talking about you never do

3    deliveries for the restaurant?

4    A.   I don't know how to explain it.  Whether I deliver or not,

5    I didn't make the money.  If I make deliveries, if I gave her

6    the money that I made from the delivery that I made, does that

7    count as me making a delivery?

8    Q.   Of course, that's a delivery.  Delivery is a job --

9    A.   Well, you claim that's takeout delivery.  Well, that's your

10   definition.  But I don't agree.  I don't believe so.  And I

11   have many hats, I wear many hats, the boss, the manager, the

12   cleaner, everything.

13   Q.   So are you telling us you give her all your delivery tips

14   on January 2015?

15   A.   Yes.

16   Q.   OK.  Let's go back to the next page, 117.

17          This is Jian Hui Chen?

18   A.   Myself.

19   Q.   OK.  Would you like to read to the bottom of the tips?

20   What does the 498.31 mean?  Is that tips?  That says tips?

21   A.   They are computer order tips, so that's way it has to be

22   charged to me, on to me.  I already mentioned this earlier.

23   The two of them did not report tips.  However, I have to give

24   them the web order tips, and I have to be responsible for the

25   tax on the Internet web orders on my own.

I4knshe3                          Chen - cross

1    Q.  I believe you just explained to everybody the tips shown on

2    the form is only online and credit card tips; I'm right?

3    A.  Yes.

4    Q.  Why are you talking about the Wang Le Ling's that's not?

5    A.  What do you mean?

6    Q.  We are talking about the Wang De Ling, right?  You are just

7    talking about you give all the cash tips to her.  So here it's

8    the cash tips; I'm right?  Under tips of De Ling Wang, January

9    2015.

10   A.  Well, if you notice, I don't know if you did, the tips I

11   gave to Wang De Ling I gave it to her that same day.  It's no

12   longer here.  So there's no such thing as me receiving any kind

13   of tips.

14   Q.  You made the delivery, you earned the tips; I'm right?

15            If you're willing to give to her, it becomes a gift;

16   I'm right?

17   A.  Well, money is not a gift, right?

18   Q.  If you give to somebody for free, that is a gift.

19            THE COURT:  Let's not have an argument about what a

20   gift is legally.

21            MR. TROY:  OK.  Your Honor, he wanted to argue it.

22            THE WITNESS:  I often give money to the homeless, too.

23   BY MR. TROY:

24   Q.  Just now you are telling us because Wang De Ling is a

25   female, so you gave your own tips to her?

I4knshe3                          Chen - cross

1    A.  Yes.

2    Q.  OK.

3    A.  I even donated online.

4    Q.  To whom?

5    A.  I have no idea.

6    Q.  So which online?

7    A.  Some of my old schoolmates, some are strangers.  I have no

8    idea who they are.

9              THE COURT:  Counsel, we are going to break for lunch

10   in about five minutes, so whenever it is an appropriate

11   stopping place between now and then, let me know.

12   BY MR. TROY:

13   Q.  Just now you are testifying in the beginning you are

14   talking about the deliveries, they make about 50 to 70 orders,

15   and when we come back to the issue, because there is a

16   translation confusion, you talk about that it's between 50 to

17   60 orders; I'm right?  We have it all on the record.

18             THE COURT:  In that case it is asked and answered.

19             MR. TROY:  OK.

20   Q.  So what exactly, how many orders the deliverymen can make

21   every day?

22   A.  I have no idea how many.  They know.  They know how much

23   they made each day.  They completely know that.  For myself, I

24   only know what my revenue for that day is.  I have no time to

25   get into the business as to each one, how much he made, how

1    much he made for today.

2            THE COURT:  I don't think that was the question.  I

3    think the question was how many deliveries are there each day.

4            Previously you testified about 50 to 60.

5            Is that correct, Mr. Troy?

6            Is that what you have in mind?

7            MR. TROY:  Yes, I believes a talking about 50, 60 or

8    50, 70.

9    BY MR. TROY:

10   Q.  So exactly how many?

11   A.  Well, let me put it the way I want to say it.  Plaintiffs

12   said they make deliveries of 50, 60, 70.  That's just an

13   approximation.

14   Q.  So please give us roughly.

15   A.  Perhaps they know more than me.

16   Q.  OK.

17   A.  When I say how many, I am giving you a very general

18   approximation.

19           THE COURT:  Can you just clarify whether he's saying

20   for everybody, like for the whole restaurant, or just for those

21   two employees?

22           MR. TROY:  I believe he's talking about two

23   deliverymen every day.

24           THE COURT:  I know.

25           MR. TROY:  I believe he mentioned under one, and later

I4knshe3                         Chen - cross

1    on when I tried to talk about translation, he said a little bit

2    of confusion regarding, you know, takeout, pickup, and the

3    delivery and so on.

4            THE COURT:  But we went back and we clarified that

5    after that I thought, and Mr. Fredericks started over.  The

6    questions were specifically about for the restaurant.  That's

7    where I have down 50 to 60.  If there's doubt about that, we

8    should probably get clarification.

9            MR. TROY:  OK.

10           THE WITNESS:  (In English) Your Honor --

11           MR. TROY:  There is no question.

12   BY MR. TROY:

13   Q.  I am following your answer, are you telling us that

14   deliverymen will be more accurate than you to estimate how many

15   orders they can deliver every day?

16   A.  Should be, yes.

17           MR. TROY:  Thank you.

18   Q.  Let's talk about the takeout or pickup, how many orders.

19   A.  However, I want to continue to say something else.

20   Q.  No, you don't talk.  I don't have a question for you.

21   A.  OK.  Go ahead.

22   Q.  I am talking about the takeout --

23           MR. FREDERICKS:  Objection.  Asked and answered.

24           THE COURT:  I am not sure what the question is.

25           MR. TROY:  Yes.  There's no question yet.

I4knshe3                      Chen - cross

1    BY MR. TROY:

2    Q.  I am asking the taking out or pickup, how many orders per

3    day --

4            MR. FREDERICKS:  Objection.  Asked and answered.

5    Q.  -- you did?

6            THE COURT:  Sustained.

7    A.  Well, I already said that what I said in the morning, and

8    if I say it now it might even be different from what I said in

9    the morning.

10   Q.  OK.  So now say it.

11   A.  OK.  So in what regard?

12           THE COURT:  The question you said, Mr. Troy was

13   takeout or pickup.  So just clarify again exactly what you are

14   asking the number for.

15           MR. TROY:  Yes.

16           THE COURT:  OK.  Just clarify it.

17   Q.  So how many pickup or takeout per day?

18           THE INTERPRETER:  I didn't really hear.

19   Q.  How many pickup or takeout, because they are the same, they

20   came to the restaurant to get it, right?  How many orders

21   roughly per day?

22           THE INTERPRETER:  How many pickups or -- OK, just

23   pickup.

24   A.  Lunch or the whole day?

25   Q.  Whole day.

I4knshe3                           Chen - cross

1   A.  About 50, 60.

2   Q.  OK.  How many dine-ins a day?

3   A.  About 20 people.  Approximately 10, 20 people.

4   Q.  OK.  You just mentioned for delivery the 60 percent of the

5   customers, they are paying credit card or online; I'm right?

6               MR. FREDERICKS:  Objection.  Asked and answered.  We

7   have already been through this.

8               THE COURT:  I agree it's asked and answered, but I

9   think that was an accurate reflection of the testimony.

10              He's just trying to orient the witness to where he's

11  going.

12              MR. FREDERICKS:  OK.

13  A.  Yes.

14  Q.  And you talked about the takeout or pickup the credit card

15  always is about 40 percent?

16  A.  Yes.

17  Q.  Credit card, right?

18  A.  Yes, yes.

19  Q.  OK.  Eat-in the credit card is about 40 percent; I'm right?

20  OK?

21  A.  Yes.

22  Q.  So is that the same to say cash to pay dining in, eat-in,

23  is 60 percent, and the takeout or pickup the cash is 60

24  percent, and the deliveries the cash paid is 40 percent, I'm

25  right?

I4knshe3                         Chen - cross

1   A.  OK.  Can I have that one more time.

2              THE COURT:  Mr. Troy, we've already passed that five

3   minutes.  Try to wrap up in the next question or two for our

4   break.

5              MR. TROY:  Sure.

6   BY MR. TROY:

7   Q.  So that means you are talking about the delivery, and then

8   60 percent paying credit card.  So that means 40 percent paying

9   cash.  I'm right?

10  A.  Yes.

11  Q.  The takeout or pickup, credit card is 40 percent; that

12  means cash is 60 percent?  Yes or no.

13  A.  Yes.

14  Q.  And let's talk about eat-in.  60 percent is cash; I'm

15  right?

16  A.  Yes.

17  Q.  OK.  So let's put it this way:  It's fair to say the

18  revenue the restaurant generates is about 50 percent credit

19  cards and online and 50 percent is the cash, roughly?

20  A.  Online?  Is that online?

21  Q.  And the same pay credit card; I'm right?

22             THE COURT:  The question was with respect to all

23  orders combined?

24             MR. TROY:  Yes.

25             THE COURT:  OK.

I4knshe3                      Chen - cross

1              (Answer not translated)

2    Q.  It's easy.  You're just dancing with yourself.

3    A.  Not including the online orders?

4              THE COURT:  Including everything.

5    A.  Well, including everything, then cash would be relatively

6    less overall.

7    Q.  I just asked you, you know, so how much is the online for

8    the delivery?

9              THE COURT:  OK.  Hold on, Mr. Troy.  We're going over

10   the same group over and over.  We have established what the

11   percentages are for each of the three.  He gave an answer which

12   was based on those three categories.  He says the cash is

13   relatively less.

14             What more do we need to do with this?

15             MR. TROY:  We would like to know what is the

16   relatively less.

17             THE COURT:  OK.  Ask him that.

18             But then we are breaking.

19             MR. TROY:  Yes.

20   A.  Online orders, I don't know if there is a cash order for

21   one for every 100 online order.  I don't even know if it's that

22   much.

23             In the past, a long time ago, there was a cash charge

24   for one of those online orders, but then later they said you

25   cannot do that, so they erased it.

I4knshe3                         Chen - cross

1            THE COURT:  This is not responsive.

2            Let me ask the question.

3            Are you able to estimate the percentage of all orders

4   placed through any means, as to what percentage is cash and

5   what percentage is by --

6            MR. TROY:  Noncash.

7            THE COURT:  Noncash.

8            The question is whether he's able to.

9            Is he able to?

10           THE WITNESS:  Yes.

11           THE COURT:  OK.  So what is your estimate?

12           THE WITNESS:  About 70 percent cash.  70 percent cash.

13           THE COURT:  And 30 percent credit?

14           THE WITNESS:  No.  70 percent is credit card online.

15           THE COURT:  Oh, OK.  Thank you.

16           THE WITNESS:  Just an estimate, more or less.

17           THE COURT:  But not just online.  Everything taken

18  together, the online, delivery -- I'm sorry -- online, pickups,

19  everything?

20           THE WITNESS:  I understand.  I understand, cash and

21  noncash, yes.

22           THE COURT:  OK.

23           THE WITNESS:  About 30 percent cash and 70 percent

24  noncash.

25           THE COURT:  OK.  Let's take our break.  Thank you.

1              We are going to take a break.  We will resume at 2:00.

2              I hope that the other witness gets here within that

3     time.  Please make sure you have a means of how she can contact

4     you.

5              Mr. Troy, about how much more cross do you think you

6     have?

7              MR. TROY:  For this witness?

8              THE COURT:  Of this witness.

9              MR. TROY:  I believe I have a lot.

10             THE COURT:  So if his wife is here when we return, can

11    you resume with her, because she will need to get through --

12             MR. TROY:  Your Honor, I don't think she will even

13    have a claim for the day.  You know, maybe when she comes here

14    and maybe we discuss and you know I will try to accommodate

15    everything, but if she's fine with everything, maybe we finish

16    this one.

17             THE COURT:  All right.  But I'm telling you now if I

18    make an assessment that she needs to go, and I am not a doctor,

19    but, based on what she tells me, I'm going to ask you to take

20    her at that time.  OK?

21             MR. TROY:  Sure.

22             THE COURT:  Thank you.

23             (Luncheon recess)

24

25

I4knshe3                        Chen - cross

1                    A F T E R N O O N   S E S S I O N

2                           (2:00 p.m.)

3              THE COURT:  Hello, everyone.  I see that we have the

4    other defendant back, and I would like to inquire with her how

5    she is feeling.  So I would like to bring her up and just find

6    out where we are and then we can determine what to do.

7    DAN QING LIU, sworn.

8              THE COURT:  Please be seated.

9              So I understand you had to go to the hospital last

10   night?

11             THE WITNESS:  Yes.

12             THE WITNESS:  (In English) a little bit dizzy.

13             THE COURT:  Dizzy?

14             THE WITNESS:  (In English) yes.

15             THE COURT:  And what time did you leave the hospital?

16             THE WITNESS:  Maybe four or five.  I don't even know

17   exactly how I got home.

18             THE COURT:  And how much sleep did you get after that

19   between then and now?

20             THE WITNESS:  I was dizzy, so I was in bed the whole

21   time.  I wanted to see my family doctor.

22             THE COURT:  Have you seen that doctor yet?

23             THE WITNESS:  Yes, I already did, yes.

24             THE COURT:  How are you feeling now?

25             THE WITNESS:  Slightly better than yesterday.

I4knshe3                          Chen - cross

1            THE COURT:  Do you feel of clear mind so that you

2    understand what's going on?

3            THE WITNESS:  Not very good.

4            THE COURT:  Meaning what?

5            THE WITNESS:  Sometimes my thoughts are not very

6    clear.

7            THE COURT:  Do you understand I am saying through the

8    translator?

9            THE WITNESS:  OK.

10           THE COURT:  Have you had any medication recently?

11           THE WITNESS:  Yes.  I have been taking the diabetic

12   medication?

13           THE COURT:  OK.  Besides medicine for diabetes, have

14   you taken any medication since your incident at the hospital?

15           THE WITNESS:  Yes.  Medication for dizziness.

16           THE COURT:  Do you know the name of that medication?

17           THE WITNESS:  No, I don't.

18           THE COURT:  Was that prescribed to you by a doctor?

19           THE WITNESS:  Yes.

20           THE COURT:  And have you been taking it as directed?

21           THE WITNESS:  I took one.  There's another one I need

22   to pick up.  I have not picked up yet at the pharmacy.

23           THE COURT:  Have you placed the order for it at the

24   pharmacy?

25           THE WITNESS:  The doctor sent the prescription to the

I4knshe3                        Chen - cross

1    pharmacy.

2              THE COURT:  Are you planning to see any other doctor

3    today?

4              THE WITNESS:  No time today.  No time, no.  I want to

5    come to court.  I want to come here.

6              THE COURT:  OK.

7              Do you feel up to being asked more questions by the

8    plaintiff's counsel without any yelling?  He'll be a gentleman.

9    I promise.

10             THE WITNESS:  My mind is still not very clear.  I am

11   not in very good condition.

12             THE COURT:  All right.

13             THE WITNESS:  I have some dizziness, my head is

14   slightly spinning, and I prefer to sit in the audience.  I

15   called 911, went to the emergency.  My health has not been very

16   good these days in the past.

17             THE COURT:  I understand.

18             The only reason we would need you in court today is to

19   continue testimony.  You don't need to sit in the audience.

20             THE COURT:  That was just a statement.

21             Let me ask counsel.  Let me start with Mr. Troy.

22             Are you willing to accept the testimony of this

23   witness, and do you think she is competent enough at this

24   moment to be able to answer your questions?

25             MR. TROY:  Pardon me, your Honor?

I4knshe3                        Chen - cross

1          THE COURT:  I want to get both of your assessment of

2     what your thoughts are on whether to proceed with this witness,

3     or, if she does not testify any further, whether we can do

4     without the rest of her testimony.

5          MR. TROY:  Your Honor, I believe yesterday we did not

6     finish.  We were talking about we are going to continue about

7     the case, and I believe we allowed the defense counsel to do

8     their direct first, and I believe we are entitled to

9     cross-exam.

10          If she is not feeling well, maybe I can do Mr. Chen

11     first and she can take a rest and we will come back or

12     whatever.

13          THE COURT:  I really do intend to finish the trial

14     today.  As we discussed before, the hope was that you would be

15     able to get whatever else you needed through the other witness,

16     having already crossed this witness for quite some time

17     yesterday.  I realize you didn't finish, but --

18          MR. TROY:  Your Honor, I can proceed.

19          THE COURT:  Hold on.

20          Mr. Fredericks, do you have a view?

21          MR. FREDERICKS:  Without having a full understanding

22     of the medical terminology, my only concern would be this

23     unidentified medication that she's taking.

24          THE COURT:  I will just say the Court's personal

25     assessment right now is that this witness is not in condition

I4knshe3                    Chen - cross

1   to give testimony.

2            I would not ask her to give testimony now based on how

3   she's been answering the questions, the contents of those

4   questions, and my personal observations of her.

5            So I am going to allow her to leave if she would like

6   so she can go back home or go to a doctor, pick up her

7   prescription, whatever it is, and we will continue.

8            I am hoping that we will be able to complete the

9   testimony through the other witness.  If there are issues that

10  Mr. Troy feels he did not get sufficient cross on, we can talk

11  about those at the end and see if they really are things that

12  need to be addressed.

13           OK.  So please tell her thank you very much.  I really

14  thank her for coming, but I am going to let her go home.

15           She don't need to be hear anymore.

16           THE WITNESS:  Thank you so much.

17           (Witness excused)

18  JIAN HUI CHEN, resumed.

19           THE COURT:  We can continue with our witness from this

20  morning.

21           MR. TROY:  Your Honor, if I may, I believe she was the

22  witness sworn in in the process of the cross-exam and maybe

23  redirect, and I wish she be excluded because --

24           THE COURT:  That's fine.

25           MR. TROY:  -- it is in the process.

I4knshe3                          Chen - cross

1             THE COURT:  I understand the process.  I suggest she

2    actually go home.

3             MR. FREDERICKS:  You're right.  From what I am

4    observing she's sort of just --

5             THE COURT:  Actually, if she's not well now --

6             MR. FREDERICKS:  I can escort her to the outside

7    benches.

8             THE COURT:  I am not even sure she should be left

9    alone based on what I am seeing.

10             She can sit in that room back there, if she wants to,

11    by herself.  If she needs help, please tell her she should come

12    out.

13             Do we have water for her?  Let's make sure she has

14    some water.

15             The witness has been placed in the jury room, and is

16    not present for this continued testimony.

17             Are you ready to proceed, Mr. Troy?

18             MR. TROY:  Yes, your Honor.

19             THE COURT:  You are still under oath, you know that?

20             Mr. Chen, do you understand you are still under oath

21    to tell the truth?

22             THE WITNESS:  Yes.

23             THE COURT:  OK.  When you're ready, Mr. Troy.

24             MR. TROY:  Yes.

25    BY MR. TROY:

I4knshe3                         Chen - cross

1    Q.   What is the position of your wife in the restaurant?

2    A.   I make her the CEO.

3    Q.   What kind of job duties she has?

4    A.   She does everything.

5    Q.   Does she do the deliveries?

6    A.   I said it before, I'll tell you again, yes.  She make

7    deliveries.  When she return, she gives the tips to the

8    employees.  So I don't know if you think that's a delivery

9    position or not.  I am not sure.

10   Q.   How often did she do the deliveries?

11   A.   Not often.  I can be certain and tell you that, not often.

12   Q.   Once a day?  Once a week?

13   A.   It varies per week.  Sometimes, yes.

14   Q.   On average, how many times a week?

15   A.   It cannot be determined on average how many times per week.

16   Q.   One?  Two?  Three?

17        THE COURT:  It's been asked and answered.  So he's

18   given you his answer.

19        MR. TROY:  OK.

20   Q.   It's more than ten per week?

21   A.   Sometimes, yes.

22   Q.   What do you mean sometimes?

23   A.   It's not for sure, but she would make deliveries.

24   Q.   OK.

25   A.   For lack of, if there's no help, short of hands, then she

I4knshe3                        Chen - cross

1  would make that delivery.

2  Q.  OK.  And she gave the cash tips to your relatives; I'm

3  right?

4  A.  It is not me.  Sometimes she did not give it to the two of

5  them when they are not around, and she make a lot of

6  deliveries, but it's not me.

7  Q.  When is the last time you put the poster in the restaurant?

8           THE COURT:  Which poster?

9  BY MR. TROY:

10  Q.  You are talking about the poster has been over there for a

11  few years, you just testified on direct.

12  A.  Maybe a few months, because -- how long did I put it up?  I

13  pay my tax July, August, and then I brought it back and then I

14  posted it after that.  It should be July, August when I posted

15  it up.

16  Q.  How many times have you ever changed the poster?

17  A.  Many, many times.

18  Q.  So how many times?  Let's talk about six years ago.  Did

19  you change it in 2012?  When is the first time you put up your

20  poster?

21  A.  Around 2012.

22  Q.  And then when is the first time you changed?

23  A.  I do not remember how many times.  I only remember one time

24  it was 6.75, and then I brought it back and then I posted it,

25  and because -- and the accounting office would notify me.  They

I4knshe3                         Chen - cross

1    informed me that delivery personnel's base pay had changed.

2    Q.  You just mentioned about 6.5?

3              MR. FREDERICKS:  Objection.

4              Mischaracterizes the testimony.

5              THE COURT:  Sustained.  It was 6.75.

6              MR. TROY:  6 point?

7              THE COURT:  6.75.

8    BY MR. TROY:

9    Q.  6.75.

10   A.  6.75, 7.25.  And then various X amount of dollars.  I did

11   not specifically try to remember them.

12   Q.  You are the person dealing with the time sheets and even

13   put how much money per hour over there.  Why did you not pay

14   attention to how much money on the poster?

15   A.  Well, I know what the minimum payment or minimum wage would

16   be because I was informed by the accounting office, but I

17   didn't pay attention in detail about it.

18   Q.  What kind of poster you are talking about?

19   A.  The one pertaining to labor law.

20   Q.  What does the labor law talk about on your poster?

21   A.  How much was minimum wage, and one week work cannot be over

22   40 hours, and then eight hours it mentioned.

23   Q.  Not more than eight hours per day, that's what it said; I'm

24   right?

25   A.  Yes, yes.

I4knshe3                          Chen - cross

1  Q.  So what is the minimum wage for the deliverymen right now?

2  A.  Right now I pay them $9.25 for a delivery person.

3  Q.  OK.  That's the general.  No, I'm asking you what is the

4  minimum wage for general employees right now on the poster?

5  A.  For tip earners, it was either $8.75 or $9.25, but I didn't

6  really look that closely.  And if they don't earn tips I think

7  it was $10.25.

8      Well, even though it's posted there for people to see

9  or to read, but in reality I didn't read.  But, in reality, the

10  accounting office did inform me, you cannot pay less than this

11  amount.

12  Q.  Would you like --

13  A.  And I was told, You can pay higher, but not lower.

14      So, OK, in my mind, it's 25 cents more than the other

15  people in my mind.

16  Q.  What kind of language is the poster?

17  A.  English and Chinese.

18  Q.  You are the person in charge of the payroll and time

19  sheets.  You don't know how much it says?

20      THE COURT:  It's been asked and answered.  He said he

21  doesn't remember the exact figure.

22      MR. TROY:  OK.

23  BY MR. TROY:

24  Q.  What is the overtime rate it says on your poster right now?

25  A.  I don't know what it says on the poster, but the accounting

I4knshe3                        Chen - cross

1   office told me overtime is 1.5.

2   Q.  OK.  Before the current rate, what is the former rate, the

3   immediate -- before it's changed, when you are talking about

4   the new poster?  When is the effective date?  Do you know?

5   A.  I don't.

6   Q.  Thank you.

7   A.  I posted it right after the accounting office brought it

8   over.

9   Q.  Just now you talked about you get the poster last year,

10  should be in June, July; I'm right?

11  A.  Yes.

12  Q.  OK.  What is the last time you get the poster?

13          THE COURT:  Didn't he already testify to that?  It is

14  what he just said.  You are asking the time before that?

15          MR. TROY:  Yes.

16          THE COURT:  That wasn't clear, at least not to me.

17  A.  Well, I often go to the accounting office in Chinatown and

18  if they have a poster for me to post, I do that.  I would do

19  that.  Sometimes --

20  Q.  I'm asking, when is the last time you get the poster?

21  A.  I don't remember.

22  Q.  OK.  How many times you did get the poster from your

23  accountant's office since you come to the business?

24          When did the Fresco Tortillas come to the business?

25  In 2000?  OK, when is Fresco Tortillas -- you bought the

1   business since when?  2000?

2   A.  Maybe year 2000, a little bit earlier, maybe a little bit

3   later, 2000.

4   Q.  How many posters you have changed in your restaurant?

5   A.  In the past, meaning five or six years before that, it was

6   not posted, but in the last five, six years, I paid greater

7   attention, more and more attention to it.

8   Q.  OK.  Let's talk about in 2012.  Do you know how much is the

9   minimum wage for the employees?

10  A.  I don't remember.  Maybe $6.25.  I really don't remember,

11  tips, no tips.

12  Q.  How about in 2017?  What is the minimum wage?

13  A.  Well, I do not remember what year was the increase and for

14  how much.  All I know in general is that it went from $6.25 to

15  $6.75, to $7.25.  It just basically went up and kept going up.

16  Q.  How about 2014?  What is the minimum wage?

17          THE COURT:  Mr. Troy, I think you've gotten his answer

18  on every year.

19          MR. TROY:  OK.

20  BY MR. TROY:

21  Q.  This morning you are talking about the most employees that

22  you have in your restaurant is two to three; I'm right?

23  A.  In the morning when I said the maximum amount of employees,

24  I meant to say the number of people or employees that could be

25  inside my restaurant, inside the area inside my restaurant.

I4knshe3                        Chen - cross

Q.  So, the most workers in your restaurant is including you

your wife and the three employees; I'm right?  That is what you

testified this morning?

A.  Yes.  Correct.

Q.  OK.  Let's go to Defense Exhibit, I believe that's 262 to

271, in 2016, April.

        Would you like to count how many employees you have in

2016 April?

A.  Where is April?  What year?

Q.  2016.

A.  2016 what month?

Q.  April.

        How many do you have?

A.  Is it seven?

Q.  You tell me.  How many?

A.  Well, we have seven in here.

Q.  OK.  Thank you.

A.  However, the seven here is different from the number of

employees, different.

Q.  OK.  Before you are talking about the two of them, you are

talking about they come to work for you in 2015; I'm right?

A.  Yes.  2015.  Yes.

Q.  OK.  Before they come to work full time or whatever you

call after 2015, June, July, did they, both of them, work for

the restaurant too, part-time or something?  Did they work for

I4knshe3                          Chen - cross

1   you before that time?

2           MR. FREDERICKS:  I am just going to object to this

3   line of questioning.  I believe he testified that the plaintiff

4   Wang started in 2014, but I would just like for him to

5   distinguish between each plaintiff to the extent possible.

6           THE COURT:  That's fair.

7           MR. TROY:  OK.  Thank you.

8   BY MR. TROY:

9   Q.  So for Mr. Wang before 2014, for Mr. Shen before 2015, did

10  they ever work for your restaurant before that time?

11  A.  What is the year?  2014, 2015?

12  Q.  Before 2014.

13  A.  Before that not part-timer either.  How should I put it.

14  How should I say it?

15  Q.  How many --

16  A.  Go ahead.

17  Q.  How many days they worked for you before 2014, before 2015?

18  A.  Not even like that, how many days a month or week.  Rather

19  they came when I'm short handed.  Maybe occasionally a day

20  here, a day there.  Sometimes when people ask for a day off, so

21  I asked them for help, temporary help, and never hire him to

22  work like that.

23  Q.  OK.  I believe they are on their full-time jobs.  How can

24  they just work for you to replace somebody when it's

25  inconvenient for your restaurant?

I4knshe3                        Chen - cross

1    A.  Well, it happened to be their day off from their regular

2    work.  I make several phone calls.  I try to find somebody who

3    happened to be able to offer some help.

4    Q.  I believe Mr. Wang and Mr. Shen, they are talking about

5    they are off on the Sunday or the Saturday; I'm right?

6    A.  Yes, yes.

7    Q.  So the only day they can come to replace somebody for you

8    is on Saturday or Sunday, I'm right?

9    A.  Different timeline.  You are talking about a different

10   timeline, a different time period.

11   Q.  What kind of different timeline?  What kind of different

12   period?

13   A.  For example, sometimes when he's working at another

14   restaurant I would call and ask him, Are you free tomorrow

15   perhaps to come over and help out.

16   Q.  You called them or they called you?

17   A.  Of course I call if I need help with my work.

18   Q.  So you called them?

19   A.  Yes.

20   Q.  So, if they happen to be off, maybe they are going to come

21   and help on that day; I'm right?

22   A.  At that point, he would ask that I accept his request,

23   which was he tells me, he told me what time he could come and

24   help, and I had no choice but to accept.

25   Q.  But always it is when they are on the days off; I'm right?

I4knshe3                        Chen - cross

1    A.  I'm not sure about that.  All I know is I asked them for

2    help when I need help, and I asked whether they could help,

3    they could come over and help me.

4    Q.  Did you keep any record regarding their coming to help out?

5    A.  No, no record.

6    Q.  How about before 2014?  Did you keep any record, a

7    so-called time sheet for all of the employees?

8    A.  Yes, yes.

9    Q.  Did you produce to your attorney?

10   A.  No.

11   Q.  Why not?

12   A.  Because he only asked that I provide two to three years of

13   time sheets.

14   Q.  The so-called time sheets, you make the records on it, you

15   claim people they work from 6 to 9 or maybe 11:30 to 1:30, and

16   you believe that's correct; I'm right?

17   A.  Yes.

18   Q.  Let's talk about 2015, September.  That's D000159.

19          On the month, if you come down, you get September 4

20   and September 5 and 11, 12, 18, 19.  That's the two days --

21   A.  What page?

22   Q.  -- Mr. Shen off; I'm right?

23          THE COURT:  Counsel, the witness is still trying to

24   find the proper page.

25          MR. TROY:  OK.  159.

I4knshe3                        Chen - cross

1   A.   What page?

2   Q.   159.

3   A.   OK.

4   Q.   You are talking about they go home, they come to the work

5   on time at 12, they go home on time at 5; I'm right?

6   A.   Yes.

7   Q.   OK.  How about Wang?  The next page, 160.

8   A.   (In English) 160, right?

9   Q.   Yes.

10  A.   (In English) Yes.

11  Q.   The record is accurate; I'm right?

12  A.   Correct.

13  Q.   I'm going to introduce two delivery tickets.  It shows

14  during that time, our client, they have the delivery sheets

15  during that day, OK?

16       MR. FREDERICKS:  Your Honor, I am just going to

17  object.  I don't believe this was ever produced in the course

18  of litigation.

19       MR. TROY:  Your Honor, this is for purposes of

20  impeachment.

21       Defense counsel, he only gave to me his exhibits

22  yesterday, even before the Court begin, and then I asked you,

23  you just give to me.  For the impeachment purposes, to prove

24  our client is working when the record says they are not.

25       MR. FREDERICKS:  Hold on, your Honor.  All of the

I4knshe3                          Chen - cross

exhibits that I offered actually were Bates stamped and

produced in the course of litigation.  These documents were

never produced by plaintiff throughout the course of the

litigation.

THE COURT:  Mr. Troy, there is a difference.  The

comparison you just made isn't a fair comparison.  The defense

had produced these documents in the litigation.  It was simply

a matter of not giving you an exhibit notebook, even though

they were all denoted as exhibits in the pretrial order, and

you certainly could have assembled it yourself from the

documents that were produced.  You are talking about documents

that I understand have not been produced.

Have these ever been produced in the litigation

before?

MR. TROY:  No, your Honor.

THE COURT:  OK.

Exhibits do not necessarily need to be listed on

someone's exhibit list when they are used for impeachment, but

it is unfair in my mind to be springing them on someone without

having at least given them to your adversary.  I am going to

allow him to be asked about these.  I am going to take under

advisement whether I will consider them or not for the ultimate

decision.

MR. FREDERICKS:  Your Honor, if I may very briefly,

during the depositions I can later on to the extent necessary

I4knshe3                        Chen - cross

1   point out the portion of the transcript where one of the

2   plaintiffs specifically identified certain evidence that they

3   had related to their employment, including certain tickets or

4   whatever it is, and I requested that information.

5          THE COURT:  You did request it?

6          MR. FREDERICKS:  I did request that information at the

7   deposition, and it was never produced.  These are of limited

8   utility, only because I do not see this being attached to any

9   specific delivery person.  But if your Honor permits

10  plaintiffs' counsel --

11         THE COURT:  I am going to permit it.  But, as I said,

12  I'm reserving judgment on whether it will be deemed admitted at

13  all and/or what weight to give it.  It's helpful to know these

14  issues.  Actually, if you could submit a letter that indicates

15  where you made your requests and include the testimony in and

16  around that, I would appreciate it.

17         MR. FREDERICKS:  Thank you, your Honor.

18         MR. TROY:  Your Honor, if I may?

19         THE COURT:  Yes.

20         MR. TROY:  The evidence is not come from the --

21  basically that's come from the restaurant.  That's what the

22  delivery ticket states.

23         THE COURT:  I understand.

24         MR. TROY:  It comes from the restaurant.  They always

25  keep copies, and the law requires them to keep six months.

I4knshe3                         Chen - cross

1    They did not produce.  And I just happen to know because my

2    client bring to me yesterday early morning, around 7.

3              THE COURT:  OK.

4              MR. TROY:  Let's get our first one.  That's talking

5    about 159 so we don't get it confused.

6              THE COURT:  And I would like a copy, please.

7              MR. TROY:  Yes, your Honor.  I believe that's 9/4.

8    BY MR. TROY:

9    Q.  Would you like to tell me, Mr. Chen, when does the delivery

10   get ordered?  What time?

11             MR. FREDERICKS:  Objection.  Which document is he

12   referring to?

13             THE COURT:  The one I have in front of me --

14             MR. FREDERICKS:  I have two, your Honor.

15             THE COURT:  The one that I have is order No.

16   818105360.

17             MR. FREDERICKS:  Got it.  Thank you.

18   A.  This is from September 12, 2015.

19   Q.  Would you like to tell us what time?

20   A.  9 p.m.

21   Q.  OK.  Let's go to the Exhibit 159.

22   A.  OK.

23   Q.  Let's go to September 12.

24   A.  OK.

25   Q.  Is that date, September 12, Mr. Shen is off?

I4knshe3                         Chen - cross

1    A.  Off.

2    Q.  OK.

3    A.  You mean around this time period on September 12?

4    Q.  All day; I'm right?

5    A.  So all day did not work.

6    Q.  OK.  Let's go to the next page.  160.  Same day, the 12th.

7            Mr. Wang, is that day he was off?

8    A.  What date?

9    Q.  12th.

10   A.  Yes.

11   Q.  So how can you explain they have these delivery receipts in

12   their possession, actually in Mr. Wang's possession?

13           MR. FREDERICKS:  Objection.  There is just no

14   foundation that Mr. Wang had these documents in his possession

15   besides Mr. Troy's representations.

16           THE COURT:  Yes.  Please establish a foundation.

17           MR. TROY:  OK.  Your Honor, may I call Mr. Wang?

18           THE COURT:  No.

19           MR. TROY:  No?

20           THE COURT:  You had your witnesses on the stand

21   yesterday and could have introduced whatever you wanted to

22   through them.

23           MR. TROY:  OK.

24   BY MR. TROY:

25   Q.  Mr. Chen, do you recognize this as a delivery receipt of

1    your restaurant?

2    A.  Yes.

3    Q.  So, when the delivery person, they make their delivery, did

4    they bring this ticket with them?

5    A.  Yes.

6    Q.  So it's fair to say on that day, two of our clients, they

7    have this delivery ticket?

8    A.  I am not sure.

9    Q.  OK.

10   A.  I'm not sure.  I'm not certain.

11   Q.  OK.

12            THE COURT:  Mr. Troy, has this been given an exhibit

13   number or letter?

14            MR. TROY:  Not yet.

15            THE COURT:  Just for identification.

16            MR. TROY:  So we will put Plaintiffs' Exhibit 1.

17            THE COURT:  I think you've introduced other exhibits,

18   haven't you?  You have introduced other exhibits I believe

19   already, haven't you?  We are not going to identify it as PX 1.

20            MR. TROY:  Your Honor, in the beginning I did, but I

21   changed to the exhibit from defendants in the beginning.

22            THE COURT:  I understand.

23            MR. TROY:  Yes.

24            THE COURT:  So did you not use any of your designated

25   exhibits yet?

 1              MR. TROY:  No.

 2              THE COURT:  All right.  PX 1 for identification.

 3              MR. TROY:  Now there is no question.

 4              THE WITNESS:  Can I answer this question, your Honor.

 5              THE COURT:  Which question?  About this cash ticket?

 6          I am not sure what the question is that's pending.

 7              THE WITNESS:  He only spoke about half of it.  I must

 8      explain everything.

 9              THE COURT:  OK.  Your attorney will have the

10      opportunity to do that on redirect, unless Mr. Troy would like

11      to hear what he has to say now.

12              Mr. Troy?

13              MR. TROY:  No.

14              THE COURT:  No, you don't want to hear it?

15              MR. TROY:  No.

16              THE COURT:  OK.

17      BY MR. TROY:

18      Q.  Let's do the second one, the same day at 1:07 p.m.

19              MR. TROY:  Mr. Fredericks, you have one.  May I

20      present it to the Court, another one?

21              THE COURT:  Will we mark this as Plaintiff's Exhibit 2

22      for identification.

23              MR. TROY:  Yes, your Honor.

24      BY MR. TROY:

25      Q.  Mr. Chen, would you like to tell us if this is the delivery

I4knshe3                    Chen - cross

1   ticket from Fresco Tortillas?

2   A.  (In English)  Yes.

3   Q.  What is the date of the delivery ticket?

4   A.  (In English) September 12, 2015.  It's 1 p.m., afternoon.

5   Q.  So my question to you is, on September 12, is Mr. Wang,

6   that day was off, according to your Exhibit 16?

7           MR. FREDERICKS:  Objection.

8           Asked and answered.

9           THE COURT:  Yes.  That's been asked and answered.  It

10  is the same date you asked about before.

11          MR. TROY:  Yes, but a different receipt, your Honor.

12          THE COURT:  I understand it is a different receipt.

13          MR. TROY:  OK.  Thank you.

14          THE WITNESS:  Do I need to answer?

15          THE COURT:  Go ahead and answer if you are ready to

16  answer.

17          THE WITNESS:  Answer what?

18          THE COURT:  Never mind.

19          MR. TROY:  Can I introduce Plaintiffs' Exhibit, your

20  Honor, that's another different date and different time.

21          So let me present this one and then this one to you.

22          MR. FREDERICKS:  Your Honor, I am going to make the

23  same objections.

24          THE COURT:  Yes.  I'm going to treat this as the same

25  as Plaintiffs' Exhibit 1 and 2 for identification.

I4knshe3                        Chen - cross

 1            Plaintiffs' Exhibit 3 falls under the same

 2   reservations and provisos I gave earlier with regard to those

 3   exhibits.

 4            I will allow questioning.

 5   BY MR. TROY:

 6   Q.  Mr. Chen, would you like to tell us, what is the date on

 7   the delivery receipt?

 8   A.  November 7, 2015.

 9   Q.  OK.  Let's talk about Exhibit 168.  According to your

10   records, during that day Mr. Wang he was off, November 7; I'm

11   right?

12   A.  OK.  Correct.  If you have a lot of tickets, bring them to

13   me at once.  Don't waste time.

14            THE COURT:  I concur with the witness's request.

15            MR. TROY:  OK.

16   Q.  No.  That's a different day.  We have to refer to

17   different --

18   A.  I admit everything.  Bring it on.

19            THE COURT:  OK.  No.  Just cool it.

20            Don't worry.  Let him ask his questions.

21   BY MR. TROY:

22   Q.  Let's talk about the three -- the four.

23            THE COURT:  Mr. Troy, how many do you plan on

24   introducing?

25            MR. TROY:  This one and maybe another one.

I4knshe3                         Chen - cross

1           THE COURT:  No more than those two, please.

2           MR. TROY:  Yes.

3           THE COURT:  This is Plaintiffs' Exhibit 4 for

4    identification.

5           Mr. Fredericks, I'm going to apply the same provisos

6    and reservations as to any of these documents that have not

7    been produced previously so you need not object further.

8           I will consider it a standing objection.

9           MR. FREDERICKS:  Thank you, your Honor.

10          MR. TROY:  OK.

11   BY MR. TROY:

12   Q.  Would you like to tell us what is the receipt of, the date?

13   A.  Well, I admit to everything you are able to show me.  All

14   the time I admit they are my takeout tickets.

15   Q.  Do you admit --

16          THE COURT:  I'm sorry.

17          When you say you are admitting to everything, are you

18   limiting your admission to these takeout tickets and not other

19   things in the case?

20          THE WITNESS:  (In English) Sorry.

21          (Through interpreter)  Correct, correct, correct.

22   Yes, yes, yes, he can show me everything, bring everything up

23   to save some time.  Yes, yes.  I meant these, yes.

24          THE COURT:  Wait.  I thought I had a clear

25   understanding from the witness's first response, but then he

I4knshe3                          Chen - cross

1    went on, and I really want to make sure we don't have

2    miscommunication here through translation.

3              MR. TROY:  Your Honor --

4              THE COURT:  I want to make sure, was his admission --

5              MR. TROY:  Your Honor, when you ask a question, he

6    just twists it from the beginning, over the trial until now.

7              THE COURT:  Mr. Troy, I ask that you not comment on

8    the judge's behavior.

9              I'm sorry.  Again, for the witness, was your admission

10   about -- you just said you admit everything.  Is that as to

11   these delivery tickets or something more than the delivery

12   tickets?

13             THE WITNESS:  What I want to say is I admit that all

14   these tickets are mine.

15             THE COURT:  OK.  Thank you.

16             MR. TROY:  OK.

17   BY MR. TROY:

18   Q.  It's fair to say Mr. Wang he worked during those ticket

19   days?

20   A.  Did not work.

21   Q.  If he did not work, how can he get the delivery receipt?

22             MR. FREDERICKS:  Objection.  Same objection, your

23   Honor.  No foundation that these were --

24             THE COURT:  I understand.

25             why don't you just ask it a little differently.

1            MR. TROY:  OK.

2            THE COURT:  If these documents have come from

3    Mr. Wang, can you explain or whatever.

4            MR. TROY:  Yes.

5    BY MR. TROY:

6    Q.   If the tickets come from Mr. Wang during his employment,

7    that means during these days Mr. Wang worked for the

8    restaurant; I'm right?

9    A.   Not accurate.

10   Q.   Why?

11           MR. TROY:  Translate.

12   A.   Can I invite Mr. Wang up for a second.

13           THE COURT:  No.  Sorry.

14   A.   Because I want Mr. Wang to do something.

15           THE COURT:  Well, that is up to your attorney and the

16   other attorney and me in terms of procedure.  So you can't ask

17   Mr. Wang to do something right now.

18           THE WITNESS:  OK.  I will leave this to the lawyers

19   then.

20           THE COURT:  No.  There was a question.  It has not yet

21   been established whether these tickets came from Mr. Wang, but

22   if they did, do you have any explanation for how he would have

23   them?

24           THE WITNESS:  Well, I have two explanations, if in

25   fact they were from Mr. Wang.

I4knshe3                         Chen - cross

1              THE COURT:  Go ahead, please.

2              THE WITNESS:  One is that in fact he was working at

3    that time.

4              THE COURT:  And what's the other?

5              THE WITNESS:  The other possibility is perhaps at some

6    point he took these from me at some point.

7              THE COURT:  OK.  Thank you.

8              Continue, Mr. Troy.

9    BY MR. TROY:

10   Q.  Except that you are talking about the minimum wage poster,

11   do you post any other labor law poster over there, too?

12   A.  Well, there are so many things posted on the wall I can't

13   even tell which one is labor related or not.

14   Q.  Do you know there is a corporation, there is a corporation

15   named Number One Fresco Tortillas?

16   A.  Yes.

17   Q.  What kind of a relationship do you have with the

18   corporation?

19   A.  Shareholder.

20   Q.  How many percentage of interest do you have?

21   A.  Possibly 50 percent.

22   Q.  Who owns the other 50 percent?

23   A.  My wife.

24   Q.  OK.  Do you have authority to hire and fire people?

25   A.  Yes.

I4knshe3                          Chen - cross

1    Q.  Do you set a schedule for the employees?

2    A.  Yes.

3    Q.  OK.  Do you pay employees or your wife pay employees?

4    A.  Sometimes I pay, sometimes my wife pay.

5    Q.  Do you know if your wife has authority to hire or fire or

6    set the schedule for the employees, too?

7    A.  She does.  However -- she does, she does have the right,

8    yes.

9    Q.  OK.  Did she ever hire or fire anybody?

10   A.  Yes.

11   Q.  Do you know she hire anyone?

12          (Answer not translated)

13   Q.  Mr. Wang?

14   A.  Well, I met Mr. Wang the earliest.

15   Q.  OK.  But your wife hired him?

16   A.  And then I was the one who spoke, had a discussion with

17   him.

18   Q.  So who hired him?

19   A.  Difficult to say.  I mean, I had the discussion with him,

20   so does that count as myself hiring him?

21   Q.  Who make Mr. Wang to come to work for the Fresco Tortillas?

22   A.  Who called?  Well, I think my wife called.  My wife

23   actually made that phone call.

24   Q.  OK.  How frequent the employees get paid in your

25   restaurant?

I4knshe3                          Chen - cross

1    A.  Monthly.

2    Q.  OK.

3    A.  Once a month.

4    Q.  Roughly, what is the day you pay Mr. Wang and Mr. Shen each

5    month?

6    A.  Generally around the 2nd.

7    Q.  OK.  When the first time your restaurant hired employees,

8    did you give them pay notice to sign?

9    A.  Yes.

10   Q.  OK.  Do you have any record?

11   A.  Yes.

12   Q.  Would you like to show me?

13   A.  Are all the documents in here?  Because I didn't bring any.

14   Q.  OK.

15   A.  My attorney, I gave everything to my attorney.

16   Q.  OK.  Would you like to tell us what is the contents of the

17   pay notice?

18   A.  Well, the content, pay for how much work is done.  One must

19   sign their signature.

20   Q.  Did you get the deliverymen, two deliverymen signed on your

21   pay notice?

22   A.  I did.

23   Q.  I don't think we get any production from your attorney.

24          OK.  What kind of version you give to your attorney?

25   Is that in English or in Chinese or --

I4knshe3                        Chen - cross

1    A.  Chinese.

2    Q.  So what is the contents of the pay notice?

3    A.  Notice content, well, names, Social Security number, how

4    much is being paid, or -- yeah, how much to pay.  How much to

5    pay.

6    Q.  You are looking for your answer.  No?

7    A.  I want to search to see if it's in here.

8    Q.  You just try to find the contents and tell me.

9            THE COURT:  Rather than take the time, will counsel

10   stipulate that there is no pay notice in the exhibit notebook?

11           MR. FREDERICKS:  Yes.

12           THE COURT:  Yes.  OK.  Let's move on.

13           MR. TROY:  OK.

14   BY MR. TROY:

15   Q.  How about the pay stub when they get paid?  Did you give

16   them a pay stub saying how many hours they worked and how much

17   is per hour and how much is the overtime?

18   A.  Yes.

19   Q.  Did you give the copy to your attorney?

20   A.  I did.

21           MR. TROY:  Mr. Fredericks, did you produce to our

22   office?

23           MR. FREDERICKS:  Your Honor, am I under examination?

24           THE COURT:  You are not under examination, no.  You

25   don't need to answer.

1                MR. TROY:  OK.

2    BY MR. TROY:

3    Q.  Do you have any copy in your possession?

4    A.  I should, yes.

5    Q.  Do you remember our clients signed, two of the delivery men

6    signed your pay notice?

7    A.  No, they did not sign.

8    Q.  Is that in English or Chinese?

9    A.  Both English and Chinese.

10   Q.  OK.  Mr. Chen, would you like to acknowledge all the

11   defense exhibits regarding to the time sheet related to my two

12   clients, Mr. Wang and Mr. Shen, all of them are not signed by

13   them?

14   A.  I admit to that, yes.

15   Q.  Mr. Chen, let's talk about the tax return.  Let's talk

16   about 2013, OK?

17           The first page, is this the tax return you produced to

18   your attorney?

19   A.  Correct.

20   Q.  When is the first time you saw this tax return?

21   A.  2013 was the first time I saw them.

22   Q.  Where did you see this one?

23   A.  At the accounting office.

24   Q.  When the first time you saw this tax return, what did you

25   do about this tax return?

I4knshe3                        Chen - cross

1          MR. FREDERICKS:  Objection.

2          Vague, your Honor.

3          THE COURT:  Sustained.

4          MR. FREDERICKS:  OK.

5          THE COURT:  Be a little more precise.

6          MR. TROY:  OK.

7     BY MR. TROY:

8     Q.  Did you sign this copy of your tax return in 2013?

9     A.  I think my wife signed it.

10    Q.  When your wife signed it, did you see it?  Did you be with

11    her?

12    A.  I was not present.

13    Q.  OK.  So the first time you saw this tax return is in CPA's

14    office, right?

15    A.  Yes.

16    Q.  So, when you saw this one, it's the copy of the tax return

17    with your wife's signature, or did not?

18    A.  Not then, no.

19    Q.  So you did not the see the real tax return your wife

20    already signed, I'm right?

21    A.  You can say that.  I didn't actually see it.

22    Q.  So, when's the first time you saw the tax return, right,

23    did you keep a copy?

24    A.  I did.

25    Q.  Where did you keep it?

I4knshe3                              Chen - cross

1   A.  At home, at the restaurant.

2   Q.  OK.  Did you produce the copy you keep to your attorney?

3               MR. FREDERICKS:  Objection.

4               Asked and answered.

5               THE COURT:  You can answer.

6   A.  I made a copy for my attorney.

7   Q.  So this one is produced, the copy of that tax return, 2013,

8   is from your copy, not from the CPA's copy?  Which one?

9   A.  You are talking about this one, right?

10  Q.  Yes.

11  A.  I Xeroxed this copy.

12  Q.  Did you personally present this one to your attorney?

13  A.  Yes.

14  Q.  How many tax returns you presented to your attorney at the

15  same time.

16  A.  Well, only because he needed a certain amount of material,

17  so I went ahead and prepared them based on his request.

18  Q.  OK.  How many tax returns do you give to him?

19  A.  Maybe three years, maybe five years.  I don't remember

20  exactly.  Possibly I think just three years.

21  Q.  How many copies of tax returns you keep in your possession?

22  A.  I should say for each single year I kept a copy, but where

23  they are exactly, I am not sure.

24  Q.  OK.  You did not put all the tax returns together; I'm

25  right?

A.  I did.  Some of them are at the restaurant, some of them at

home.  The reason is when I returned from Chinatown to the home

instead of the restaurant, and I left them at the house, for

example.

Q.  Did you file this tax return?

A.  Yes.

Q.  When did you file 2013?

A.  This is corporation tax, right?  So June.

Q.  Where did you file this tax return?  To where?

A.  The accountant, the accountant's office.

Q.  You mailed it to the accountant's office to file it?

A.  Personally.  I personally delivered them.  I brought them

down myself.

Q.  Who prepared these tax return forms for you?

A.  Accountant.

Q.  Why did you deliver it back to him?

A.  Because this is merely a copy for filing, for storing --

sorry -- for storing away, filing away.

Q.  OK.  So what kind of tax return in 2013 you bring back to

the CPA?

A.  I don't know how you ask your questions but let me tell

you.  I prepare materials for my accountant, and then they

prepare -- they verify the information, and then they prepare

it to mail it or send it to IRS.  And at the same time they

make a copy for me to bring home.

1  Q.  OK.  So the CPA helped you to file the tax return to the

2  IRS?

3  A.  Correct.  But on occasion, maybe once or twice, I actually

4  brought them with me, and I was the one who actually mailed

5  them out.

6  Q.  OK.  So you mailed to IRS directly?

7  A.  Yes.  That's right.  Even the envelope was preprepared.

8  All I need to do is put stamp on it and mail it.

9  Q.  OK.  Would you like to take a look at the Exhibit 001 to

10  009.  Do you think this is the exactly the tax return you --

11  your CPA or you mailed to the IRS.  That's all pages, all

12  paper?

13         MR. FREDERICKS:  Objection.  Asked and answered.

14         MR. TROY:  OK.

15  Q.  Is this the comprehensive tax return for 2013?

16  A.  Yes.  Should be, yes.  However, I'm not terribly familiar

17  with the content, the detailed content.

18  Q.  OK.

19  A.  I completed every step that was necessary.  But in terms of

20  whatever is put in the envelope by the accountant, I cannot

21  understand nor read the English portion.

22  Q.  So the CPA already put all the paper in one envelope, and

23  then you mail out?

24  A.  On occasion, yes.  Other times they actually mail them out

25  on my behalf.

I4knshe3                    Chen - cross

1    Q.  OK.  How many copies you mail out?

2    A.  Sometimes it's federal, sometimes it's state, sometimes

3    it's the city.

4    Q.  OK.  Let's talk about 2014, starting from Exhibit 11.

5            When is the first time you see this tax return?  In

6    2014?

7    A.  The first time I saw it was at the accountant's also.

8    Q.  When?

9    A.  Around the time of tax season.

10   Q.  What is the time of tax season?

11   A.  Generally June or July is the time when the company is

12   doing its taxes.

13   Q.  OK.  How about 2015?

14           THE INTERPRETER:  '15?

15           MR. TROY:  Yes.

16   A.  The same thing.

17   Q.  So, you filed the tax return in June or July of 2015; I'm

18   right?

19   A.  Correct.  Corporate tax, correct.

20   Q.  OK.

21           THE COURT:  Are we almost done with the tax returns?

22           MR. TROY:  Yes, your Honor.  I'm done with the tax

23   returns.  Let's talk about --

24           THE COURT:  I meant all the tax returns.

25           MR. TROY:  Yes.

1            THE COURT:  OK.

2   BY MR. TROY:

3   Q.  Let's talk about the time sheets.  Let's talk about 2015,

4   September.

5            OK.  Let's go to the Exhibit 156.  Let's talk about

6   Dan Qing Liu.  So, in that year, in that month your wife

7   received $497.65 tips; I'm right?

8   A.  Yes.

9   Q.   So including the regular hours paid your wife totally get

10  $1,700; is that right?

11  A.  Yes.

12  Q.  OK.  The next page, 157.  You get paid for $1700, and you

13  get tips for $1211.30, right?

14  A.  Yes.

15  Q.  So totally how much do you get for the month?

16  A.  2688.59.

17  Q.  No, it's not correct, because that's maybe after tax.  Your

18  gross pay is 1700 plus 1211.  I believe it should be 2911.

19  A.  (In English) 2911.30.

20            THE INTERPRETER:  2911.30.

21  Q.  Let's talk about your wife.  Your wife get 1100 and 597.

22  The front page, 156.  So your wife get $1,697.

23            Add both of you together, that's $4608; I'm right?

24  Here in the month of September 2015?

25  A.  Where?

I4knshe3                          Chen - cross

1    Q.  Add your income and your wife's income together?

2    A.  OK.

3    Q.  That's 4608.

4    A.  OK.

5    Q.  OK?

6    A.  OK.  Yes.

7    Q.  Average, that's times 12 months, do you know how much is

8    that one?  That's about $55,000 plus; I'm right?

9    A.  Income for every month is different.  How can you use any

10   random month and times that by 12?

11   Q.  I know, but we don't have time to go through every one.

12   I'm talking about evaluating and about average, right?

13   A.  What you said is different from reality, so I don't know

14   how you want me to answer you.

15   Q.  So, you don't think it's fair to say you and your wife made

16   roughly about 55,000 or more a year?

17   A.  We did.  We did, 40, 50,000.  We did.

18   Q.  OK.  Let's go back to the tax return, 2015, line 12.  I

19   believe that's 460 in the beginning.

20   A.  Where?

21   Q.  2015.  Let's talk about line 12.  Would you like to tell us

22   on line 12, compensation of officer, how much is the figure

23   over there?

24   A.  From line 9 to 12?

25   Q.  Only 12.

I4knshe3                        Chen - cross

1   A.  Well, over here it says $30,800.

2   Q.  So what is the difference between $30,800 and the $55,000?

3   A.  About $20,000 difference; $20,000-plus difference.

4   Q.  OK.  So that's about the difference.  You put 30,000, but

5   the difference is $25,000; I'm right?

6           You tell me.

7   A.  You said that my rough income.

8   Q.  Why you just saying you and your wife generally around

9   $50,000 or so, but why on your tax return it's only reflected

10  to have $30,000?

11  A.  Well, this has to be asked of the accountant.  This

12  question you have to ask the accountant.

13  Q.  I believe the accountant only tried to put whatever your

14  information into the tax return.  I don't think they can

15  enlarge or maybe decrease your income or increase your income

16  of your records; I'm right?

17  A.  Correct.

18  Q.  Let's talk about the time sheets generally.  You are

19  talking about when people, they come to the job, you make them,

20  you make the time for them on the spot; I'm right?

21  A.  Yes.

22  Q.  Let's talk about the Exhibit 301 -- I'm sorry.  Not 301.

23          THE COURT:  Mr. Troy, we are going to take a

24  five-minute break.  The translator needs a little break I think

25  and the court reporter, as do I.  It is almost 4 o'clock.

1          I said our ending time today was 4:30, and I want to

2     complete trial today.  How much do you have left?  Earlier

3     today you indicated about two hours.  I'm not holding you to

4     exactly that obviously.  We've now gone nearly all together

5     about three hours on this witness with you.

6          So how much longer do you think you have?

7          MR. TROY:  Your Honor, I believe I can complete it in

8     30 minutes.

9          THE COURT:  I am sure there will be some redirect --

10     or not, Mr. Fredericks?  No?  OK.

11          All right.  30 minutes, let's make sure it's done, and

12     then I want to have a little discussion about a couple of

13     issues.  If you want to make a closing statement of some sort

14     that's fine, although, as I indicated, I'm going to ask for

15     proposed findings and conclusions.

16          My clock says 3:54.  Let's resume at 4 o'clock.

17          OK.

18          (Recess)

19          THE COURT:  Folks ready to go?

20          MR. TROY:  Yes, your Honor.

21          THE COURT:  Please continue.

22          MR. TROY:  OK.

23     BY MR. TROY:

24     Q.  Let's come to the 300, D000300.

25          That is the time sheet for Xi Yong De in September

1    2016.  Mr. De come to the job 11 o'clock every day; I'm right?

2    A.  Yes.

3    Q.  And he timed out at 5?

4    A.  Yes.

5    Q.  And then the regular hours is six hours a day?

6    A.  Yes.

7    Q.  So he get tips $60?

8    A.  Yes.

9    Q.  I'm right?

10   A.  Uh-huh.

11   Q.  Who do this recording?

12   A.  This was done in front of her.

13   Q.  In front of her?

14   A.  Yes.  I did it in front of her.  She said:  Don't worry,

15   don't worry.  Just go ahead.  Go ahead.

16   Q.  OK.  Here is employee's signature; I'm right?

17   A.  Yes.

18   Q.  When is the date he signed?

19   A.  When De's salary or payment, these things were distributed

20   given out at that time, the last day.

21   Q.  You are talking about September 30?

22   A.  Correct, correct.  Around the 30th, yes.

23   Q.  So when you write down 11 a.m., she is in front of you?

24   A.  Correct, correct.

25   Q.  Every day except the off days; I'm right?

I4knshe3                          Chen - cross

1    A.  Yes.

2    Q.  OK.  Let's go to the next page 301.

3             Who is Jian Hui Chen?

4    A.  Myself.

5    Q.  OK.  When you come to the job on that month.  Don't fly

6    back just to see the page.  When?

7    A.  (In English) Yes.

8             MR. TROY:  Have the record reflect the witness go back

9    to see the one page in front --

10   A.  Well, over here I recorded 11:30.

11   Q.  So, if you come to the job every day at 11:30, how can you

12   witness -- you put a record at 11, and she's with you?

13   A.  Why is it not possible?

14   Q.  Why it's possible?  You tell me.

15   A.  It's my restaurant.

16   Q.  Go ahead.

17   A.  OK.  I go to work early.

18   Q.  So?

19            (Answer not translated)

20   Q.  I ask the questions.  You don't ask the questions, please.

21   A.  OK.

22   Q.  Why?

23   A.  Why what?

24   Q.  I asked you what time you come to the job, and you are

25   talking about 11:30.

I4knshe3                        Chen - cross

1    A.  I don't start working until 11:30.

2    Q.  OK.  What time you come to the job?

3    A.  Difficult to say.  Sometimes 11, sometimes 10 something,

4    sometimes 9 o'clock, 9 something, sometimes in the afternoon.

5    Q.  So are you saying that, again, your time in the record is

6    not accurate, even yourself?

7    A.  Well, in terms of myself, I went in early, but I did not

8    start actually.  I did not actually start working.

9    Q.  When you were timing in the employees, it's not work for

10   the restaurant?  Yes or no.

11   A.  You can say it your way, but I don't agree.

12   Q.  How about the front page, 299?

13   A.  299?

14   Q.  Who is the person for this record?

15   A.  My wife's.

16   Q.  You do the same stuff on the same day, you time in her at

17   11, but you time in yourself at 11:30.

18              (Answer not translated)

19   Q.  Yes or no.

20   A.  Repeat the question, please.

21   Q.  You time in at 11:30.  How can you time in your wife at 11

22   o'clock?

23   A.  Well, my wife does start work at 11, sometimes even

24   earlier.

25   Q.  Are you talking about your wife come to the work earlier

1      than 11 o'clock, but you timing in her just exactly 11 o'clock

2      every day?

3      A.   Yes.

4      Q.   So, are you telling us not only every employee's time-in is

5      not accurate, yours is not accurate and your wife's is not

6      accurate, too; I'm right?

7      A.   I believe they are accurate.

8      Q.   Nobody -- do you think anybody is going to believe you?

9            Have you ever asked the people in the city they time

10     in at 11 exactly every day, that time sheet?  They get every

11     delivery, when they get it delivered before the store hours,

12     they have to make that delivery, so they always cannot come

13     back in office hours.  Has to be out of office hours; I'm

14     right?  Yes or no?

15           THE INTERPRETER:  Can I have the question read back.

16           Judge, I couldn't catch the entire question.

17           THE COURT:  Can the court reporter please read back

18     the question.

19           (Record read)

20           THE COURT:  I am going to ask that a new question be

21     asked.  That's compound and unclear in many ways.

22     Q.   What is your office hours?

23           MR. TROY:  No.  Restaurant's office hours.

24     A.   11 until 10:30.

25     Q.   Have you ever timed out at 11?

I4knshe3                         Chen - cross

1   A.   Before 11 or after?

2   Q.   Whatever.  How about 11?

3   A.   So you want to know whether I have ever left the restaurant

4   at 11?

5   Q.   Yes.

6   A.   Basically, no.

7   Q.   OK.  Let's go to the Exhibit 333, the time sheet.

8            The fourth column, time out, January 10.

9            Did you time out every day at 11 p.m.  I'm sorry,

10  almost every day.

11           Yes or no.

12           (Answer not translated)

13  Q.   Yes or no.

14  A.   Let me explain.

15  Q.   Yes.

16  A.   So you're talking about 11 to 11, right?  OK.  Yes.

17  Q.   So you always left at 11 in 2013 May; I'm right?

18           (Answer not translated)

19  Q.   I am talking about time out, not time in.

20  A.   Well, it says here that I'm at the restaurant at 11.

21  Q.   Yes.  Your time out.

22  A.   2 p.m. I timed out.

23  Q.   That's break.  I'm talking about time out.  Is that you

24  time out at 11 p.m.?

25  A.   No, work 2 p.m. to 6 p.m.

I4knshe3                        Chen - cross

1   Q.  I'm asking whether or not you timed out at 11?

2   A.  Yes.  11.

3   Q.  Why?  Store hours is up to 10:30.  Why you go home at 11?

4   A.  Sometimes -- there were times where I thought of

5   experimenting, closing late perhaps even to see if there's any

6   customers, perhaps even as late as 2 a.m.  I know for a fact

7   that other restaurants close at 4 o'clock, some of them.

8   Q.  So you are trying to get out at 11 for so many months in

9   2015?

10  A.  Yes.

11  Q.  Thank you.

12  A.  So left at 11 p.m., is that right?

13  Q.  Yes.

14  A.  Yes, yes.  Because there is a club nearby, right next door

15  or nearby, and they often come and buy water, drinks and

16  whatnot.

17  Q.  So you agree, even the store hours is 10:30, but the

18  restaurant is still open at 11?

19  A.  Well, it's open until 11 without affecting anybody else.

20  So it's just me.  I try to do it myself.

21  Q.  OK.  So is it possible that some of the employees,

22  especially the deliverymen, they stay up to 11 after they make

23  final delivery?  Is that possible?

24             THE INTERPRETER:  Sorry, Judge.

25             THE COURT:  Hold on.

I4knshe3                          Chen - cross

```
 1              THE INTERPRETER:  I couldn't understand.  He's
 2   repeating.
 3              THE COURT:  State over and do it in segments so the
 4   translator can translate.
 5   A.  Employee, they go home when their time out -- when it's
 6   their time out.
 7              No pickup, no dine-in at night, so I pick them up.  I
 8   pick up the phone.  And I just close the glass door, and I go
 9   out and make my delivery.
10   Q.  OK.  This morning you testified that deliverymen may be
11   more knowledgeable about how many orders they deliver, but
12   those two deliverymen they are talking about 70, 80 or even
13   more.  And today you on direct you talked about the pickup or
14   pickup is around 50, 60, 70, and the dine-in is 20.
15              So it's fair to say that the take out or pickup plus
16   the eat-in is about equal the same order each day between the
17   dine-in and the pickup and the deliveries?  Is that fair to
18   say?
19   A.  I suppose, yes.  I can't even be certain myself.
20   Q.  OK.  So that means the restaurant makes about 140 or 150 or
21   even 160 orders per day?  I'm right?  At least?
22              THE COURT:  I'm sorry.  What did you say at the end?
23   At least?
24              MR. TROY:  That totally.
25              THE COURT:  Right.
```

1              MR. TROY:  It's 140, 150, or 160.

2    BY MR. TROY:

3    Q.  Is that fair to say?

4    A.  What's the total?

5    Q.  Yes.  140, 150 or 160?  Pick out one.  Fair to say?

6    A.  Yes, yes, yes.  You can say that.

7    Q.  OK.

8    A.  Approximately.

9    Q.  So is it fair to say if each order average is $10, it's

10   going to be more than $1,400 a day; I'm right?  At least if you

11   make 150 orders, that's becoming $1500; I'm right?

12              (Answer not translated)

13   Q.  I agree with you.  I'm sorry.

14   A.  Sometimes someone comes in and buys just a taco for $2.29

15   plus tax, maybe $2.40 and then maybe a soda.  You count that as

16   one order?

17   Q.  Yes.

18   A.  Sometimes one order is $200.

19   Q.  Yes, I agree with you.  That's the average.  What is the

20   minimum delivery for your restaurant?

21   A.  8, 8.50.

22   Q.  After tax, how much?

23   A.  8.50.

24   Q.  8.50?

25   A.  (In English) Yeah.

1  Q.  OK.  They get a soda for free?

2  A.  (In English) Free.

3  Q.  OK.  So the minimum delivery is $8, OK.

4          So if every day the restaurant generates $1400 or

5  $1500, is that more than $500,000 a year?

6          THE COURT:  Are you asking him to make that

7  calculation in his head?

8          MR. TROY:  Yes, if he wants.

9          THE COURT:  If you are able.

10          THE WITNESS:  Not so much.

11  BY MR. TROY:

12  Q.  So let's talk about 1400 times 365.  Because you are a

13  restaurant, you work, you are open seven days a week; I'm

14  right?

15  A.  OK.  Well, you multiply 7 by 1400.  I multiply 7 by 300.  I

16  don't know how we're -- I don't know how we can come to a

17  mutual understanding.

18  Q.  I already said to you you're open 7 days a week.

19  A.  (In English) Seven days a week.

20          THE COURT:  Slow down.  One at a time.

21  A.  (In English) Seven days, working days, weekend, Friday

22  night every one come home, go to --

23          (Through interpreter) They go back home go back to

24  their hometown.  They go to the suburbs, like Jersey.

25          (In English) Working day people stay here, weekend.

I4knshe3                    Chen - cross

1           MR. TROY:  Your Honor, I have nothing further.

2           THE COURT:  I am not sure that the witness is

3    answering the question.

4           THE WITNESS:  OK.

5           THE COURT:  Earlier you said in response to his

6    question that you could have as much as $1400 in receipts in

7    one day, is that accurate?

8           THE WITNESS:  I don't know if I should agree or not

9    because that particular number is not an average number.

10          THE COURT:  If you had to assess, what would the

11   average receipts be per day?

12          THE WITNESS:  Well, the $1400, the $1500 he mentioned

13   have happened before.  I am not -- it did happen.  But there

14   are days with $300, $400 as well.  $600, $700, $800 per day as

15   well.

16          THE COURT:  OK.

17          Continue, Mr. Troy.

18          MR. TROY:  OK.

19   BY MR. TROY:

20   Q.  Is it ever more than $1400, sometimes a day?

21   A.  Sometimes.

22   Q.  Have you ever reached to $2,000 a day?

23   A.  OK.  Cinco de Mayo day.  Cinco de Mayo day, yes, every

24   year.

25   Q.  I heard about on that day the delivery they can make it, on

I4jnshe3

1   that day they make $5,000 or $6,000 a day, because my client

2   just told me that.

3            THE COURT:  Mr. Troy, keep your voice down.

4            MR. FREDERICKS:  Is there a question pending?

5            THE COURT:  I'm sorry?

6            MR. FREDERICKS:  Is there a question pending?

7            THE COURT:  No.

8            Ask a question and keep your voice down.

9            MR. TROY:  OK.

10  BY MR. TROY:

11  Q.  Have you ever generated more than $1200 a day?

12           MR. FREDERICKS:  Objection.  Asked and answered.

13           He asked about $1400.  So I don't see the relevance of

14  $1200.

15           THE COURT:  Sustained.  That's right.  You've already

16  established that he's had as much as $1500.

17           Mr. Troy, try to efficiently wrap it up.

18           MR. TROY:  Your Honor, I have nothing further.

19           THE COURT:  Thank you.

20           MR. TROY:  Thank you.

21           THE COURT:  Is there redirect?

22           MR. FREDERICKS:  No, your Honor.

23           THE COURT:  All right.  I have a few questions.

24           How many days of the year is the restaurant open for

25  business?

I4jnshe3

1          THE WITNESS:  It's closed on 4th of July, sometimes on

2     the 4th of July, so 4th of July, have not been open on the 4th

3     of July for a long time, Thanksgiving also, closed,

4     Thanksgiving Day, and recently Christmas also.

5          THE COURT:  Have you ever been closed more than seven

6     days in one year?

7          THE WITNESS:  No.  Except recently, the most recent

8     one it closed was Martin Luther King Day I think.

9          THE COURT:  What I asked is are you open most days of

10    the year except for a few holidays?

11         THE WITNESS:  Yes.  Sometimes on Sundays, even later,

12    a little bit later.

13         MR. TROY:  Your Honor, if I may?

14         THE COURT:  Yes.

15         MR. TROY:  I believe that the records he produced, on

16    each of the records that he produced on the time sheets there

17    is no day where everybody is off.  And, according to our

18    clients, they only closed one day.  That's Christmas.

19         THE COURT:  I think we've established that at most it

20    is a few days a year as a general rule.

21         How many delivery people are on duty at any one time?

22         How many do you have at the restaurant at any one time

23    of delivery people?

24         THE WITNESS:  At a minimum -- well, sometimes just one

25    professional deliveryman.

I4jnshe3

1              THE COURT:  You say sometimes.  How much of the time

2      is it just one, and how much of the time is it more than one

3      for each day, on average?

4              THE WITNESS:  Well, Sunday, weekend, one person.

5              THE COURT:  OK.

6              THE WITNESS:  Monday through Friday normally two paid

7      deliverymen.

8              THE COURT:  And are those two deliverymen there for

9      the entire day together?

10             THE WITNESS:  No, no, not together.

11             THE COURT:  And how many shifts of deliverymen are

12     there in any given day on the weekdays?

13             THE WITNESS:  Two shifts on weekdays.

14             THE COURT:  And there is one person during each shift?

15             THE WITNESS:  Yes.

16             THE COURT:  And how long is a shift?

17             THE WITNESS:  Well, I save the busy time for them, for

18     him to deliver, and I deliver when it's not busy.

19             THE COURT:  I'm sorry.  I thought I asked how long is

20     one shift in time.

21             How much time is one shift for a deliveryman?

22             THE WITNESS:  No more than eight hours.  A lot of

23     people only want to work five hours.  That way they can make

24     some money during lunch working for me and then at night they

25     go uptown to do dinner.  That way they make more money if they

1    are working, if the individual works the two shifts together.

2                THE COURT:  I didn't quite understand that.

3                Do you know if the employees who work for you only

4    five or six hours a day also work elsewhere for additional

5    hours?

6                THE WITNESS:  Yes, sometimes after work.

7                MR. TROY:  Your Honor, I think that's not fair.

8                THE COURT:  I will allow you to ask questions after.

9                MR. TROY:  I believe you should put, if you want to

10   ask him, maybe you put our clients and them together, or maybe

11   you should hear my clients.

12               THE COURT:  Yes, I will do that.

13               Which employees specifically do you know to have

14   another job besides what they do for you?

15               THE WITNESS:  Both of them.  Both of the plaintiffs.

16               THE COURT:  How do you know that?

17               THE WITNESS:  Because if they go uptown at night, they

18   get better tips than with me.

19               THE COURT:  Have you seen where they go uptown at

20   night?

21               THE WITNESS:  I don't get into their business in that

22   regard.  Whatever I heard, I heard.  Whatever I do not heard, I

23   don't look into it.

24               THE COURT:  Mr. Troy, don't worry about it.  The Court

25   totally discounts the testimony about employees going uptown to

I4jnshe3

1    work somewhere else or having any other job, given the lack of

2    knowledge in any specifics.

3              What are the busiest times of the restaurant during a

4    day, a typical day?

5              THE WITNESS:  Usually between 12 and 1, and 7 p.m. to

6    8 p.m.

7              THE COURT:  And those times, how many deliveries,

8    about, do you think you get during those busiest times, orders

9    for delivery?

10             THE WITNESS:  Well, if one person makes deliveries the

11   busiest time slot, ten deliveries is possible, ten-plus

12   deliveries is possible.

13             THE COURT:  During one hour?

14             THE WITNESS:  Yes.

15             THE COURT:  And one person can make ten deliveries

16   within one hour?

17             THE WITNESS:  Yes.  Ten, more or less.

18             THE COURT:  OK.

19             Is there cleanup at the end of the day for the

20   restaurant?

21             THE WITNESS:  Yes.

22             THE COURT:  During what hours does that cleanup take

23   place?

24             THE WITNESS:  When I'm free, I would do the cleanup

25   job.

1          THE COURT:  Are you the only person who cleans up?

2          THE WITNESS:  No.  Other people.

3          THE COURT:  And have Mr. Shen and Mr. Wang helped

4    clean up sometimes?

5          THE WITNESS:  The delivery person, they don't like to

6    do these kinds of things.

7          THE COURT:  I didn't ask if they liked it.  I asked if

8    sometimes they do it.

9          THE WITNESS:  Well, I did mention yesterday that

10   Mr. Wang was enthusiastic at one point, but didn't do a very

11   good job.  So I don't ask him for help these days.

12         THE COURT:  OK.  I'm not asking about whether he was

13   enthusiastic or did a good job.  I'm asking whether there are

14   times that Mr. Wang and Mr. Shen helped clean up.

15         THE WITNESS:  Sometimes helped to move stuff, a thing

16   or two, yes.

17         THE COURT:  And who washed dishes and pots in the

18   morning to get ready for the day?

19         THE WITNESS:  No -- OK.  We use one -- disposable

20   containers only.  So there's nothing to wash.  In terms of the

21   cookery, I wash them myself, but that's not a lot.

22         THE COURT:  Are you the only person who has ever

23   washed the cookery?

24         THE WITNESS:  My wife sometimes.

25         THE COURT:  You use a lot of vegetables and cut-up

I4jnshe3

1   vegetables and meat, is that right?

2           THE WITNESS:  Not a lot.

3           THE COURT:  OK.  Well, is it correct that you use

4   vegetables and meat that have to be cut up?

5           THE WITNESS:  Yes, yes.

6           THE COURT:  And are those cut up and prepared in the

7   morning, each morning?

8           THE WITNESS:  Well, the way it works, after lunch,

9   when it's not so busy, I start cutting, and leave them there.

10  I do prep work.

11          THE COURT:  What about the morning before lunch?  Is

12  there any prep of vegetables and other provisions?

13          THE WITNESS:  No, there is not.

14          THE COURT:  So, how are there fresh vegetables and

15  provisions for lunch if you are cutting up the provisions after

16  lunch?

17          THE WITNESS:  Because sometimes they would be cut the

18  night before.

19          THE COURT:  You say sometimes.  What about other

20  times?

21          THE WITNESS:  Other times, like lettuce, I cut them,

22  and they have to be soaked in water.

23          In the morning sometimes the tomato will be cut, maybe

24  about 20 of them, diced.

25          THE COURT:  And do people help you do that?

I4jnshe3

|1|          THE WITNESS:  All these things that I need to do for

the entire store only takes about three, four hours and would

be done in three, four hours.

          THE COURT:  By?

          THE WITNESS:  All by myself.

          THE COURT:  All by yourself?

          THE WITNESS:  Yes.

          THE COURT:  OK.  Thank you.

          I realize I asked some questions, so I just want to

make sure I give each counsel a chance to follow up on any of

those if they wish to.

          MR. TROY:  Your Honor, the record produced by Mr. Chen

I believe sometimes he worked only six hours according to the

record, sometimes even two hours a month, total a month.

          Let's talk about 2014.

          THE COURT:  The records will speak for themselves, and

you can point that out in any findings or conclusions.  You can

point out to me anything you are going say to me now.

          MR. TROY:  Your Honor, there are a couple of months he

only worked two hours a day.

          THE COURT:  I get it, according to those records.

          MR. TROY:  According to the records.

          THE COURT:  Yes.

          MR. TROY:  I don't think we have time to do those kind

of stuff.  Everybody knows in New York City every

I4jnshe3

1    deliveryman -- they basically.  They are a small restaurant.

2    They have to do the side jobs.

3              THE COURT:  That is argument.

4              Any questions?

5              MR. FREDERICKS:  If Mr. Troy is not going to ask any

6    questions because it is outside the scope of your Honor's

7    questions, I don't have any.

8              THE COURT:  OK.  You are excused.  Thank you very

9    much, and please take care of your wife.

10             (Witness excused)

11             THE COURT:  All right.

12             That ends the testimony for this case.  Is there any

13   evidentiary cleanup or housework that needs to be done from

14   either side?

15             Let me start with Mr. Troy.

16             MR. TROY:  Your Honor, yes.

17             I believe yesterday the defendants, the lady boss

18   talked about she went to the CPAs and get all the papers or tax

19   returns, everything.

20             THE COURT:  Right.  I remember that.

21             MR. TROY:  We did not get any charts together to know

22   regarding the tax returns and regarding to the cash income and

23   cash expenses.  We did not get any charts.

24             THE COURT:  You definitely asked her about income and

25   expenses.  What you didn't have the opportunity to do is to

I4jnshe3

1    challenge her with the testimony of her husband, because you

2    wouldn't have had that chance anyway.  And you don't even need

3    it, because you have inconsistent testimony on that subject.

4              MR. TROY:  Your Honor, basically I agree with you.

5    But sometimes between the different ones they have some

6    discrepancies.  That's why we tried to ask two of them.

7              THE COURT:  I think you've pointed that out.

8              Can we say that you will not be calling back

9    Ms. Chen -- I'm sorry.  What's her last name?

10             MR. FREDERICKS:  Chen.

11             MR. TROY:  Your Honor, can I reserve the right until I

12   read the transcript and then I write to report to the Court?

13   Because, you know, maybe to stop and do all that kind of stuff

14   a little bit.

15             THE COURT:  You have had over four hours of cross

16   today.  You had two of her at least, maybe two and a half.  I

17   think that's more than sufficient.

18             If there is a particular evidentiary item that you

19   think is essential that would have come out from her and nobody

20   else, you can bring it up, but I'm not going to delay things

21   where we may not have another witness testifying for quite some

22   time.

23             What I suggest is, in the proposed findings and

24   conclusions you let me know.  If you have something to say

25   about that, say it.  But certainly it seems to me that you've

I4jnshe3

amply cross-examined and exposed the issues that you have a

concern about.  We do not have a witness today who is in shape

to testify.

       Why don't you collect your thoughts and let me know on

Monday by the end of the day if you can confirm that you are

done examining.  I really don't think she should be brought

back.  I don't think it's necessary.  If you do say you want to

bring her back, I need to know exactly what for and why that

you don't have already.  OK?

       MR. TROY:  OK.

       THE COURT:  With that, are there any other evidentiary

issues?

       Are there any documents, any exhibits that people want

to make sure are in the record, or am I going to accept in the

record all the ones that were identified in the notebooks and

on the pretrial order?

       No one raised objections to those, and in fact some of

them are the same between counsel.

       So, please, what I would like to do is, I am going to

say I will except all exhibits in the two notebooks as exhibits

for the case, give them the weight that I think they are due

unless one of you tells me now that they have an objection to

their admission into evidence, and I will discuss that with

you.

       MR. TROY:  Your Honor, you know, we raised the issue

I4jnshe3

1    regarding to the tax return admission.  I believe the tax

2    return has been excluded by the Court on the ruling of motion

3    for summary judgment.

4              THE COURT:  But you listed it on your exhibit list.

5    It's in your exhibit book.  You can't exclude an exhibit you

6    listed on your own list.

7              MR. TROY:  We will now release it for argument

8    purpose.  The reason why I mentioned that one in the beginning

9    of the trial, I believe the ruling is the law of the case.

10             THE COURT:  Status on summary judgment is very

11   different than status on trial.  Something that may not be

12   admissible for summary judgment purposes can become admissible

13   for trial, particularly if a counsel puts it on their exhibit

14   list and says they're going to have it admitted, which is what

15   the pretrial order does.  By putting it on your exhibit list

16   you are waiving any objection to it as I see it.

17             MR. TROY:  Your Honor, if I may, regarding to the tax

18   returns admission, I believe the Court expressly is talking

19   about, you know, one, it's not signed, and until now it's not

20   signed.  And it's not authenticated.  They get every chance,

21   but they never cured it.

22             THE COURT:  I don't disagree with you that there are

23   limitations on how it will be assessed and whether it will be

24   given any weight.  But it was on your exhibit list, and it's

25   therefore an exhibit.  Just because I will be admitting it does

I4jnshe3

1 | not mean I am crediting it.

2 |       Do you understand the difference?

3 |       MR. TROY:  Thank you, your Honor.

4 |       THE COURT:  All right.

5 |       Anything else on evidentiary cleanup?

6 |       MR. FREDERICKS:  No, your Honor.

7 |       Just Plaintiffs' Exhibit 1 through 4, which you have

8 | already directed me to send the subsequent letter to you.

9 |       THE COURT:  Yes.  I just want confirmation about what

10 | was asked in that regard and what was said at the deposition,

11 | and obviously copy Mr. Troy.  If he has anything to say about

12 | it, he can respond.

13 |       MR. FREDERICKS:  Right.

14 |       By when?

15 |       THE COURT:  When can you do it?

16 |       MR. FREDERICKS:  By the end of next week?  Is that OK?

17 |       THE COURT:  For that the end of next week is fine.

18 |       MR. FREDERICKS:  Thank you.

19 |       MR. TROY:  Your Honor, the response?

20 |       When is it due?  One week?

21 |       THE COURT:  Why don't you get it to him -- you want a

22 | week, really, to respond?  That's fine.

23 |       MR. TROY:  OK.

24 |       THE COURT:  Because I am going to ask for findings of

25 | fact and conclusions of law.  You obviously need the transcript

I4jnshe3

```
 1    to do that.  So I'm going to say four weeks from the issuance
 2    of the transcript I would like proposed findings and
 3    conclusions.  OK?
 4              MR. FREDERICKS:  I apologize.  Are we going to get
 5    notice the ECF that the transcript is available, or we contact
 6    the reporters directly?
 7              THE COURT:  I will defer to Mr. Reporter.  My
 8    understanding is it does get filed on ECF, but you also have
 9    ways to arrange with the reporter for proper payment for
10    earlier preparation.
11              MR. FREDERICKS:  Four weeks from its issuance?
12              THE COURT:  I'm sorry, there is a form online that you
13    should fill out and submit and it does have to be paid for.  So
14    you will make arrangements with the reporter.
15              MR. FREDERICKS:  Thank you, your Honor.
16              THE COURT:  All right.
17              MR. TROY:  Your Honor?
18              THE COURT:  I'm sorry?
19              MR. TROY:  I'm sorry, your Honor.
20              THE COURT:  No, you go ahead.
21              MR. TROY:  I believe we have a pending legal issue,
22    because Mr. Fredericks on his opening statement, he touched
23    about for argument purposes, if we cannot prove for $500,000,
24    and he think maybe the Court has no jurisdiction; I'm right?
25              THE COURT:  Yes.
```

I4jnshe3

1          That was an argument that was made and was set forth

2     in the pretrial order as well that their position is that there

3     was insufficient yearly receipts not equal to or above 500,000

4     and therefore the FLSA doesn't apply.  That is very much at the

5     moment a factual issue in dispute.

6          MR. TROY:  Your Honor, not only is the issue in

7     dispute I believe the Court of Appeals second in our

8     jurisdiction really has a case regarding to this issue.

9          MR. FREDERICKS:  Your Honor, I --

10          THE COURT:  I didn't understand what Mr. Troy said.

11          MR. FREDERICKS:  I think this is something for the

12     findings of facts and conclusions of law.

13          MR. TROY:  Your Honor, the Second Circuit Court of

14     Appeals has a case that's *Purgess v. Sharrock*.  That's 33 F.3d

15     134, 138-39.

16          THE COURT:  Again, issues like this can be argued in

17     the conclusions of law.

18          MR. TROY:  OK.

19          THE COURT:  But tell me what -- I still want to know

20     what your point is.

21          MR. TROY:  Your Honor, the point is even the Court has

22     no jurisdiction regarding to the FLSA for this case, the

23     plaintiffs' position because the dismissal of the federal court

24     of the action after there has been a substantial expenditure in

25     time, effort, and money in preparing the defendants' claim,

I4jnshe3

1    knocking them down with the related rejection of supplemental

2    jurisdiction --

3                THE COURT:  Can I interrupt for a second.  I think we

4    are on the same page about this.  That was an issue I wanted to

5    raise.

6                MR. TROY:  Yes.

7                THE COURT:  You tell me if you are saying something

8    different than this, but I think it's saying the same thing.

9                MR. TROY:  Thank you.

10               THE COURT:  If I were to find that jurisdictional

11   amount had not been met for the FLSA -- and I have no idea if I

12   will find that or not -- but if I were to find that, and there

13   were no FLSA jurisdiction, I then have the discretion to retain

14   or not retain the state cause of action.

15               When there has been a trial like this, it's a

16   preference of the appellate court as well that the district

17   court keep jurisdiction because of the resources that have been

18   expended.

19               I can tell you right now that's what I intend to do,

20   unless Mr. Fredericks presents me with some counter law or some

21   other reasons that dictate otherwise.  But I'm inclined to

22   agree with Mr. Troy.

23               Are we on the same page about what you were trying to

24   say, Mr. Troy?

25               MR. TROY:  Yes, your Honor.

I4jnshe3

1           THE COURT:  OK.

2           So I do suggest it be mentioned in the briefs.

3           Mr. Fredericks, if it's something you would like to

4   argue please do, but understand where I'm coming from.  But

5   that's based on what the law says.

6           MR. FREDERICKS:  I understand.

7           THE COURT:  You will see the cases.

8           That leads to another question I have, which is, if I

9   find that there is no FLSA jurisdiction, no FLSA case, what

10  impact does that have on damages when you only have the New

11  York law?  You don't have to answer that now, but I would like

12  that just explained in the brief.

13          MR. TROY:  Your Honor, basically I don't think it has

14  any effect, because it talks about you just pick up whatever

15  you want to pick up, FLSA or New York Labor Law.  It's the

16  same.

17          THE COURT:  You will brief it.  You'll tell me what

18  the damages are and why they're justified.

19          Mr. Fredericks will tell me why they are not.  I do

20  believe there are some differences that are important.  That

21  was actually my main question.

22          Is there anything else from anybody from either side.

23          MR. TROY:  No.  Not from the plaintiffs, your Honor.

24          The only thing is I believe that our office filed on

25  ECF the application to change the caption.  I believe that's

I4jnshe3

1    the only thing pending for the judge to solve.

2              THE COURT:  We will take that into account --

3              MR. TROY:  Thank you.

4              THE COURT:  -- and act on that.

5              Just to be clear, Mr. Troy is going to let me know by

6    the end of Monday his position with respect to Ms. Chen, and

7    Mr. Fredericks is by the end of next week going to provide his

8    letter.

9              MR. FREDERICKS:  Is there any possible way just to

10   have it that Monday?

11             THE COURT:  Sure.

12             MR. FREDERICKS:  I'm sorry, your Honor.  I've moved

13   with my children --

14             THE COURT:  So Mr. Fredericks will provide by a week

15   from this Monday --

16             MR. FREDERICKS:  Thank you.

17             THE COURT:  -- which is April 30, the letter

18   addressing the evidentiary issue about the tickets, the meal

19   tickets or delivery receipts.

20             Mr. Troy will have a week to respond to that.

21             The parties will provide proposed findings of fact and

22   conclusions of law within four weeks of issuance of the

23   transcript.

24             First of all, I want to thank you both.  I know that

25   you were probably putting a lot together in a short time, and I

I4jnshe3

1    know one or both of you had other things that were tending to

2    that got in the middle.

3            I think with all of that you did a great job.  I

4    appreciate how everything was handled.

5            And I thank your witnesses for being here and doing

6    what they needed to do.

7            I will, as always, encourage a resolution.  I know you

8    have been through mediation already.

9            Mr. Fredericks, you can imagine that if I were to

10   retain jurisdiction on the New York claim, then if there were

11   liability there are going to be certain amounts at issue.

12   Whether there will be liability, I don't know.  There's a lot

13   that went on here, but you both will educate me about that.

14           I suggest you both consider whether you want to broach

15   that subject again.

16           MR. FREDERICKS:  Thank you.

17           THE COURT:  All right.

18           Thank you both.

19           MR. FREDERICKS:  Thank you, your Honor, and your staff

20   and everyone for their patience and understanding for a

21   difficult time for one of my clients.

22           (Trial concluded)

23

24

25